```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        17 CR 227 (VEC)

 5   SALVADOR DIAZ,

 6                 Defendant.
                                          Trial
 7   ------------------------------x

 8                                        New York, N.Y.
                                          February 25, 2019
 9                                        10:00 a.m.

10   Before:

11
                     HON. VALERIE E. CAPRONI,
12
                                          District Judge
13                                        -and a Jury-

14                          APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     BY:  ELINOR TARLOW
17        DANIEL NESSIM
          REBEKAH DONALESKI
18        Assistant United States Attorneys

19   Salvador Diaz, Pro Se Defendant

20   SUSAN G. KELLMAN
     CARLOS SANTIAGO
21        Standby Attorneys for Pro Se Defendant

22   Also Present:  Madison Dunbar, Paralegal Specialist

23                     U.S. Marshal Nicholas A. Ricigliano

24

25
```

1              (Case called)

2              MS. TARLOW:  Good morning, your Honor.

3              Elinor Tarlow for the government.  I am joined at

4    counsel table by Assistant United States Attorney Daniel

5    Nessim, Rebekah Donaleski; a paralegal in the United States

6    Attorney's Office, Madison Dunbar; and Inspector Nicholas

7    Ricigliano with the United States Marshal Service.

8              MS. KELLMAN:  Good morning, your Honor.

9              THE COURT:  Good morning, everybody.

10             MS. KELLMAN:  Good morning, your Honor.  Susan Kellman

11   for Mr. Diaz.  I'm joined at counsel table by Carlos Santiago,

12   who's present, your Honor, as an attorney and a member of the

13   mentoring program.  Mr. Diaz present in court, your Honor, and

14   we're ready to proceed.

15             THE COURT:  Good morning, everyone.  Please be seated.

16   Let me just get signed on.

17             So over the weekend I received a motion from Mr. Diaz.

18   Ms. Kellman, do you have anything to say?  Has your client

19   decided that he wants to represent himself again?

20             MS. KELLMAN:  I don't believe that he does, even

21   though he's fairly certain that I don't understand the issues

22   in the case, nor does my colleague who is probably smarter at

23   this than I am, but I would ask the Court to docket the motion.

24             THE COURT:  I think it has been docketed.  Has it been

25   docketed?

1              THE LAW CLERK:  Not yet.

2              THE COURT:  It will be.

3              Mr. Diaz, let me explain something to you.

4              Mr. Diaz, a counseled defendant cannot make his own

5      motions.  At the final pretrial conference you told me you did

6      not want to represent yourself, you did not want to be

7      represented by Mr. DeMarco, so I made efforts to find a new

8      attorney.  I got Ms. Kellman.

9              Now the question is:  How do you want to proceed?  You

10     have a constitutional right to be represented by counsel, you

11     have a constitutional right to represent yourself, but what you

12     do not have a constitutional right to do is to be wishy-washy,

13     you can't go back and forth between representing yourself and

14     being represented by counsel.

15             So what do you want to do?

16             MR. DIAZ:  I understand everything you say.  And I

17     actually I'm embarrassed that I've been wishy-washy because I

18     have been.  I think the circumstances have me say that I've

19     been that way, otherwise I would lose some rights that I'm

20     allowed under the Constitution because of the representation

21     that I've been getting.

22             I expressed this items on the motion to my attorneys

23     several days ago, the very first day we met, and I explained to

24     them my view and they explained to me their view and they

25     disagreed what I said, they misinterpreted and they said I

1    misinterpreted everything.  I told them go ahead and submit it

2    anyway, make an entry.  Say you disagree with it.  I told them

3    that submit my motion anyway, to disassociate -- make a note

4    informing the Court they did not agree with the motion.  This

5    is something at my urgence.  So they still did not submit it.

6              I felt the motion is valid.  The response they were

7    giving me why it was not valid --

8              THE COURT:  Mr. Diaz, here's the thing.  I'm asking

9    you what time it is and you're telling me how to build a clock.

10   The question is, do you want to represent yourself or do you

11   want to be represented by counsel?  Ms. Kellman knows her way

12   around a courtroom.  She's been trying cases for 30 years.  She

13   makes tactical decisions and strategic decisions, that's what

14   happens when you have a lawyer.  It doesn't mean you have to

15   agree with all their decisions.  At the end of the day, you

16   need to be consulted on them and you need to talk about them.

17             Now, do you want to represent yourself?

18             MR. DIAZ:  Yes.

19             THE COURT:  All right.  Mr. Diaz, we've gone through

20   this before, but I'm going to go through it again.

21             Are you under the care of a doctor or a psychiatrist

22   at the moment?

23             MR. DIAZ:  Doctor, yes.

24             THE COURT:  For what?

25             MR. DIAZ:  Mostly irregular heartbeat.

1              THE COURT:  Are you on medication?

2              MR. DIAZ:  Yes.

3              THE COURT:  Does that affect your ability to perceive

4     what's going on around you?

5              MR. DIAZ:  No.

6              THE COURT:  Have you ever received medical care or

7     psychiatric care for a mental illness?

8              MR. DIAZ:  No.

9              THE COURT:  In the past 24 hours, other than your

10    heart medicine, have you taken any drugs, medicines or pills,

11    or have you consumed any alcohol?

12             MR. DIAZ:  I have taken some other medicine for that,

13    it's prescribed but it's for minor stuff.  One is for high

14    cholesterol and the other one is for vitamin deficiency.

15             THE COURT:  OK.  Is your mind clear today?

16             MR. DIAZ:  Yes.

17             THE COURT:  Do you understand what we're about to go

18    through, we're about to go through whether you understand what

19    you're doing?

20             MR. DIAZ:  Yes.

21             THE COURT:  And you're making the decision to proceed

22    and represent yourself rather than to be represented by

23    counsel?

24             MR. DIAZ:  I understand.

25             THE COURT:  I find that Mr. Diaz is fully competent to

1    waive his right to counsel.

2             Mr. Diaz, you have the right under the Constitution to

3    have an attorney represent you at trial.  Do you understand

4    that?

5             MR. DIAZ:  Yes.

6             THE COURT:  You also have a right to represent

7    yourself in a criminal case, including during the trial.  Do

8    you understand that?

9             MR. DIAZ:  Yes.

10            THE COURT:  Have you ever attended law school?

11            MR. DIAZ:  No.

12            THE COURT:  Have you ever studied law?

13            MR. DIAZ:  In jail.

14            THE COURT:  In jail.  OK.

15            Have you ever represented yourself other than the

16   representation you've provided in this proceeding?

17            MR. DIAZ:  Well, other than that, no, I've never been.

18            THE COURT:  You have been a defendant in a court

19   marshal.  Have you ever been a defendant in a civilian criminal

20   trial?

21            MR. DIAZ:  No.

22            THE COURT:  Did you represent yourself at the court

23   marshal?

24            MR. DIAZ:  No.

25            THE COURT:  You had an attorney, right?

1          MR. DIAZ:  Yes.

2          THE COURT:  Have you ever attended a civilian trial

3   from beginning to end?

4          MR. DIAZ:  No, I have not.

5          THE COURT:  Have you ever seen a jury selected in a

6   civilian criminal trial?

7          MR. DIAZ:  Yes.

8          THE COURT:  Are you familiar with the Federal Rules of

9   Evidence?

10          MR. DIAZ:  Yes.

11          THE COURT:  Are you familiar with the Federal Rules of

12   Criminal Procedure?

13          MR. DIAZ:  Vaguely, but I am in some way, yes.

14          THE COURT:  Ms. Kellman and Mr. Santiago are familiar

15   with both.  Ms. Kellman has tried, I'm going to guess well over

16   100 cases in her career.  I don't know about Mr. Santiago, but

17   to put it mildly, Ms. Kellman is a experienced criminal defense

18   attorney.  Do you understand that?

19          MR. DIAZ:  I understand that, yes.

20          THE COURT:  During the trial the rules of evidence and

21   the rules of criminal procedure have to be followed.

22          Do you understand that?

23          MR. DIAZ:  Yes.

24          THE COURT:  An attorney, by experience and by

25   education is generally better able to follow and apply the

1    rules than you're going to be.

2              Do you understand that?

3              MR. DIAZ:  I agree with it.

4              THE COURT:  Because of unfamiliarity with the rules,

5    you may end up forfeiting arguments that might otherwise have

6    been helpful to you because you don't raise them in accordance

7    with the rules and therefore they're precluded.  Do you

8    understand that?

9              MR. DIAZ:  I understand.

10             THE COURT:  For example, the motion that you made over

11   the weekend was waived because you failed to make it in time

12   when you were representing yourself.  So I set a deadline for

13   motions, that deadline was in December, you did not make this

14   motion, so this motion is out of time.  So even if you're right

15   on the law, you've forfeited the right to make the motion.  Do

16   you understand that?

17             MR. DIAZ:  I understand what you're saying.

18             THE COURT:  Do you understand that you could have

19   similar situations during the course of the trial?

20             MR. DIAZ:  Yes.

21             THE COURT:  You're aware that notwithstanding the fact

22   that you're now deciding to go back to representing yourself,

23   we are starting trial today?

24             MR. DIAZ:  Yes.

25             THE COURT:  Do you understand that the indictment

1    that's lodged against you is going to be tried to a jury and

2    the jury is going to render a decision on that?

3              MR. DIAZ:  Yes.

4              THE COURT:  I can safely say that you are well aware

5    of what you're charged with and what the possible penalties

6    are.

7              If you represent yourself, I am not going to give you

8    help on representing yourself.  Do you understand that?

9              MR. DIAZ:  Very well.

10             THE COURT:  The right of self-representation is not a

11   license to abuse the dignity of the courtroom and it's not a

12   license not to comply with the relevant rules of procedural and

13   substantive law.

14             Do you understand that?

15             MR. DIAZ:  I understand.

16             THE COURT:  The Court may terminate your

17   self-representation if you deliberately engage in serious and

18   obstructionist misconduct.

19             Do you understand that?

20             MR. DIAZ:  I understand.

21             THE COURT:  I can assure you that that will include if

22   you raise the issues that I have precluded you from raising,

23   including the underlying fairness or validity of your court

24   marshal conviction.

25             Do you understand that?

```
 1              MR. DIAZ:  I understand.

 2              THE COURT:  The government has an obligation to prove

 3    you're guilty beyond a reasonable doubt through the use of

 4    admissible evidence.

 5              Do you understand that?

 6              MR. DIAZ:  I understand.

 7              THE COURT:  You have no obligation to prove that

 8    you're innocent at trial.

 9              Do you understand that?

10              MR. DIAZ:  I do.

11              THE COURT:  You don't have an obligation to put any

12    evidence in.

13              Do you understand that?

14              MR. DIAZ:  I understand.

15              THE COURT:  Presumption of innocence allows you to sit

16    silently and the jury cannot hold that against you.

17              Do you understand that?

18              MR. DIAZ:  I do.

19              THE COURT:  You have the right to object to the

20    government's evidence and to cross-examine its witnesses.

21              Do you understand that?

22              MR. DIAZ:  I'm sorry, repeat that, please.

23              THE COURT:  You have the right to object to the

24    government's evidence and you have the right to cross-examine

25    the witnesses that the government calls.
```

 1              MR. DIAZ:  I do.

 2              THE COURT:  Do you understand that?

 3              You have the right to call your own witnesses, the

 4   right to offer evidence, and the right to subpoena witnesses to

 5   come to court to testify under oath.

 6              Do you understand that?

 7              MR. DIAZ:  I understand.

 8              THE COURT:  You have the right to take the stand at

 9   trial and under oath testify on your behalf.

10              Do you understand that?

11              MR. DIAZ:  I understand.

12              THE COURT:  You're not obligated to do that, but you

13   can if you wish.

14              Do you understand that?

15              MR. DIAZ:  I do.

16              THE COURT:  I think we discussed this when you were

17   representing yourself before.  If you decide to do that, what

18   you need to do is to start each paragraph of your testimony

19   with a statement, sort of a subject matter of what that

20   paragraph will be about.

21              Do you understand that?  Do you understand that?

22              MR. DIAZ:  Yes.

23              THE COURT:  If you decide to testify, you're going to

24   be subject to cross-examination by the government just like any

25   other witness.

1           Do you understand that?

2           MR. DIAZ:  Yes.

3           THE COURT:  If you decide that you don't want to

4    testify as a witness, the right that you have as a criminal

5    defendant to remain silent may be undermined if you represent

6    yourself because the jury may draw impressions about you

7    because of how you chose to conduct the trial.

8           Do you understand that?

9           MR. DIAZ:  I understand that.

10          THE COURT:  Proceeding pro se may undermine your

11   ability to establish a defense.  Do you understand that?

12          MR. DIAZ:  Yes.

13          THE COURT:  So, for example, conceivably you could do

14   things representing yourself that might make it harmless error

15   that I precluded you from putting in evidence of the underlying

16   fairness of your court marshal.

17          Do you understand that?

18          MR. DIAZ:  Yes.

19          THE COURT:  Let me make sure you understand that,

20   Mr. Diaz, because that's critical.  As I understand it, the

21   reason you are going to trial is to preserve your right to

22   appeal the decision I made that precluded you from putting in

23   evidence that would collaterally attack or that would undermine

24   the validity of your underlying court marshal, correct?

25          MR. DIAZ:  That was my initial -- point of view.

1    Since then I had some other issues that I think I can present

2    as defense, like I said, in those motions.

3           THE COURT:  That's great.  So that's further

4    indication.  So you now have some theories of a defense?

5           MR. DIAZ:  Yes, I do.

6           THE COURT:  It is conceivable that if, depending on

7    what happens during this trial, that you could undermine your

8    right to appeal wrongful decisions that I make because the

9    Court of Appeals would say, Yes, Judge Caproni was wrong about

10   that, but it doesn't matter, because there was so much evidence

11   of guilt here that her error was harmless?

12          Do you understand that?

13          MR. DIAZ:  I do understand that.

14          THE COURT:  If Ms. Kellman is representing you, she

15   has training and education, she has the ability and knowledge

16   of how to make a record so that she best puts your case in the

17   best footing possible if, and if and when you lose this case

18   and you're convicted so that there is the ability to appeal

19   rulings that I made that she believes and you believe are

20   erroneous.

21          Do you understand that?

22          MR. DIAZ:  I do.

23          THE COURT:  Again, as an example, one of the issues

24   that we're going to talk about this morning is that the

25   government wants to put in the notification that was provided

1    to you while you were still in custody in the Brigg Leavenworth

2    to prove that you have knowledge of your obligation to register

3    and your obligation to keep your registration up to date.

4              One issue that is raised by that is the fact that that

5    document makes it clear that you were in custody at the time,

6    that you were in prison.  They're arguing to me that it should

7    come in any way, that the prejudicial impact of that is

8    minimal.  You may want to argue the alternative.  Based on the

9    letter from the government, I understand that the defense is

10   objecting to that document coming in.  If Ms. Kellman is

11   representing you, she's going to articulate the best argument

12   possible for why I should not allow the document in.  If she's

13   not representing you, you're on your own to make those

14   arguments.

15             Do you understand that?

16             MR. DIAZ:  I do.

17             THE COURT:  They have to be cogent and they have to be

18   focused on that.  I'm not going to allow you to take every

19   argument down a rathole that has nothing to do with the issue

20   at hands.

21             Do you understand that?

22             MR. DIAZ:  I understand.

23             THE COURT:  You're going to have to cross-examine the

24   government's witnesses.

25             Do you understand that?

1          MR. DIAZ:  Yes.

2          THE COURT:  Attorneys know how to ask questions on

3    cross-examination to avoid drawing out information that will

4    hurt you, and they're in a position to make judgments about

5    when it's better not to ask a question because the risk that

6    the answer is going to be detrimental is too high.

7          Do you understand that?

8          MR. DIAZ:  I understand.

9          THE COURT:  If you ask questions of government

10   witnesses, you run the risk that the jury may assume you know

11   and did certain things because of the the types of questions

12   you're asking.

13         Do you understand that?

14         MR. DIAZ:  I understand.

15         THE COURT:  If you ask questions of the government's

16   witness, your lack of experience may result in you asking

17   questions that bring out testimony that would be harmful to you

18   and that would not have been brought out by a more adept

19   questioner.

20         Do you understand that?

21         MR. DIAZ:  I understand.

22         THE COURT:  If you're convicted at trial, you have the

23   right to appeal that conviction.

24         Do you understand that?

25         MR. DIAZ:  Yes.

1          THE COURT:  It is a frequent argument on appeal that

2     the defendant argues on appeal that the attorney did not

3     represent them well, that is, they had ineffective assistance

4     at trial.

5          Do you understand that?

6          MR. DIAZ:  Yes.

7          THE COURT:  It's not uncommon for those appeals to be

8     granted.  It's not done a lot, but it does happen from time to

9     time.

10         Do you understand that?

11         MR. DIAZ:  Yes.

12         THE COURT:  If you represent yourself, you are

13    forfeiting that argument, even if you are entirely incompetent

14    in your defense.  You cannot appeal on the grounds that you

15    were incompetent.

16         Do you understand that?

17         MR. DIAZ:  I understand that, but the one part I don't

18    understand and I may -- I don't know if the Court can answer

19    this is, does that apply to the guidance that the counseling

20    that I have received up to this point, while I had counsel?

21         THE COURT:  I don't understand the question.

22         MR. DIAZ:  If I consider that they have been

23    inefficient during the past three days, can I bring that up in

24    appeal?

25         THE COURT:  Probably not.  Because the issue is going

1   to be whether you received competent representation at trial.

2   I don't want to say never, maybe you could come up with some

3   argument on appeal that would demonstrate that something done

4   or not done during the three days that Ms. Kellman represented

5   you that was so terribly incompetent that it went to the

6   fundamental fairness of your trial.  I can't imagine what that

7   would be but conceivably.

8        MR. DIAZ:  That's exactly my point.  As I expressed to

9   the Court before, I understand everything you have said.  I'm

10  not a lawyer.  I'm at a disadvantage here, and a lot of

11  reasons, when it comes to the technicality of conduct a trial.

12       THE COURT:  Yes, you are.

13       MR. DIAZ:  I am.  I totally understand that, but I'm

14  here because I am not getting the representation that I think I

15  deserve now or my lawyers up to now have failed in some things

16  that I consider essential, I am being forced to represent

17  myself.

18       THE COURT:  Let me make one thing perfectly clear,

19  Mr. Diaz, you are not being forced to represent yourself.

20  Quite the contrary.  You have competent counsel sitting there.

21  It is going to be your choice, yes or no, to proceed with

22  competent counsel or to represent yourself.

23       MR. DIAZ:  I understand what you're saying.  When I

24  say "forced," I mean it's the lesser of two evils.

25       THE COURT:  I'm trying to explain to you, Mr. Diaz,

1   and let me make this perfectly clear, it is not the lesser of

2   two evils.  You are making a grave mistake to represent

3   yourself.

4           MR. DIAZ:  Very well.

5           THE COURT:  Do you wish to represent yourself?

6           MR. DIAZ:  Yes.

7           THE COURT:  Are there any other questions that the

8   government would like for me to ask him?

9           MS. TARLOW:  No, your Honor.

10           THE COURT:  Ms. Kellman, would you and Mr. Santiago

11   agree to continue as standby counsel?

12           MR. DIAZ:  Yes, of course, Judge.

13           MR. SANTIAGO:  Yes.

14           THE COURT:  Lest there be any confusion, let's swap

15   places so Mr. Diaz is sitting in lead counsel's position.

16           All right, Mr. Diaz.  You're representing yourself.

17   Before you change places, one other thing that I want to make

18   perfectly clear to you Mr. Diaz.  This is it, unless I pull the

19   plug on this because you are being disruptive, you are now

20   representing yourself.  Halfway through the trial, you cannot

21   say I've made a terrible mistake, I want Ms. Kellman to

22   represent me.

23           Do you understand that?

24           MR. DIAZ:  I understand that.

25           THE COURT:  This decision is final until there is a

1      verdict.

2              MR. DIAZ:  It's my decision.

3              THE COURT:  It's your decision, and you're not

4      changing it again.

5              MR. DIAZ:  No, I'm not.

6              THE COURT:  That's what I'm stressing.  Thank you.

7      Please change positions.

8              Please be seated, Mr. Diaz.

9              Mr. Diaz has moved to dismiss the indictment for lack

10     of venue and for failure to state an offense.  These motions

11     are denied.  First, Mr. Diaz's motions are untimely.  At the

12     conference on November 20, 2018, I asked Mr. Diaz whether he

13     had any pretrial motions relating to the recently superseded

14     indictment.  Mr. Diaz said no.  That's in the transcript at

15     page 20 of that conference.  I then adjourned trial for three

16     months to give Mr. Diaz an opportunity to further consider the

17     issue.  I entered an order directing Mr. Diaz to file any

18     pretrial motions by December 21.  That's at Docket 105,

19     paragraph 6.  Mr. Diaz filed no motions until February 23, two

20     days before trial.  Federal Rule of Criminal Procedure 12(c)

21     requires a party to file motions to dismiss by the deadline set

22     by the Court, or else those motions are waived (unless the

23     defendant shows good cause) see *United States v. Crowley*,

24     236 F.3d, 104 at page  110 (2d Cir. 2000); also, *United States*

25     *v. Novak*, 443 F.3d, 150 at 161 (2d Cir. 2006).  I find no good

1   cause to excuse waiver here, as the arguments that Mr. Diaz

2   makes were discussed expressly at the November 20 conference.

3   At that conference, I explained venue to Mr. Diaz and told him

4   that failure to challenge venue would result in waiver.  That's

5   in the transcript at pages 10 through 13.  I also asked the

6   government at that time to provide authority for prosecuting a

7   federal sex offender under the interstate commerce theory of

8   the offense.  The government cited a case and Mr. Diaz raised

9   no objection.  Mr. Diaz has no excuse for waiting until the eve

10  of trial to raise these objections.

11          Additionally, even if these arguments have not been

12  waived, they are meritless.  Section 2250 phrases the "federal

13  conviction"  And "interstate commerce" theories of the offense

14  in terms of "or" Indicating that the government may proceed

15  under either one.  That makes sense:  If an unregistered sex

16  offender travels in interstate commerce, the government has a

17  federal interest in prosecuting him, regardless of whether he

18  is a federal or state sex offender.  I'm unaware of a case that

19  directly addresses this issue, but in *United States v. Van*

20  *Buren*, a federal sex offenders was prosecuted under the

21  interstate travel theory; the Second Circuit affirmed the

22  conviction albeit on other grounds*, Van Buren* is 599 F.3d at

23  170 (2d Cir. 2010).

24          As to venue, the Second Circuit square held in

25  Holcombe that venue for register in any district in which the

1    defendant begins or ends his interstate travel.  Holcombe is

2    843 F.3d 12 (2d Cir. 2018).  Again, this case was brought to

3    Mr. Diaz's attention months ago in the government's letter

4    dated November 19, 2018, which appears at docket 99.  Mr. Diaz

5    offers no reason that it should not apply here.

6            For those of these reasons, Mr. Diaz's motions to

7    dismiss are denied.

8            The next step.

9            MR. DIAZ:  May I answer that?

10           THE COURT:  Hang on.  *Holcombe*, for the record, is 883

11   F.3d at page 12.

12           What did you say, Mr. Diaz?

13           MR. DIAZ:  May I argue on what you just mentioned?

14           THE COURT:  No.  You submitted your motion and I've

15   ruled on that.  We're not going to argue it.

16           The next step though is the government's request to

17   introduce Government Exhibit's 2.

18           Mr. Diaz, would you like to be heard on whether

19   Government Exhibit 2 is admissible?

20           MR. DIAZ:  I believe --

21           THE COURT:  You need to stand up when you're talking

22   to me.

23           MS. KELLMAN:  Your Honor, just so we can establish a

24   procedure, is it possible for me to consult with Mr. Diaz prior

25   to him responding to the Court?

 1                THE COURT:  Absolutely.

 2                Mr. Diaz, would you like to be heard on the request to

 3       introduce -- it's Government Exhibit Government's Exhibit 2,

 4       correct?

 5                MS. TARLOW:  Yes, your Honor.

 6                MR. DIAZ:  No, I don't have any objection in the

 7       redacted form as introduced?

 8                THE COURT:  Are you proposing to introduce it in a

 9       redacted form?  They're only redacting, as I recall, your

10       personal information like social security number and stuff like

11       that?

12                MS. TARLOW:  And the description of the offense, your

13       Honor.

14                THE COURT:  And the description of the offense,

15       correct.  So you have no objection?

16                MR. DIAZ:  No objection if the description of the

17       offense is redacted.

18                THE COURT:  Mr. Diaz, the question is, do you have any

19       objection to the introduction of the document the way the

20       government has shown you they intend to introduce it?

21                MR. DIAZ:  No objection, your Honor.

22                THE COURT:  OK.  The government can introduce

23       Government Exhibit 2 redacted as you have shown the defense.

24                Any other matters that need to be discussed before we

25       get the jury up here?

1          MS. TARLOW:  Yes, your Honor.  One matter.

2          With respect to the Court's preliminary instructions

3    to the jury, after we rereviewed the preliminary instructions

4    in light of the Court's final charge, we would ask that the

5    third element of the offense be described consistent with how

6    the statute is phrased in the indictment, namely, that the

7    defendant failed to register as a sex offender or update his

8    registration, and therefore, the references to keep "current"

9    or the word "current" be removed.

10          THE COURT:  So it would say, "Third, the government

11   must prove that Mr. Diaz knowingly failed to register as a sex

12   offender."

13          MS. TARLOW:  Or update his registration.

14          THE COURT:  Or update his registration.

15          MS. TARLOW:  So on page 1, paragraph 3.

16          THE COURT:  My pagination is not the same as yours.

17   Does the paragraph start third?

18          MS. TARLOW:  It starts with in the preliminary

19   instruction, it starts with, "First, the government must prove

20   that Mr. Diaz was required by federal law to register as a sex

21   offender or to keep his registration information updated and

22   current."  We would ask the words "and current" be removed.

23          THE COURT:  OK.

24          MS. TARLOW:  In the following paragraph and in the

25   first sentence, the last words "and current" also be removed.

1          Then, as your Honor noted, in the next paragraph that

2    starts with third, that "and current" be removed at the end of

3    that first sentence.

4          THE COURT:  Any objection to those, Mr. Diaz?

5          MS. TARLOW:  Your Honor, there's one final point where

6    it comes up on up is the following paragraph last sentence it

7    says, "And to keep his registration information current," and

8    we would ask that the word current be removed.

9          THE COURT:  Or changed to "updated"?

10         MS. TARLOW:  Yes, your Honor.

11         THE COURT:  Any objections?

12         MR. DIAZ:  No, your Honor.

13         THE COURT:  Those changes will be made in the

14    preliminary instruction.

15         MS. TARLOW:  Your Honor, one additional point.  We

16    would ask that the Court provide a limiting instruction

17    regarding that there is a difference between the state

18    reporting requirements and the federal reporting requirements

19    under SORNA.  As your Honor is aware, an individual is required

20    to register or update his registration within three business

21    days.  We expect that our first witness and second witness will

22    testify in a very limited manner that on the state level,

23    according to documents they reviewing that reporting

24    environment within ten business days and we are concerned there

25    may be some confusion with the jury about the difference in

1    those requirements.

2            THE COURT:  Why are they testifying about, what the

3    state requirement is?

4            MS. TARLOW:  They're not testifying.  There are

5    documents we are introducing into evidence which discussed the

6    defendant's reporting requirements, and within that discussion

7    there is reference to within ten business days.

8            THE COURT:  All right.  Mr. Diaz, do you have any

9    objection to a limiting instruction?

10           MR. DIAZ:  No objection, your Honor.

11           THE COURT:  Do you have any proposed language?  Or do

12   you just want me to tell them that there's a difference between

13   the Federal Rules and the state laws?

14           MS. TARLOW:  Yes, your Honor. that will be fine.

15           THE COURT:  And I'll tell them what the Federal Rules

16   are.

17           Anything else from the government?

18           MS. TARLOW:  No, your Honor.  Thank you.

19           THE COURT:  Who is opening?

20           MR. NESSIM:  I am, your Honor.

21           THE COURT:  How long is your opening going to be?

22           MR. NESSIM:  It should not be more than ten minutes.

23           THE COURT:  Mr. Diaz, do you have anything further for

24   me to discuss before we get the jury out here?

25           MR. DIAZ:  Yes, I have an objection.

1          THE COURT:  You have to stand up when you're talking

2     about to me.

3          MR. DIAZ:  I do have an objection to Government

4     Exhibit 35.

5          THE COURT:  We'll deal with that when we get to

6     Exhibit 35.  Is that going to be with your first witness?

7          MS. TARLOW:  No, your Honor, not the first witness.

8          THE COURT:  We've got plenty of time to deal with 35.

9          Is it going to affect how you open, Mr. Diaz?

10          MR. DIAZ:  I'm sorry?

11          THE COURT:  Will it affect my ruling on Government

12     Exhibit 35?  Is it going to have any effect on how you open to

13     the jury?

14          MR. DIAZ:  No, it will not, your Honor.

15          THE COURT:  Are you going to make an opening

16     statement?

17          MR. DIAZ:  I may, yes, your Honor.  I'm not sure right

18     now, but this is all of a sudden and I'm not prepared at this

19     moment, so I may, after I consult.

20          THE COURT:  Again, Mr. Diaz, that might be a reason

21     for you to stick with your attorney.

22          MR. DIAZ:  I understand that, but I want to proceed

23     myself.

24          THE COURT:  Look, that's your constitutional right.

25     As I told you, I think at the final conference you're limited

1     to 15 minutes on your opening statement, if you decide to make

2     an opening statement.

3              MR. DIAZ:  Yes.

4              THE COURT:  You're not required to.  Do you understand

5     that?

6              Why don't we bring in the jury.  We're not going to

7     get a jury for a few minutes.  So hang out, please.

8              (Recess)

9              THE COURT:  Please be seated.  We should have a jury

10    soon.  Guys, you're going to have to be out of those seats.

11    Those chairs up against the wall are perfect.

12             Just for the record, Ms. Kellman, you can provide

13    Mr. Diaz advice, if he wants to listen to you, but when we

14    actually go to take strikes, only he can come.

15             MS. KELLMAN:  OK.  Yes, ma'am.

16             THE COURT:  Mr. Diaz, let me make a suggestion to you.

17    You need to keep your voice down.  So to the extent you're

18    trying to have a confidential conversation with your standby

19    counsel, I can hear it.  More importantly, the government

20    sitting right in front of you can hear it.

21             MR. DIAZ:  Yeah, very well.  Thank you, your Honor.

22             (A jury was selected)

23

24

25

1              THE COURT:  Members of the jury, now that you've been

2    sworn, I will tell you about your duties as jurors and give you

3    instructions that will help you understand what will be

4    presented during trial.  At the end of the trial, I'll give you

5    instructions again.  Those instructions will be much more

6    detailed and will control your deliberations.

7              At the outset, let me impress upon you that you are in

8    every sense of the word judges, judges without robes, the sole

9    judges of the facts of this case.  I am the judge of the law,

10   but you are the judges of the facts.  It's customary for people

11   to rise as a judge enters and leaves a courtroom, not

12   necessarily as a mark of respect for the judge as a person, but

13   as a mark of respect for the position that he or she occupies.

14   You will soon become aware that as you enter and leave the

15   courtroom, the parties and I will be standing as a mark of our

16   respect for the position that you hold as judges of the facts

17   of this case.

18             You will determine the facts solely from the evidence

19   that will be presented during the course of the trial.  You

20   must not infer from any of my questions or rulings on

21   objections or anything else that I may do during the trial that

22   I have a view on the credibility of the witnesses or an opinion

23   about the facts or about how you should decide the case.  As

24   the sole judges of the facts, you will have to determine which

25   of the witnesses you believe, what portion of their testimony

you accept, and what weight you attach to it.

        It is the duty of the parties to object when the other side offers testimony or other evidence that the party believes is not properly admissible.  Therefore, you should draw no inference if a party objects to some evidence, nor should you draw any inference from my rulings on an objection.  If I sustain an objection, I will not permit the witness to answer, or if the witness has already answered, I will instruct that the answer be stricken and that you disregard it.  If I overrule an objection, the witness will be allowed to answer. You should not give any added weight to the answer to a question that was objected to and you should not speculate about what the answer would have been if an objection to a question is sustained.

        You will decide the facts from the evidence that will be presented in court.  That evidence will consist of the testimony of witnesses on both direct and cross-examination, documents and other things received into evidence as exhibits, and any facts that the parties agree to or admit or that I may instruct you to find.  There's no magic formula that you should use to evaluate the evidence.

        I will, however, give you some general guidelines for determining the credibility of witnesses at the end of the case.  For now, I will just tell you to bring into this courtroom all of the experiences and background of your lives.

You should not leave your common sense at home.  The same types

of judgments which you use every day to make important

decisions in your own life are the judgments that you should

bring to bear on your consideration of the evidence in this

case.

I want to take a moment to tell you what is not

evidence in the case.  Questions are not evidence.  It is only

the witnesses' answers that are evidence.  Similarly, arguments

are not evidence.  The opening and closing statements are

intended to help you understand the evidence and to reach your

verdict, but they are not themselves evidence.  Anything that I

may say concerning the evidence is not evidence.  Testimony

that has been stricken or excluded is not evidence, and it may

not be considered by you in rendering your verdict.  Finally,

anything that you may have seen or heard outside the courtroom

is not evidence.

The defendant Salvador Diaz has chosen to represent

himself during this trial.  Mr. Diaz, like every defendant in a

criminal case, has a constitutional right to be represented by

an attorney or to represent himself.  Mr. Diaz's decision to

represent himself can have no bearing on your verdict and you

may not draw any inference favorable or unfavorable based on

the fact that he is representing himself.

Although Mr. Diaz is representing himself, there will

be attorneys standing by to advise him if he chooses to consult

1    with them.  Those attorneys, Susan Kellman and Carlos Santiago,

2    are referred to as standby counsel.  Whether Mr. Diaz chooses

3    to consult with standby counsel has no bearing on any issue

4    that you must decide and you must not draw any inference from

5    Mr. Diaz's decision to consult or not to consult with

6    Ms. Kellman or Mr. Santiago.

7            Even though Mr. Diaz is representing himself, the same

8    rules apply to him as apply to attorneys.  Questions that he

9    may ask and arguments that he may make are not evidence.  The

10   only evidence in this case is the sworn testimony that

11   witnesses provide on the witness stand, the exhibits that are

12   received into evidence, and any facts that the parties agree to

13   or admit or that I may instruct you to find.

14           Now I'm now going to tell you a little bit about the

15   law that you will have to apply to the facts as you find them.

16   These are only preliminary and summary instructions.  They are

17   designed to help you evaluate the evidence as you see and hear

18   it in light of what you will be asked to decide after you have

19   heard all of the evidence.  The final instructions that I will

20   give you at the end of the trial will contain more detail about

21   the applicable law.  To the extent there are any differences

22   between my preliminary instructions and the final instructions

23   at the end of the trial, the final instructions will control.

24           The government has charged Mr. Diaz with failing to

25   register or to update his registration as a sex offender.  The

government has the burden of proving every element of this
charge beyond a reasonable doubt.

           In order to sustain its burden, the government must
prove three elements beyond a reasonable doubt.  First, the
government must prove that Mr. Diaz was required by federal law
to register as a sex offender or to keep his registration
information updated.  Under federal law, an individual is
required to register as a sex offender and to keep his
registration information current if he has previously been
convicted of a sex offense.  I will instruct you on the
definition of a sex offense at the conclusion of the trial.

           Second, the government must prove that Mr. Diaz
traveled in interstate commerce during the time that he was
required to register as a sex offender or to keep his sex
offender registration updated.  To travel in interstate
commerce just means to travel from one state to another.

           Third, the government must prove that Mr. Diaz
knowingly failed to register as a sex offender or to keep his
sex offender information updated.  Federal law requires sex
offenders to notify the authorities of any change in residence
within three business days of the change.  Thus, the government
must prove that Mr. Diaz changed his residence, and knowing
that he had a duty to notify the authorities of the change,
voluntarily and deliberately failed to do so.

           In considering whether the government has proven these

elements, you should not concern yourselves with the facts or

circumstances underlying Mr. Diaz's alleged prior conviction.

You may not consider evidence of Mr. Diaz's alleged prior

conviction as evidence that he has a criminal personality or a

bad character.  You may consider any evidence of a prior

conviction only to determine whether Mr. Diaz is required to

register as a sex offender and to keep his registration

information current and not for any other purpose.

          I've only given you a short summary of the elements of

the charged crimes.  At the conclusion of the trial, I will

explain in greater detail what the government must prove in

order to satisfy its burden of proof.  For now I'll ask you to

remember throughout the trial that Mr. Diaz is presumed

innocent and the government has the burden of proving guilt

beyond a reasonable doubt.  The indictment against Mr. Diaz is

only an accusation.  It is not proof of guilt or anything else.

Mr. Diaz starts off with a clean slate and he keeps that clean

slate throughout the trial.

          Because the burden of proof is on the government,

Mr. Diaz does not need to present any evidence in this case if

he chooses not to.  He could sit in silence throughout all of

these proceedings without ever saying a word and you could draw

no inference against him.  You cannot find Mr. Diaz guilty

unless and until you are unanimously convinced beyond a

reasonable doubt of his guilt based on the evidence in this

case.

You have each been given memo books in which you may
take notes.  You don't have to take notes, but you can if you
wish.  Please be sure that any note-taking does not interfere
with your listening and considering the evidence.  Also, if you
do take notes, you must not show them to or discuss them with
any other juror or anyone else either before or during your
deliberations.  Any notes you take may be used solely to assist
you and your notes are not a substitute for your recollection
of the evidence.  If during your deliberations you have any
question about any of the testimony or just need your
recollection refreshed, you will be permitted to ask that the
official transcript that is being made of these proceedings be
read to you.  Leave your northbound notebooks on your seat when
you leave the courtroom.  We will safeguard them during the
trial.  After the trial has concluded your notes will be
collected and destroyed.

Now I need to caution you about certain rules that
govern your conduct as jurors.  First, you must keep an open
mind during the trial.  The you cannot decide the case based on
little bits and pieces of evidence and it's not fair to the
parties for you to start making up your mind until you've heard
all of the evidence.

Along those lines, do not talk to each other or to
anyone else about this case until all of the evidence has been

received, you've been charged on the law and sent to the jury

room to deliberate.  If you are asked, you may say you are a

juror in a criminal case that is expected to last less than one

week, but you may not tell anyone anything about the case until

you have been discharged from the jury by me.

        Do not let anyone talk to you about the case.  If

someone tries to talk to you, please report it to me

immediately through Mr. Pecorino.  You should not, however,

discuss with your fellow jurors either that fact or any other

fact that you feel is necessary to bring to the attention of

the Court.  Do not talk to any of the parties or the attorneys

or any witnesses.  By this I mean do not talk at all, even to

pass the time of day or to say good morning.  The lawyers and

the parties know that they are not supposed to speak to you or

even acknowledge you with a hello or a good morning outside of

the courtroom.  So while it may seem odd not to say hello or to

acknowledge the parties or the attorneys, if you run into them

coming into the courthouse or in the elevator, you will simply

be creating an awkward situation for everyone if you speak to

them or even acknowledge their presence with a nod or a smile.

They know they cannot speak to you even to exchange

pleasantries, so don't put them in a position where they seem

to snub you because you acknowledged them.

        I do not anticipate that there will be any press

coverage of this case, but if there is, do not read any news

stories or articles or listen to any radio or television

reports about the case or about anyone who has anything to do

with it.  Do not do any research or any investigation about the

case on your own.  You as jurors must decide this case based

solely on the evidence presented in the courtroom.  This means

that during the trial, you must not conduct any independent

research about the case, the matters in the case, the parties

involved, the attorneys or any witnesses.  Do not consult

dictionaries or reference material or search the Internet to

obtain information about the case.  Do not visit in person or

via the Internet any place you may hear described during the

trial.

My direction that you not talk about the case until

you retire to deliberate includes the use of social media or

other technology to communicate with anyone about the case or

even about your experience as a juror, including postings on

Twitter, Facebook, Snapchat, Instagram or YouTube.  I've

probably missed some services, maybe even your current

favorite.  I have not intentionally done so.  Do not

communicate about the case or about your experiences as a juror

through any means until you have completed your deliberation

and have been excused.  I stress this at some length because I

know that some people have become so accustomed to posting

everything they do on certain sites that they might do so

without even thinking about it.  If you're one of those people,

1    you have to squelch that desire until this case is over.  If

2    you become aware that any other juror is violating this

3    instruction, you should bring it to my attention through

4    Mr. Pecorino, but do not make it known to the other jurors.

5             Finally, I would like to summarize the stages of the

6    trial for you.  First, each side may but does not have to make

7    an opening statement.  An opening statement is not evidence.

8    It's just the outline of what that party intends to prove and

9    is offered to help you follow the evidence.  After opening

10   statements, the government will present evidence and Mr. Diaz

11   may cross-examine them.  Then, if desired, Mr. Diaz may, but he

12   does not have to, present evidence and the government may

13   cross-examine them.  After Mr. Diaz has rested, the government

14   may call additional witnesses to rebut any evidence that

15   Mr. Diaz has presented.

16            After all of that, the parties will make their closing

17   arguments to summarize and give their interpretation of the

18   evidence.  Obviously, like opening statements, the closing

19   arguments are not evidence.  After the closing arguments, I

20   will give you instructions on the law and then you will retire

21   to deliberate on your verdict.  Keep an open mind until I have

22   instructed you on the law at the end of the day and after you

23   and your fellow jurors have discussed the evidence.

24            We will generally sit from 9:30 to 5:00.  So that we

25   can start promptly at 9:30 I'm asking you all to get here

1    between 9 and 9:15.  Remember, it always takes a little bit of

2    time to get through security, so allow for a little extra time.

3    We'll have coffee and a light breakfast available for you

4    starting at 9.  Let me stress how important it is for you all

5    to arrive on time.  I estimate that this trial will last less

6    than a week, but that schedule depends on us staying on time

7    every day.  We cannot start unless we have all of the jurors.

8    So please be on time.

9            We will break for lunch generally between 12:30 and 1

10   for about an hour and we'll have a ten-minute break in the

11   middle of the morning and in the middle of the afternoon.  We

12   will not take any other breaks, so please plan accordingly.

13   This week we will sit Monday through Thursday.  I don't think

14   we're going to go beyond that.  I think that will be long

15   enough, but if it's not, we'll talk about on Thursday whether

16   or not we're going to sit on Friday or not.  I usually don't

17   sit on Friday?  It's going to kind of depend on what's going

18   on.  Let me stress again, if you're late you will keep all of

19   your fellow jurors, me, and the parties waiting.  We cannot

20   start until all of our jurors and the alternates are here.  So

21   please be on time.

22           The parties and I will be here no later than 9:15 so

23   we can avoid keeping you waiting.  That said, if there are

24   times that we do keep you in the jury room waiting.  Recognize

25   that we're working in the courtroom and we will try to minimize

1    the amount of time that you're waiting for us in the jury room.

2             With that, Mr. Nessim.

3             MR. NESSIM:  Good afternoon.

4             In 2014, Salvador Diaz, the defendant, moved from

5    New York to New Jersey.  The defendant knew exactly what he

6    needed to do to move his life over to his new state.  He got a

7    New Jersey driver's license, he gave his bank his New Jersey

8    address, he registered to vote in New Jersey.

9             But Salvador Diaz didn't do the one thing he was

10   required by law to do, the one thing he knew he had to do.

11   Salvador Diaz did not register as a sex offender in New Jersey.

12   The defendant Salvador Diaz, that man, was convicted of a sex

13   offense, and because of that conviction, he is required by law

14   to register as a sex offender in every state where he lives.

15   And he must keep his registration up to date.  If the defendant

16   moves to a different state, he must register as a sex offender

17   in that new state.  The defendant knew about these requirements

18   and he ignored them.  That's why we're here, because Salvador

19   Diaz broke the law when he failed to register as a sex offender

20   after he moved from New York to New Jersey.

21            Now, this opening statement is our opportunity to give

22   you a preview of what we expect will happen at this trial.  I'm

23   going to do that in three parts.  First, I'll talk about what

24   the evidence will show; second, I'm going to say a bit about

25   the charges in this case; and third, I'll describe how we're

going to prove beyond a reasonable doubt that the defendant is
guilty.

So what will the evidence show?  You'll learn that
states like New York and New Jersey compile registration
information from the sex offenders who are living in that
state.  The state then makes that information available to the
public.  This helps inform the public about sex offenders who
might live in their neighborhoods or work near their schools.
You'll learn that in 2000, the defendant was convicted of a sex
offense.  As a result of that conviction, the defendant was
required to register as a sex offender in every state where he
lived, and the defendant was required by law to update his
registration or make a new registration if he moved his
residence.

You'll learn that the defendant was informed of these
registration requirements.  After his sex offense conviction
and that the defendant even signed forms acknowledging that he
was aware of those requirements.  And, after his release from
prison, the defendant actually was registered as a sex offender
in New York.  Between 2007 and 2014, the defendant for
approximately seven years, he lived with his mother in an
apartment in upper Manhattan.  He signed annual sex offender
registry forms with New York State affirming that his
registration at that address was current and correct.

But that all changed in 2014 when the defendant moved

with his mother from Manhattan, New York, to Long Branch,
New Jersey.  He knew that he was required to update his sex
offender registration, but you'll hear that he did not register
in New Jersey in 2014, or in any other year after that.  You
will also learn about all of the steps that the defendant took
to move every other aspect of his life over to New Jersey.
You'll learn that within months of vacating his apartment in
New York, the defendant had already changed his address with
his bank, he got a New Jersey driver's license and registered
his cars in New Jersey.  He registered to vote in New Jersey,
but he didn't register as a sex offender in New Jersey.

          Now, the defendant wasn't on the lease on the
New Jersey apartment with his mother, but he had a key fob to
access the building and he lived there.  You'll learn that the
building management began to suspect that the defendant was
living at his mother's apartment building.  They told the
defendant that if he wanted to stay there, he would need to be
formally permitted to live at the apartment which would require
a background check.

          But the evidence will show that the defendant didn't
want that.  And after that conversation, the building
management at the New Jersey apartment reviewed surveillance
footage and showed that the defendant had been sneaking into
and out of the building.  The management was so sure that the
defendant was living at the building in violation of his

1    mother's lease that the building took preliminary steps to

2    evict the defendant's mother.

3         So what did the defendant do?  He just moved to a

4    different address in New Jersey with his sister, and month

5    after month he failed to register as a sex offender.  You'll

6    learn that the defendant's failure to register finally caught

7    up with him in 2017 when the defendant was arrested by the U.S.

8    marshals.  You will hear this the defendant admitted that he

9    moved from New York to New Jersey to live with his mother and

10   then his sister.  The defendant told the Deputy U.S. Marshal

11   who arrested him that he knew he was required to register as a

12   sex offender but that the last time he had registered was in

13   2014 in New York.

14        As a result of what I just described, the defendant is

15   charged with one count of failing to register as a sex offender

16   under the Sex Offender Registration and Notification Act, which

17   is sometimes called SORNA.  That's what the evidence is going

18   to show.

19        Now let's talk about how we are going to prove that

20   the defendant is guilty.  The evidence will come in several

21   forms, including through documents and the testimony of

22   witnesses.  Let's start with the documents.  You'll see

23   documentary evidence like the certified copy of the defendant's

24   conviction for a sex offense and the forms the defendant signed

25   acknowledging that he was required to register as a sex

offender in any state where he lived.  You'll see a sex

offender registration forms that the defendant did submit when

he lived in Manhattan before 2014.  You'll also see all of the

documents proving that the defendant moved from New York to

New Jersey in 2014.  You'll see the documents showing the

defendant and his mother vacated their Manhattan apartment in

2014, and the lease documents for the apartment in New Jersey.

You'll see the defendant's New Jersey car registration,

driver's license, and voter registration.  You'll see that the

defendant updated his address with his bank showing that he

lived first with his mother in New Jersey, then his sister,

also in New Jersey.

            You'll hear from witnesses at this trial, like the

building managers at the apartments where defendant lived in

New York and New Jersey.  You'll hear from a representative of

the State of New Jersey, who will tell you that the defendant

never registered as a sex offender there.  Finally, you'll hear

from the Deputy U.S. Marshal what arrested the defendant in

January 2017.  She will tell you that the defendant himself

told her that he knew he had to register as a sex offender, he

last registered as a sex offender in 2014 in New York State,

and after he left New York, he lived with his mother and sister

in New Jersey.

            This evidence will prove beyond a reasonable doubt

that the defendant is guilty of failing to register as a sex

1   offender.  This will not be a long trial, but it is an

2   important trial.  It's important to the defendant and it's

3   important to the government.  And it is simple, the defendant

4   knew he was supposed to register as a sex offender but

5   intentionally failed to do so.

6          Before I sit down, I'd like to ask you to do three

7   things throughout this trial.  First, pay close attention to

8   the evidence; second, follow Judge Caproni's instructions on

9   the law; and third, use your common sense, the same common

10  sense you use to make decisions in your daily life.  If you do

11  those three things, you will reach the only verdict consistent

12  with the evidence in this case, that the defendant is guilty.

13         THE COURT:  Thank you, Mr. Nessim.

14         Mr. Diaz.

15         MR. DIAZ:  Good afternoon, ladies and gentlemen of the

16  jury, your Honor.

17         Let me tell you a little bit about myself first.  My

18  name is Salvador Diaz.  Obviously I'm not an attorney.  I chose

19  to represent myself.  I may seem a little nervous, it's because

20  I am.  But I'm going to try to explain to you some of the

21  issues that I think my situation is.

22         First of all, I'm a 65 year-old native of the

23  Dominican Republic.  I came here in 1970 and throughout the

24  decade of the 70s I both worked as a tailor in the Garment

25  District in New York and I completed high school.  In 1990, I

1    joined the United States Navy and was -- I joined the United

2    States Navy in 1980, reaching the rank of chief officer.  For

3    20 years I was a widely recognized as an expert in my field of

4    electronics and weapons system within the Navy.

5          "Stigma" is defined as a word or disgrace associated

6    with a particular circumstances, quality or person.  Throughout

7    our history -- the history of our nation, since the beginning

8    of the history of our nation, we have undergone always been

9    subjected to some stigma of some type regarding certain actions

10   of individuals.  Sex offense is one of those.  Because of that

11   stigma, it can greatly affect the way that you or a particular

12   individual can -- it can affect the impartiality of many

13   individuals.  That's exactly why we chose you as a jury.  You

14   went through, you saw a lengthy questionnaire and a lot of

15   personal questions were asked about you to determine that you

16   would be capable of reaching a decision without being affected

17   by the fact that I'm being accused of being a sex offender.

18   That is exactly what you're expected to do.  Excuse me a

19   minute, let me read this.

20          The burden of proof in this is on the government to

21   prove that I failed to register as a sex offender.  I am

22   presumed innocent until that the government presents that

23   evidence.  So when you listen to the government's case, it's

24   going to be important that you pay attention to a few things

25   that are key in this case.  The judge already instructed you to

a limited extent as to what the government needs to do so prove

my guilt.  That is, they both satisfy the element of the

offense, the elements are the things that the government has to

prove according to the law.  So you must pay very close

attention to these elements that they've brought into evidence.

Again, the judge will explain what that means.

        Also, the government must prove in this case that I am

a sex offender, that I am required to register as a sex

offender, and that I knowingly failed to register.  They have

already talked to you about that.  We will see what the

evidence produces.

        That is why it's important that you understand what

knowingly means.  Here, the evidence is that mere negligence or

failure to register is not enough to satisfy the evidence.  The

government must prove this to you, because you are the trier of

fact beyond a reasonable doubt.  You must be convinced that

they have proved the elements of the offense beyond a

reasonable doubt.  So, please, pay close attention to the

evidence and I'm sure that you will reach a fair verdict, which

is what the United States of America guarantees, a fair trial.

So keep that in mind, please.

        I thank you now.

        THE COURT:  Thank you, Mr. Diaz.

        OK.  Call your first witness.

        MR. NESSIM:    The government calls Alison Ernst, your

1    Honor.

2     ALISON ERNST,

3          called as a witness by the Government,

4          having been duly sworn, testified as follows:

5          MR. DIAZ:  Your Honor, we have the same issue here

6    that we had this morning with the podium, that it's obstructing

7    our view from the jury and the jury view from us.

8          THE COURT:  Mr. Diaz, have a seat.  Can you push the

9    podium back just a little bit.

10         MR. NESSIM:  Yes, your Honor.

11         THE COURT:  That's where it lives.

12         MR. NESSIM:  Your Honor, I'm just providing the

13   defendant with a copy of the exhibits that I plan to use with

14   the witness.

15         THE COURT:  OK.

16   DIRECT EXAMINATION

17   BY MR. NESSIM:

18   Q.  Good afternoon, Ms. Ernst.

19   A.  Good afternoon.

20   Q.  Where do you work?

21   A.  New York State Division of Criminal Justice Services, Sex

22   Offender Registry.

23   Q.  And what is the abbreviation for the Division of Criminal

24   Justice Services?

25   A.  DCJS.

1   Q.  How long have you worked at DCJS?

2   A.  18 years.

3   Q.  How long have you worked at the sex offender registry?

4   A.  For three.

5   Q.  In what city is your office located?

6   A.  Albany, New York.

7   Q.  What is the sex offender registry?

8   A.  It's a unit that was put in place from the SORA law that

9   went into effect to notify communities of registered sex

10  offenders.

11  Q.  And what is your title at the sex offender registry?

12  A.  Identification specialist.

13  Q.  What are your duties and responsibilities as an

14  identification specialist?

15  A.  To record and maintain all of the registered sex offenders

16  in New York State, and as my title, I handled any fingerprints

17  or identity elements that arise within the registry.

18  Q.  During the course of your work as identification

19  specialist, have you become familiar with the sex offender

20  registry requirements in New York State?

21  A.  Yes.

22  Q.  What is the name of the sex offender registry in New York?

23  A.  The New York State Sex Offender Registry.

24  Q.  Is that accessible to the public or to a smaller subset of

25  people?

1   A.  Excuse me?

2   Q.  Who is that database accessible to?

3   A.  We have two databases, we have an in-house and a public

4   website.

5   Q.  Let's start with the in-house.  Does that database have a

6   particular title?

7   A.  Yes, it's the IJ portal.

8   Q.  When you say "in-house," who is accessible to?

9   A.  To the New York State Sex Offender Registry and also law

10  enforcement.

11          THE COURT:  Did you say IJ portal?

12          THE WITNESS:  Yes, ma'am.

13  Q.  And the second database, who is that accessible to?

14  A.  The public.

15  Q.  How is an individual's information added to the sex

16  offender registry?

17  A.  When they become convicted of -- convicted of a

18  registerable offense.

19  Q.  And a registerable offense is a defined set of offenses?

20  A.  Yes.

21  Q.  How is the information physically added to the database?

22  A.  We receive a registration form depending on where they were

23  convicted and how they were convicted.  If you were convicted

24  and served probation, the court sends in your registration

25  form.  If you're convicted and sent to prison or jail, your

1  jail or prison does the registration form.  And if it's an out

2  of state conviction, the board of examiners determines whether

3  you need to register or not and then they send us the

4  registration form.

5  Q.  And what information is provided on those forms?

6  A.  The defendant's ID data, arrest information, and where the

7  person is going to be residing.

8  Q.  And how are those forms processed once you receive them?

9  A.  We enter it into the IJ portal.

10 Q.  And what information specifically is included into the IJ

11 portal?

12 A.  Everything that's on the registration form.

13 Q.  If you could remind us again, what is that information?

14 A.  The name, DOB, social security number, race, sex, anything

15 to do with the crime, information action the arresting agency,

16 and where the person is going to be residing.

17 Q.  And once a sex offender is registered, what, if any,

18 ongoing registration requirements apply to them in New York

19 State?

20 A.  They need to update their photo, they need to make any

21 changes to their records within a ten-day time frame, they need

22 to annually verify all of their information on the sex offender

23 registry.

24         THE COURT:  Let me just tell you, what she just told

25 is you what the New York State requirements are.  Those

1    requirements are not necessarily the same as the federal

2    requirements and you'll hear evidence about the federal

3    requirements.  So she's just give you this as background

4    information.  This is about compliance with the federal law.

5    BY MR. NESSIM:

6    Q.  You mentioned an annual verification, how does that process

7    work?

8    A.  21 days before the defendant's or the sex offender's

9    registration date, a long form goes out with all of the

10   information register's record gets printed out and mailed to

11   the last reported address in the sex offender registry.

12   Q.  And what information is the individual who receives that

13   form expected to do?

14   A.  They need to go through and make up any corrections or

15   update any information that is required, sign and date it, and

16   return it to DCJS.

17   Q.  And how long does an individual receiving that form have to

18   return it?

19   A.  10 days.

20   Q.  And what happens if they don't return that form in time?

21   A.  It's a charge.  They could be charged in a crime.

22   Q.  To back up a moment, you mentioned the information that's

23   included in the IJ portal when you received the forms.  What,

24   if any, information is made available to the public in the

25   public database?

1   A.   If the defendant is the registered as a level two or three,

2   they're on our public website and the informs that's on the

3   public website is their name, race, address information, and

4   employment information, and then the details of their crime.

5              THE COURT:  I understand we have a technical problem

6   here.

7              MR. NESSIM:  It appears so, your Honor.

8              THE COURT:  Can I see the lawyers one moment, please.

9              Again, whenever we take a sidebar, which is what we're

10   go to do, please feel free to stand and stretch.  It will help

11   you stay awake.

12              (Continued on next page)

1                    (At sidebar)

2              THE COURT:  What's the story?

3              MR. NESSIM:  It seems the screens are not working.

4              THE COURT:  AV has just arrived.

5              So you can't shift to something.

6              MR. NESSIM:  It's a very document-heavy witness.  It's

7    the annual verification forms.  Some of them I'll be reading

8    from.

9              THE COURT:  Well, they're here.  I'm going to send the

10   jury out.  Hopefully they can get it fixed very quickly.  If

11   not, you're going to proceed without them.

12             MR. NESSIM:  Yes.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  Ladies and gentlemen, I'm going send you

3     back to the jury room.  We're going to see if we can get the

4     audio visual stuff fixed.  You might as well relax in the jury

5     room while we do that.  Hopefully it's not going to be very

6     long.

7              Don't discuss the case.  Stay in the jury room,

8     please.  Leave your books on your chair.

9              (Recess)

10             (Jury present)

11             THE COURT:  Please be seated, everybody.

12             Ms. Ernst, you're still under oath.

13             Mr. Nessim.

14    BY MR. NESSIM:

15    Q.  Welcome back, Ms. Ernst.

16    A.  Hi.

17             MR. NESSIM:  Your Honor, at this time the government

18    offers Government Exhibit 1 into evidence pursuant to Federal

19    Rule of Evidence 902.

20             THE COURT:  Any objection?

21             MR. DIAZ:  No objection.

22             THE COURT:  Government Exhibit 1 is received.

23             (Government Exhibit 1 received in evidence)

24             MR. NESSIM:  Can we please publish Government Exhibit

25    one for the jury?

1        THE COURT:  Does everybody have on the screen in front

2    of them?

3        MR. NESSIM:  Page 1 reads, "United States of America,

4    Department of the Navy."

5        Ms. Dunbar, can you please turn to page 2 of

6    Government Exhibit 1 and let's zoom into the top half of the

7    document.

8        It reads, "General Court Marshal Order No. 5-01,

9    before a general court marshal convened at naval legal services

10   office," and slightly later in that paragraph, "Salvador Diaz,

11   u.S. Navy was arraigned and tried on the following offenses and

12   the following findings or other dispositions were reached:

13   Charge one, violation of the UCMJ, Article 120, finding

14   guilty."

15       Thank you, Ms. Dunbar.  You can take that down.

16   BY MR. NESSIM:

17   Q.  Ms. Ernst, have you reviewed the DCJS's sex offender

18   registration records relating to Salvador Diaz in your

19   preparation to testify today?

20   A.  Yes.

21   Q.  I'm showing you what's been marked for identification as

22   Government Exhibits 2 through 4, 6 through 13, and 62.

23       THE COURT:  I'm sorry.  6 through --

24       MR. NESSIM:  6 through 13 and 62.

25       (Continued on next page)

1    BY MR. NESSIM:

2    Q.  Please take a moment to look through these and let me know

3    when you've had a chance to see them.

4    A.  All set.

5    Q.  Do you recognize those documents?

6    A.  Yes.

7    Q.  Are those records maintained by the New York DCJS?

8    A.  Yes.

9    Q.  Is the creation and retention of those records in the

10   regular practice of DCJS?

11   A.  Yes.

12   Q.  Were those records made at or near the time of the

13   information described within them?

14   A.  Yes.

15   Q.  And were they made by individuals with direct knowledge of

16   the information or based on information conveyed from

17   individuals with direct knowledge?

18   A.  Yes.

19        MR. NESSIM:  Your Honor, at this time the government

20   offers Government Exhibit two through four, six through 13, and

21   62.

22        THE COURT:  Any objection?

23        THE DEFENDANT:  Yes, your Honor.  I have an objection

24   to document three, Government Exhibit 3.

25        THE COURT:  Come up.  Come to side bar, please.

(Continued on next page)

1                (At side bar)

2                THE COURT:  What's your objection?

3                THE DEFENDANT:  Well, this is a lot of handwriting.

4    First of all, I'd like to voir dire the witness to determine if

5    she's the one that used this handwriting in the document,

6    because I have an objection as to the accuracy.  And I don't

7    think they're accurate and I'd like to find out how did this

8    come about.

9                THE COURT:  I'll let you -- you can cross-examine her

10   when the time comes.

11               THE DEFENDANT:  Well, I feel --

12               THE COURT:  She established a foundation.  You're

13   going to try to cross-examine to suggest that even though these

14   are business records, they're not accurate, right?

15               THE DEFENDANT:  Yes.  They're not accurate.

16               THE COURT:  But they've established a foundation that

17   they are business records, that is they are maintained in the

18   ordinary course, it's regular practice to maintain them,

19   they're prepared by someone with knowledge of the facts.  Your

20   argument is going to be the people that acknowledged the facts

21   were wrong, right?

22               THE DEFENDANT:  Yes.

23               THE COURT:  You want to be heard?

24               MR. NESSIM:  I believe they're business records, and

25   we think they would be proper ground.

1            THE COURT:  Your objection is overruled.  But you can
2    cross-examine her on that.  All of the points you just made are
3    legitimate points to make in cross-examination.
4            THE DEFENDANT:  Very well.
5            THE COURT:  Okay.  Step back.
6        (Continued on next page)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          THE COURT:  Objection is overruled.  So, Government

2     Exhibit 2, 3, 4, 6 through 13, and 62 are received.

3          (Government's Exhibits 2, 3, 4, 6 - 13, 62 received in

4     evidence)

5          MR. NESSIM:  Ms. Dunbar, please publish Government

6     Exhibit 2.

7     BY MR. NESSIM:

8     Q.  What is this document?

9     A.  It's a notice of release.  Acknowledgment of sex-offender

10    registration requirements.

11    Q.  And what is a notice of release?

12    A.  It's when a defendant is released from a facility and it

13    has intentions of residing in New York state and they have been

14    convicted of a sexual registerable offense.

15    Q.  And is this a notice of release that was sent to DCJS?

16    A.  Yes.

17    Q.  Who sent this notice?

18    A.  The United States Disciplinary Barracks in Fort

19    Leavenworth, Kansas.

20         MR. NESSIM:  Ms. Dunbar, can you please highlight the

21    top half of the page through number six.  Thank you.

22    Q.  Ms. Ernst, who is this notice of release -- who is the

23    subject of this notice of release?

24    A.  Salvador N.  Diaz.

25         MR. NESSIM:  Ms. Dunbar, can you please blow up the

bottom of this exhibit, section eight.

Q.  Ms. Ernst, what is the home address that's listed for
Mr. Diaz?

A.  26988th Avenue, Apartment 6B; New York, New York 10030.

Q.  Can you please read that certification?

A.  "I hereby acknowledge that I was informed that, upon my
release from confinement or military service, I am subject to
registration requirements as a sex-offender in any state or
U.S. territory in which I reside, be employed, carry on a
vocation or be a student.  I was further informed that the
chief local law enforcement officer of the jurisdiction in
which I will reside upon release from confinement or military
service is being provided written notice of the date of my
release from confinement of military service, the offenses of
and which I was convicted and that I am subject to a
registration requirement as a sex-offender.  This notice will
also be submitted to the state local law enforcement and
sex-offender officials.  I understand that I must contact the
office that files to make sure that sex-offender registration
requirements are met."

Q.  You can skip that address.  But can you read the
acknowledgment below?

A.  "I acknowledge that I was informed that every change of my
address must be reported in a manner provide by state law.  I
also acknowledge being informed that if I move to another

1  state, I must report the change of address to the responsible

2  agency in the state I am leaving and comply with the

3  registration requirements in the new state of residence.  I

4  understand that the failure to register may constitute grounds

5  to revoke parole."

6          Finally, "I understand that if I fail to register,

7  and/or change or update such registration information, as

8  required under a state sex-offender registration program, I may

9  be subject to criminal prosecution."

10  Q.  Are there initials beside those acknowledgments?

11  A.  Yes.

12  Q.  Can you read those?

13  A.  S.D.

14  Q.  And is the acknowledgment signed?

15  A.  Yes.

16  Q.  By an offender?

17  A.  Yes.

18  Q.  Can you read that signature, please?

19  A.  Salvador Diaz.

20  Q.  What happens once DCJS receives the notice that we just

21  talked about?

22  A.  When the registry receives the form, we forward it to the

23  board of examiners, the only entity in New York state that can

24  determine if a non-New York state conviction is registerable in

25  New York state.

1           MR. NESSIM:  Ms. Dunbar, please publish Government

2    Exhibit 3.

3    Q.  What is this?

4    A.  New York sex-offender registration form.

5    Q.  And what is the it used for?

6    A.  This is all the information that gets put into our IJ

7    portal, which the defendant becomes a registered sex-offender

8    in New York state.

9    Q.  So, how does DCJS receive a form like this?

10   A.  In this case, since it was a non-New York state conviction,

11   this came from the board of examiners for the New York state

12   sex-offender registry to register the defendant.

13   Q.  And what does this sex-offender registration form in

14   Mr. Diaz's file indicate about his need to register?

15   A.  That the board of examiners has deemed him required to

16   register as a sex-offender in New York state.

17          MR. NESSIM:  Ms. Dunbar, can you please zoom in to the

18   stamp at the top of the page.

19   Q.  What is the date this document was received by DCJS?

20   A.  April 6th, 2007.

21   Q.  How do you know that?

22   A.  Because any mail or forms that come into our office must be

23   stamped at the time of receipt.

24          MR. NESSIM:  Ms. Dunbar please publish Government

25   Exhibit 4.

1    Q.   What happens after you receive the form we just saw?

2    A.   Since it was a non-New York state conviction, we fill out a

3    registration form and mail it to the offender for him or she to

4    sign and return it to us.  And this is the receipt from the

5    certified mailing.

6    Q.   Government Exhibit 4?

7    A.   Correct.

8    Q.   How do you know that this is the receipt from that

9    certified mail?

10   A.   Because that's the only form that the sex-offender registry

11   sends out certified mail.

12   Q.   And who prepared this label that's on the receipt?

13   A.   Someone at the New York State Sex-offender Registry.

14   Q.   And what is the address on the label?

15   A.   2698 8th Avenue, 6B; New York, New York City 10030.

16          MR. NESSIM:  Ms. Dunbar, please publish Government

17   Exhibit 62.

18   Q.   What is this?

19   A.   This is a copy of the New York State Sex-offender Registry

20   from the IJ portal, that is our in-house record.

21   Q.   And who maintains the information on the IJ portal?

22   A.   The sex-offender registry unit.

23   Q.   And who is the subject of this report?

24   A.   Salvador Diaz.

25          MR. NESSIM:  Ms. Dunbar, please turn to page three of

1    this exhibit and zoom in to the current registration section.

2    Q.  Ms. Ernst, what is the date of registration?

3    A.  March 30th, 2007.

4    Q.  And what is the ending date?

5    A.  Life.

6         MR. NESSIM:  Ms. Dunbar, please publish Government

7    Exhibit 6.

8    Q.  What is this?

9    A.  It's a sex-offender registry address verification form.

10   Q.  And what is a sex-offender registry address verification

11   form?

12   A.  This is the form that we used to mail out once a year.

13   Q.  This is part of the annual verification process?

14   A.  Correct.

15   Q.  And who is this form addressed to?

16   A.  Salvador Diaz.

17   Q.  What address is this form mailed to?

18   A.  2698 8th Avenue, Apartment 6B; New York City, New York

19   10030.

20   Q.  What is printed under the name of the form at the top of

21   the page?

22   A.  Please correct any information that is inaccurate.

23   Q.  What, if any, changes were made to this form?

24   A.  The address was changed, and a vehicle was added.

25   Q.  What is the change to the address that was made?

1   A.  Change to the address to 52 Arden Street, Apartment 5A; New

2   York City, New York 10040.

3   Q.  Is this form signed?

4   A.  Yes.

5   Q.  Please read the signature.

6   A.  Salvador Diaz.

7   Q.  What is the date?

8   A.  4/3/2008.

9   Q.  Let's turn to page two.  Was this form returned to DCJS?

10  A.  Yes.

11  Q.  How do you know?

12  A.  Because any mailings or forms that come into our office

13  must be stamped -- time and date-stamped.

14  Q.  And why is it important to stamp the forms coming into your

15  office?

16  A.  To verify when we receive them.  Annual verification, the

17  change of address forms must be processed in a timely manner,

18  so they have to be stamped in as soon as we receive them.

19  Q.  And why do they need to be processed in a timely manner?

20  A.  Because of the ten-day law change for the sex-offender and

21  also the annual verification.  They only have ten days to

22  return it to us.  Sometimes the forms sit in bins for a day or

23  two, and we need to make sure that we know when we received it

24  in order to make the sex-offender not fail if they report

25  within that timeframe.

1          MR. NESSIM:  Ms. Dunbar, please publish Government

2    Exhibit 7.

3    Q.  Ms. Ernst, what is this?

4    A.  Sex-offender registry address verification form.

5    Q.  And what year is this for?

6    A.  2010.

7    Q.  Who was it sent to?

8    A.  Salvador Diaz.

9    Q.  At what address?

10   A.  52 Arden Street, Apartment 5A; New York, New York 10040.

11   Q.  Was it signed?

12   A.  Yes.

13   Q.  Can you read the signature?

14   A.  Salvador Diaz.

15          MR. NESSIM:  Ms. Dunbar, please publish Government

16   Exhibit 8.

17   Q.  What is this?

18   A.  This is the New York state sex-offender registry annual

19   address verification form.

20   Q.  Why does this form look different than the last two address

21   verification forms we've seen?

22   A.  We needed to update our form to include more information as

23   concerning internet and multiple addresses.

24   Q.  And who is this form sent to?

25   A.  Salvador Diaz.

1  Q.  And what year?

2  A.  2011.

3           MR. NESSIM:  Zoom in to the instructions on the first

4  page.

5  Q.  Ms. Ernst, would you please read the instructions?

6  A.  "Instructions:  One, review each line of information on

7  this form carefully.  Two, if you find any information that is

8  incorrect or outdated, cross out incorrect or outdated

9  information with a single line.  Three, enter any corrections

10  or any new additional information in the blank boxes provided.

11  This form must be signed and all pages returned, even if none

12  of the information has changed.  Failure to return all pages of

13  this form within ten days of receipt is a felony and may result

14  in the issuance of a warrant for your arrest."

15           MR. NESSIM:  Ms. Dunbar, please turn to the second

16  page and let's zoom in to the primary address section.

17  Q.  What's listed as the primary address here?

18  A.  52 Arden Street, Apartment 5A; New York, New York, 10040.

19           MR. NESSIM:  Ms. Dunbar, please turn to page five of

20  this exhibit and zoom in.

21  Q.  Ms. Ernst, please read the text at the top of the page?

22  A.  "I certify that the information on this form is complete

23  and accurate.  I have crossed out all information that is

24  incorrect or outdated.  I have added all corrections and all

25  new information.  I understand that failing to provide this

1    information or providing false information is a felony.

2    Q.  Is this form signed?

3    A.  Yes.

4    Q.  Can you please read the signature?

5    A.  Salvador Diaz.

6            MR. NESSIM:  Ms. Dunbar, please publish Government

7    Exhibit 9.

8    Q.  Is this the same form we've seen a couple times?

9    A.  Correct.

10   Q.  What's the date of this form?

11   A.  2012.

12   Q.  That's the year on the form?

13   A.  Correct.

14   Q.  Who was it sent to?

15   A.  Salvador Diaz.

16           MR. NESSIM:  Ms. Dunbar, please turn to the second

17   page and let's zoom in to the primary address section.

18   Q.  What's listed as the address here?

19   A.  52 Arden Street, Apartment 5A; New York, New York 10040.

20           MR. NESSIM:  Ms. Dunbar, please turn to page five.

21   Q.  Ms. Ernst, is this form signed?

22   A.  Yes.

23   Q.  Can you please read the signature?

24   A.  Salvador Diaz.

25           MR. NESSIM:  Ms. Dunbar, please publish Government

1    Exhibit 10.

2    Q.  What is this?

3    A.  Sex-offender registry annual address verification form.

4    Q.  Who is the form sent to?

5    A.  Salvador Diaz.

6    Q.  For which year?

7    A.  2013.

8          MR. NESSIM:  Ms. Dunbar, please turn to the second

9    page and let's zoom in to the primary address section.

10   Q.  Can you please read the address listed?

11   A.  52 Arden Street, Apartment 5A; New York, New York 10040.

12         MR. NESSIM:  Ms. Dunbar, please turn to page five.

13   Q.  Is this form signed?

14   A.  Yes.

15   Q.  Can you please read the signature?

16   A.  Salvador Diaz.

17         MR. NESSIM:  Ms. Dunbar, please publish Government

18   Exhibit 11.

19   Q.  Is this an annual address verification form?

20   A.  Yes.

21   Q.  Who was you it sent to?

22   A.  Salvador Diaz.

23   Q.  For what year?

24   A.  2014.

25         MR. NESSIM:  Ms. Dunbar, please turn to the second

1    page and highlight the primary address section.

2    Q.  What is listed as the primary address?

3    A.  52 Arden Street, Apartment 5A; New York, New York 10040.

4         MR. NESSIM:  Ms. Dunbar, please turn to page four and

5    highlight the driver's license information.

6    Q.  Is the driver's license listed?

7    A.  Yes.

8    Q.  What state issued these driver's license?

9    A.  New York.

10        MR. NESSIM:  Ms. Dunbar, please turn to page five.

11   Q.  Is this form signed?

12   A.  Yes.

13   Q.  Can you please read the signature?

14   A.  Salvador Diaz.

15        MR. NESSIM:  Ms. Dunbar, please publish Government

16   Exhibit 12.

17   Q.  Is this an annual verification form?

18   A.  Yes.

19   Q.  Who was the form sent to?

20   A.  Salvador Diaz.

21   Q.  For which year?

22   A.  2015.

23   Q.  At which address?

24   A.  Tea Arden Street; Apartment 5A; New York, New York 10040.

25        MR. NESSIM:  Ms. Dunbar, please turn to page five.

1    Q.  Was this form signed?

2    A.  No.

3            MR. NESSIM:  Ms. Dunbar, please turn to page seven.

4    Q.  What is this?

5    A.  This is the returned envelope from the verification form

6    from the post office.

7    Q.  Why was the envelope returned?

8    A.  Any mail the sex-offender registry mails out to any

9    offenders is non-forwardable, so the post office returns it to

10   us if the offender is not at that address.

11           MR. NESSIM:  Ms. Dunbar, please turn to page eight.

12   Q.  On what date -- if you can read it.  On what date did the

13   sex-offender registry receive this form?

14   A.  April 6th, 2015.

15           MR. NESSIM:  Ms. Dunbar, please publish Government

16   Exhibit 13.

17   Q.  Is this another annual address verification form?

18   A.  Yes.

19   Q.  Who was it sent to?

20   A.  Salvador Diaz.

21   Q.  For which year?

22   A.  2016.

23   Q.  What address was it mailed to?

24   A.  52 Arden Street, Apartment 5A; New York, New York 10040.

25           MR. NESSIM:  Ms. Dunbar, please turn to page five.

1    Q.  Was this form signed?

2    A.  No.

3           MR. NESSIM:  Ms. Dunbar, please turn to page ten.

4    Q.  What is this?

5    A.  This is the returned envelope from the annual address

6    verification form.

7           MR. NESSIM:  Ms. Dunbar, please turn to page eight.

8    Q.  On what date did DCJS receive the returned envelope?

9    A.  March 31st, 2016.

10          MR. NESSIM:  I can have one moment your Honor?

11          No further questions.

12          THE COURT:  Okay.  Mr. Diaz.

13   CROSS-EXAMINATION

14   BY THE DEFENDANT:

15   Q.  Good afternoon.

16   A.  Good afternoon.

17   Q.  Referring to Government Exhibit three --

18          THE DEFENDANT:  Does she have a copy?

19          THE COURT:  We can get it pulled up.  You want the

20   jury to be able to see it at the same time.

21          THE DEFENDANT:  Well, I want the witness to see it.

22          THE COURT:  Yes.  But would you also like the jury to

23   see it?

24          THE DEFENDANT:  And the witness.

25          THE COURT:  It will be on her screen.

```
 1              THE DEFENDANT:  Very well.

 2              THE COURT:  It's on your screen also.

 3    BY THE DEFENDANT:

 4    Q.  This page has some typewritten information and some

 5    handwritten information?

 6    A.  Correct.

 7    Q.  Is that your handwriting?

 8    A.  No.

 9    Q.  Do you know who wrote all those things in there?

10    A.  No.  This was before I joined the registry team.

11    Q.  So, how do you know this information is correct?

12              JUROR:  Because according to procedure, the person who

13    did the form would have gotten the information from the board

14    of examiners.

15              THE DEFENDANT:  I beg your pardon, your Honor.  I'm

16    looking for a different document.

17    Q.  Referring to block number 30, can you read what it says in

18    there?

19    A.  Military U.S. Army.

20    Q.  And was I in the U.S. Army?

21    A.  I have no idea.

22    Q.  I refer you back to Government Exhibit 1.  It says

23    Department of the Navy.

24              THE COURT:  Do you have a question?

25              THE DEFENDANT:  Yes.
```

1    Q.  How do you account for that?

2    A.  I personally cannot account for that because I was not at

3    the registry at the time that this was prepared.

4    Q.  So, you didn't -- in essence, you're telling us that you're

5    not -- you cannot testify for the veracity of any of these

6    document, you can only say that it exists?

7    A.  Because they were produced during the course of DCJS's

8    business records.

9    Q.  Yes.  I understand that.  But you're also saying that as

10   we're demonstrating that there are some inaccuracies in the

11   document, and you're not able to account for those?

12   A.  Correct.

13   Q.  In addition, just to make sure in block number 32, it says

14   "date of arrest," right?

15   A.  I still have the other one up.  I don't know what you're

16   referring to.

17             THE COURT:  Can you go back to GX3.

18             THE DEFENDANT:  Government Exhibit 3.

19             THE WITNESS:  Excuse me.  What block again?

20             THE DEFENDANT:  No. 30.

21             THE COURT:  I thought you said 32.

22             THE DEFENDANT:  Yes.  My mistake.  32.

23   Q.  What does that block tell you?

24   A.  12/12/2000.

25   Q.  What does it indicate to you?

1    A.  December 12th of 2000.

2    Q.  But what is the title of the block?

3    A.  Date of arrest.

4    Q.  Date of arrest.  It says that I was arrested December 12,

5    2000.  If you refer to page two of document number one --

6    sorry.  I'm sorry.  That's the incorrect one.

7    Q.  We know also in block 33, it says "date of crime."

8         Can you read that?

9    A.  12/12/200.

10   Q.  You find that inconsistent that the date of crime is the

11   same date as the date of arrest?

12   A.  Yes.

13   Q.  The date of conviction, block number 40, what does it read

14   there?

15   A.  October 2nd, 2001.

16   Q.  Does that sound consistent to you, that this is reading

17   here "date of arrest, 2000," now it's saying that it was in

18   2001?

19   A.  Date of arrest --

20   Q.  Date of conviction?

21   A.  Date of arrest and date of conviction can be far apart

22   because you have a trial and all of that.

23   Q.  That is correct.  However, looking at page four of

24   Government Exhibit 3 -- sorry, page three --

25              THE COURT:  Government Exhibit 3 is just a one-page

1   document.

2           THE DEFENDANT:  Well, I don't know where this came

3   from.  What is that?

4           MR. NESSIM:  Exhibit 1.

5           THE DEFENDANT:  My apologies to the jury and the

6   Court.

7           Exhibit 1, page number three.  It's actually page

8   number two.

9           THE COURT:  It's the third page of the document.

10          THE DEFENDANT:  The third page of the document.

11  BY THE DEFENDANT:

12  Q.  What does it say there?

13  A.  Sentence:  Adjudged on December 1st, 2000.

14  Q.  Now, that doesn't jibe with the fact that you're saying the

15  date of arrest may have been different.  But the date of

16  conviction, how can I judge a sentence before the conviction?

17          MR. NESSIM:  Objection.

18          THE COURT:  Sustained.

19          THE DEFENDANT:  What was?

20          THE COURT:  Ask another question.

21  BY THE DEFENDANT:

22  Q.  The date of conviction is listed there, as you said, on

23  October of 2001.

24          Is that consistent with the date of the crime and the

25  date the sentence was adjudged?

1    A.  No, they're not consistent.

2    Q.  So, these documents, from what I see, are totally

3    unreliable?

4            MR. NESSIM:  Objection.

5            THE COURT:  Yeah.  Sustained.

6            Mr. Diaz, you'll have an opportunity to sum up.  Now,

7    you just get to ask her questions.

8            THE DEFENDANT:  Very well.  That is all, your Honor.

9            THE COURT:  Okay.

10           Any redirect?

11           MR. NESSIM:  Briefly, your Honor.

12   REDIRECT EXAMINATION

13           MR. NESSIM:  Ms. Dunbar, can you please publish

14   Government Exhibit 3?

15   BY MR. NESSIM:

16   Q.  Ms. Ernst, you testified that this is a document that was

17   prepared by the board of examiners; is that right?

18   A.  Correct.

19   Q.  And then it's maintained by the DCJS in its file on

20   Mr. Diaz?

21   A.  Correct.

22   Q.  And what does this form trigger again?

23   A.  The registration process to get Mr. Diaz up on the

24   sex-offender registry.

25   Q.  And is information like which branch of the army material

 1    to that determination?

 2              THE DEFENDANT:  Objection, your Honor.

 3              THE COURT:  Overruled.

 4    BY MR. NESSIM:

 5    Q.  Is that an important fact, what branch of the army Mr. Diaz

 6    was in?

 7    A.  No.

 8              THE COURT:  I think you mean which branch of the

 9    service.

10              MR. NESSIM:  Which branch of the service.  Excuse me.

11              THE WITNESS:  Correct.  That is not an important.

12    BY MR. NESSIM:

13    Q.  And you don't work for the armed services?

14    A.  No.

15    Q.  You don't have knowledge about the court marshal

16    proceedings?

17    A.  No, I do not.

18              THE COURT:  Okay.  This is your witness, Mr. Nessim.

19    Don't lead, please.

20    BY MR. NESSIM:

21    Q.  Ms. Ernst, when this file is received from the board of

22    examiners, just remind us again, what happens next?

23              THE DEFENDANT:  Objection, your Honor.  That's been

24    asked and answered.

25              THE COURT:  Hang on.  Sustained.

1    BY MR. NESSIM:

2    Q.  Was Mr. Diaz required to register as a sex-offender?

3    A.  Yes.

4    Q.  And did he satisfy those requirements?

5    A.  No.  As far as what?  I'm sorry.  I'm confused.

6    Q.  Was he initially registered?

7    A.  Yes.

8    Q.  And was he responding to your address verification --

9            THE DEFENDANT:  Objection, your Honor.

10           THE COURT:  Sustained.  It's beyond the scope.

11           MR. NESSIM:  May I have one moment, your Honor?

12           THE COURT:  Sure.

13           MR. NESSIM:  Nothing further, your Honor.

14           THE COURT:  Okay.  Anything further, Mr. Diaz?

15           THE DEFENDANT:  No, Your Honor.

16           THE COURT:  Okay.  Thank you.  You may step down.

17           Call your next witness.

18           MS. TARLOW:  Your Honor, the government calls Kelly

19   Rourke.

20   KELLY ROURKE,

21       called as a witness by the Government,

22       having been duly sworn, testified as follows:

23   DIRECT EXAMINATION

24   BY MS. TARLOW:

25   Q.  Good afternoon, Ms. Rourke.

1          Where do you work?

2    A.   I work for the NYPD sex-offender unit.

3    Q.   What is your title?

4    A.   Police officer.

5    Q.   How long have you worked for the NYPD?

6    A.   Just over 21 years.

7    Q.   What are some of your duties and responsibilities as an

8    officer assigned to the NYPD sex-offender monitoring unit?

9    A.   We track and monitor all sex-offenders in New York City,

10   the five boroughs.

11   Q.   As part of those responsibilities, do you maintain records

12   associated with sex-offenders?

13   A.   Yes, we do.

14   Q.   Have you reviewed the records maintained by the NYPD

15   associated with an individual named Salvador Diaz?

16   A.   Yes, I have.

17   Q.   Officer Rourke, I'm handing you exhibits that have been

18   marked as Government Exhibits 5, 27 and 28.  Can you please

19   review those documents and look up at me when you're finished.

20          Do you recognize these documents?

21   A.   I do.

22   Q.   What are they?

23   A.   They are two documents that we have offenders sign when

24   they come into our office.  And the third document is the

25   signed registration form.

1    Q.  Where were these particular forms maintained?

2    A.  We maintain them in our office.  The two forms and the

3    registration were in his file.

4    Q.  In Mr. Salvador Diaz's file?

5    A.  Yes.

6    Q.  Is the retention of these forms in the regular practice of

7    the NYPD?

8    A.  Yes.

9    Q.  Were these forms created at or near the time that the

10   activities reflected therein took place?

11   A.  Yes.

12          MS. TARLOW:  Your Honor, the government officers

13   Government Exhibits 5, 27 and 28 into evidence.

14          THE COURT:  Any objection?

15          THE DEFENDANT:  No objection, your Honor.

16          THE COURT:  All right.  5, 27 and 28 are received.

17          (Government's Exhibits 5, 27 and 28 received in

18   evidence)

19   BY MS. TARLOW:

20   Q.  Ms. Rourke, can you please read the title of this form?

21   A.  "This is the New York State Sex-offender Registration Form.

22   Q.  And whose name is signed on the bottom left of the form?

23   A.  Salvador Diaz.

24   Q.  What is the date of this form?

25   A.  February 18th, 2010.

1    Q.  Turning your attention to the second page of this exhibit.

2          MS. TARLOW:  Ms. Dunbar, can you please highlight

3    point two of this form?

4    Q.  Officer Rourke, can you please direct your attention to the

5    highlighted portion and read aloud what is written?

6    A.  Yes.  If you move to another state, you must register as a

7    sex-offender within ten days of establishing residence.

8    Q.  Turning your attention back to the first page of this form

9    -- turning your attention to Exhibit 27.

10         What is the title of this form?

11   A.  New York State Sex-offender Rules and Regulations.

12   Q.  Whose name is printed on the bottom of the form?

13   A.  Salvador Diaz.

14   Q.  Whose name is signed on the bottom left of the form?

15   A.  Salvador Diaz.

16   Q.  And what is the date?

17   A.  December 2nd, 2009.

18         MS. TARLOW:  Ms. Dunbar, please publish Government

19   Exhibit 28.

20   Q.  What is the title of this form?

21   A.  Top ten ways registered sex-offenders fail to register.

22   Q.  What is the date that this document was signed?

23   A.  December 2nd, 2010.

24         MS. TARLOW:  Ms. Dunbar, please highlight point one of

25   this form.

1   Q.  Officer Rourke, directing your attention to this portion of

2   the form, can you please read aloud what is written?

3   A.  Yes.

4           "Actually live at your registry address.  Effective

5   August 17th, 2007, the crime of failure to register is a felony

6   charge."

7           MS. TARLOW:  Ms. Dunbar, please highlight point five

8   of this form.

9   Q.  Officer Rourke, can you please read aloud the first

10  sentence of point five?

11  A.  "If you move to a new address, you have no later than ten

12  days to officially file an address change."

13          MS. TARLOW:  Ms. Dunbar, please highlight point ten of

14  this form.

15  Q.  Officer Rourke, directing your attention to this portion of

16  the form, can you please read aloud what is written?

17  A.  Again, "Actually live at your registry address."

18  Q.  And can you please read the name signed on the bottom of

19  this form?

20          JUROR:  Salvador Diaz.

21          THE DEFENDANT:  Objection, your Honor.

22          THE COURT:  You're objecting to whose name is signed

23  at the bottom of the form?

24          THE DEFENDANT:  No.  I'm objecting to the introduction

25  to this evidence here.

```
 1            THE COURT:  You already said you didn't have an
 2   objection.  Sit down.  It's too late.  We already have an
 3   objection.
 4            MS. TARLOW:  May I have one moment, your Honor?
 5            THE COURT:  You may.
 6            MS. TARLOW:  Nothing further, your Honor.
 7            THE COURT:  Okay.  Mr. Diaz, do you have any
 8   cross-examination questions?
 9            THE DEFENDANT:  Yes, your Honor.
10            THE COURT:  Okay.
11   CROSS-EXAMINATION
12   BY THE DEFENDANT:
13   Q.  Good day.
14   A.  Hello.
15   Q.  Exhibit 5, can you verify the accuracy of this document?
16   A.  I don't understand the question.
17   Q.  Well, can you swear to the best of your knowledge that this
18   document is accurate?
19   A.  Yes.
20   Q.  Based on what?
21   A.  Based on it's maintained in a folder that we're under a
22   business duty to report accurately.
23   Q.  Do you have an idea who maintains the folder?
24   A.  Yes.
25   Q.  Who would that be?
```

1   A.  The NYPD Sex-offender Register Unit.

2   Q.  Do you know who filled this form out?

3   A.  I don't.

4   Q.  Then how do you know exactly?  Just because -- you're

5   relying that the state -- everything that the state does is

6   accurate?  Is that the reason?

7   A.  Well, when we get the form, it's already filled out.  When

8   the sex-offender unit gets the form, it's filled out already

9   with the exception of the signature.

10  Q.  So, you have no idea exactly --

11          THE COURT:  Wait a minute, Mr. Diaz.  You've got to

12  let her finish her answer before you ask the next question.

13          So, you said you received it.  It's already filled out

14  with everything except the signature.

15          THE WITNESS:  Oftentimes, yes.

16          So, sometimes it's already signed and it's

17  cross-referenced to other court documents.

18  BY THE DEFENDANT:

19  Q.  But my question again was, you don't have any idea whether

20  it's accurate or not.  You're just assuming that it's accurate

21  because it's in state records?

22          MS. TARLOW:  Objection, your Honor.

23          THE COURT:  Overruled.

24          THE WITNESS:  I'm sorry.  Could you repeat that

25  question again?

BY THE DEFENDANT:

Q.  You don't have any idea whether this is an accurate

document or not, you're simply relying on the fact that it is a

state document, you're accepting it as proof that it is

accurate?

          THE COURT:  By "accurate," you mean the information

that's entered on the form?

          THE DEFENDANT:  Correct.

          THE WITNESS:  Yes, I believe that it's accurate,

because we get it from a government agency that's also under a

responsibility to report these accurately.

Q.  In reference to document 27.  You stated that as a New York

city police officer, document No. 27 -- what is the title of

the document?

A.  New York State Sex-offender Rules and Regulations.

Q.  So, are you aware that this is not a New York state court?

A.  Say that again?

Q.  Are you aware that this is not a state court that we're in?

          THE COURT:  Are you aware that we're not in state

court?

          THE WITNESS:  I am aware.

BY THE DEFENDANT:

Q.  Are you aware that no one has referred charges to my person

in New York state?

A.  I'm not aware of that.  But I know that this is a federal

1    court, yes.

2    Q.  Correct.  So, why then present the evidence of something

3    that is totally irrelevant to what is at stake here?

4              MS. TARLOW:  Objection, your Honor.

5              THE COURT:  Sustained.

6    Q.  The same thing, Government Exhibit 28.  This is also a New

7    York State Police Department sex-offender monitoring unit form.

8    Is that correct?

9    A.  This is a New York City Police Department form.

10   Q.  Right.  So, Government Exhibit 28, and the previous one

11   that we just discussed are not federal forms.

12             Why are you referring to them in a federal program?

13             MS. TARLOW:  Objection, your Honor.

14             THE COURT:  Sustained.

15   BY THE DEFENDANT:

16   Q.  But you do recognize that this is not federal forms; is

17   that correct?

18   A.  Yes.

19   Q.  Going back -- and I apologize for that I'm going back and

20   forth -- to document five.  Government Exhibit 5.  You've read

21   what's highlighted.  And I can't understand what it says.

22             THE COURT:  Mr. Diaz, you can't testify.  You can only

23   ask questions.

24             Can you blow up number two, please?

25             THE DEFENDANT:  Yes, please.

1    BY THE DEFENDANT:

2    Q.  Can you read number seven, please?

3              THE COURT:  Number seven?

4              THE DEFENDANT:  Yes.

5              THE COURT:  She'll blow it up for you in just a

6    second.

7              Can you read that?

8              THE WITNESS:  Yes.

9              THE COURT:  You want her to read it out loud?

10             THE DEFENDANT:  No.  If she can read it.

11             Can you read it?

12             THE COURT:  Out loud?

13             THE DEFENDANT:  No, if she can read it or not.

14             THE COURT:  Oh, is it legible enough?

15             THE DEFENDANT:  Exactly.

16             THE COURT:  Okay.  Can you read it?

17             THE WITNESS:  Yes.

18   BY THE DEFENDANT:

19   Q.  But would you be able to read it if it was shown to you in

20   the original size?

21   A.  Yes.

22   Q.  We just had to blow it up.

23   A.  Well, I can read it off of this, which is the original

24   size.

25   Q.  Oh.  That one is more accurate than --

1        THE COURT:  It's the same thing.  It's just a paper

2  copy, Mr. Diaz.  She has the paper copy in front of her.

3  BY THE DEFENDANT:

4  Q.  Now, going back to the front of the document, Government

5  Exhibit 5, you weren't there at the time that this document was

6  signed, were you?

7  A.  No.

8  Q.  Okay.  Very well.

9        THE DEFENDANT:  That's all, your Honor.

10        THE COURT:  Ms. Tarlow.

11        THE DEFENDANT:  I'm sorry.  One more question.

12        THE COURT:  Okay.

13  BY THE DEFENDANT:

14  Q.  Number 30, you testified before to the best of your

15  knowledge that this was an accurate document; is that correct?

16  A.  What page are you on?

17  Q.  Number five, the front of the page.

18  A.  Okay.

19  Q.  And if you look at block number 30 --

20  A.  Okay.

21  Q.  -- what does it say there?  Can you read that?

22  A.  It says U.S. Army, arresting agency.

23  Q.  Do you know that I was in the army?

24  A.  No.

25  Q.  Do you know what service I was in?

1    A.  The army.

2              THE DEFENDANT:  Very well.  Thank you.

3              THE COURT:  Any redirect?

4              MS. TARLOW:  No, Your Honor.

5              THE COURT:  Call your next witness.

6              MS. TARLOW:  The government calls Pablo Rios.

7    PABLO RIOS,

8         called as a witness by the Government,

9         having been duly sworn, testified as follows:

10   DIRECT EXAMINATION

11   BY MS. TARLOW:

12   Q.  Good afternoon, Mr. Rios.

13   A.  Good afternoon.

14   Q.  Where do you work?

15   A.  I work for Lemle & Wolff.

16   Q.  What is Lemle & Wolff?

17   A.  Owner and manager and developer of affordable housing.

18   Q.  What is your title at Lemle & Wolff?

19   A.  My title is property manager.

20   Q.  How long have you been in that role as property manager?

21   A.  With Lemle & Wolff, I've been one year -- a year and a

22   half.

23   Q.  Are you familiar with the building that is located at 52

24   Arden Street in Manhattan?

25   A.  Yes, I am.

1   Q.   Is that a property that's managed by Lemle & Wolff?

2   A.   Yes.

3   Q.   Does Lemle & Wolff maintain records associated with their

4   properties?

5   A.   Yes, we do.

6   Q.   What, if any, types of records does Lemle & Wolff maintain?

7   A.   We maintain applications, leases, lease renewals, anything

8   pertinent to the tenant relationship.

9   Q.   Have you reviewed records maintained by Lemle & Wolff

10  associated with an individual named Salvador Diaz?

11  A.   Yes, I have.

12  Q.   Mr. Rios, I'm handing you documents that have been marked

13  for identification as Government Exhibits 14 through 17 and

14  Government Exhibit 19.

15  A.   Okay.

16  Q.   Please review those documents and look at me when you're

17  finished.

18          Do you recognize these documents?

19  A.   Yes, I do.

20  Q.   Generally what are they?

21  A.   Most of the documents, all but one, are lease renewal

22  forms.  So, when a tenant signs the vacancy lease, which is the

23  first initial lease that has all of the language, then these

24  are subsequent leases to -- after that first release.  This

25  shows what times of the tenancy and when it starts and when it

1   ends.

2   Q.  And you said that they were all but one lease renewal form.

3   What is the final form?

4   A.  The final part is what we call --

5   Q.  Are these forms that were maintained in your office filed

6   for a particular apartment?

7   A.  Yes.

8   Q.  Were these forms made in the regular course of business at

9   Lemle & Wolff?

10  A.  Yes.

11  Q.  Were they created at or near the time that activities

12  therein took place?

13  A.  Yes.

14          MS. TARLOW:  Your Honor, the government offers

15  Government Exhibit 14 through 17 and Government Exhibit 19 into

16  evidence.

17          THE COURT:  Any objection?

18          THE DEFENDANT:  No.

19          THE COURT:  Okay.  14, 15, 16, 17 and 19 are received.

20          (Government's Exhibits 14, 15, 16, 17, 19 received in

21  evidence)

22          MS. TARLOW:  Ms. Dunbar, please publish Government

23  Exhibit 14.

24  Q.  What type of form is this?

25  A.  A renewal release form.

1    Q.   What apartment is listed on this form?

2    A.   It's apartment 5A, as in apple.

3    Q.   What is the address of that apartment?

4    A.   52 Arden Street.

5    Q.   Who are listed as the tenants of apartment 5A?

6    A.   Gladys Rodriguez and Salvador Diaz.

7    Q.   When does the lease renewal period begin on this form?

8    A.   On this form the lease periods begins September 1st, 2008.

9    Q.   And when does the lease period end?

10   A.   It expires August 31st, 2010.

11   Q.   Was this form signed?

12   A.   It was signed.

13   Q.   Please read the name that is signed on the bottom right of

14   the form next to the tenant signature.

15   A.   It was signed by Gladys Rodriguez and Salvador Diaz.

16            MS. TARLOW:   Please publish Government Exhibit 15.

17   Q.   What type of form is this?

18   A.   This is also a renewal lease form.

19   Q.   And what apartment is listed on this form?

20   A.   5A, as in apple.

21   Q.   And, again, is that 52 Arden Street?

22   A.   Correct.

23   Q.   Who are listed as the tenants of Apartment 5A on this

24   renewal form?

25   A.   Gladys Rodriguez and Salvador Diaz.

1    Q.  When does the lease renewal period begin?

2    A.  September 2010.

3    Q.  When does the lease renewal period end?

4    A.  Expires August 31st, 2012.

5    Q.  Was this lease renewal form signed?

6    A.  Yes, it was.

7    Q.  Please read the name signed on the bottom right of the form

8    next to the letters TNT?

9    A.  Salvador Diaz and Gladys Rodriguez.

10          MS. TARLOW:  Ms. Dunbar, please publish Government

11   Exhibit 16.

12   Q.  What type of form is this?

13   A.  Renewal release form.

14   Q.  What apartment?

15   A.  5A, as in apple.

16   Q.  And is that also at 52 Arden Street?

17   A.  That is correct.

18   Q.  Who are listed as the tenants of Apartment 5A on this

19   renewal form?

20   A.  The tenants are Gladys Rodriguez and Salvador Diaz.

21   Q.  When does the lease renewal period begin?

22   A.  It begins September 1st, 2012.

23   Q.  When does the lease period end?

24   A.  It ends August 31, 2014.

25   Q.  Was this lease renewal form signed?

1    A.  Yes, it was.

2    Q.  Please read the name that is signed on the bottom right of

3    the form?

4    A.  Gladys Rodriguez and Salvador Diaz.

5    Q.  And whose signatures are those, according to the form?

6    A.  The tenants are indicated at the top.

7            MS. TARLOW:  Ms. Dunbar.

8    Q.  Please turn your attention to Government Exhibit 17.

9            What type of form is this, Mr. Rios?

10   A.  This is also renewal lease form.

11   Q.  And what apartment is listed on this form?

12   A.  The apartment is 5A, as in apple.

13   Q.  And is that also at 52 Arden Street?

14   A.  That's correct.

15   Q.  Who are listed as the tenants of apartment 5A on this

16   renewal form?

17   A.  Gladys Rodriguez and Salvador Diaz.

18   Q.  When does the lease renewal period begin on this form?

19   A.  It begins September 1st, 2014.

20   Q.  And when does the lease period end?

21   A.  According to what is selected, one year lease renewal, so

22   it expires August 31st, 2015.

23   Q.  Was this renewal lease form signed?

24   A.  Yes, it was.

25   Q.  By whom?

1   A.   Only by Gladys Rodriguez.

2   Q.   Was Mr. Diaz listed as a tenant on any subsequent lease

3   renewal forms for this apartment?

4   A.   After this, no.

5          MS. TARLOW:   Ms. Dunbar, please publish Government

6   Exhibit 19.

7   Q.   Mr. Rios, what is this document?

8   A.   This is a form that we use called apartment vacancy report.

9   Q.   And what apartment is listed as having been vacated?

10  A.   5A, as in apple.

11  Q.   And what is the address of that apartment?

12  A.   52 Arden Street.

13  Q.   And what date is that apartment listed as having been

14  vacated?

15  A.   It's listed as having been vacated December 31st, 2014.

16  Q.   Who is listed as having vacated the apartment?

17  A.   Gladys Rodriguez.

18  Q.   Is Mr. Diaz' name listed?

19  A.   Not on this form.

20  Q.   Does Lemle & Wolff always list all tenants on these

21  reports?

22  A.   We try to in the ordinary course.

23  Q.   Are there some circumstances where all tenants who are

24  living in the apartment may not be listed?

25  A.   If they left prior to, the tenant, they might not be

1   listed.  And in our property management system, if they're the

2   tenant of record, or if they're the first name that's there,

3   sometimes we might miss that.

4   Q.  What, if anything, does Lemle & Wolff do to confirm that an

5   apartment has been vacated?

6   A.  We do inspection and generate a report.

7   Q.  And when would a vacancy report be generated?

8   A.  As soon as we conduct an inspection.

9   Q.  Is the vacancy report only when all tenants in the

10  apartment have vacated that apartment?

11  A.  Yes.  That means we have possession of the apartment, and

12  all tenants have vacated.

13            MS. TARLOW:  One moment, your Honor.

14            THE COURT:  Okay.

15            MS. TARLOW:  Nothing further.

16            THE COURT:  Mr. Diaz, do you have any cross?

17            THE DEFENDANT:  No.  No cross of him.

18            THE COURT:  Okay.  Thank you.  You can step down.

19            It's almost 5 o'clock, so we're going to stop for the

20  day.  You get five minutes off.  We use that tomorrow and keep

21  you five minutes late.

22            So, don't discuss the case.  Have a wonderful evening.

23  Please remember to be here between 9:00 and 9:15 so we can

24  start promptly tomorrow.  Don't discuss the case and have a

25  wonderful evening.

1              (Jury not present)

2              THE COURT:  Okay.  How are we doing on time,

3   Ms. Tarlow?

4              MS. TARLOW:  Yes, your Honor.  We are proceeding as

5   expected.  We have six witnesses remaining.

6              THE COURT:  Are they going to be about the same length

7   as these?

8              MS. TARLOW:  Yes, your Honor.

9              THE COURT:  Okay.  Mr. Diaz, as of now, do you

10  anticipate a defense case?

11             THE DEFENDANT:  I am sorry, your Honor?

12             THE COURT:  As of right now, do you anticipate a

13  defense case?

14             THE DEFENDANT:  Not as of now, no, Your Honor.

15             THE COURT:  Not as of now.  So, you're not planning to

16  testify?

17             THE DEFENDANT:  I may, but that's --

18             THE COURT:  Okay.  As of right now you're saying no,

19  but you may change your mind.  Is that what you're telling me?

20             THE DEFENDANT:  Yes.  I have to examine.  This was not

21  expected.  Just as it was not expected for you, it was

22  unexpected for me.

23             THE COURT:  I can't say it was entirely unexpected for

24  me.

25             THE DEFENDANT:  For me, it was.

1          THE COURT:  I don't know why.

2          As I told you, we're going to do a charge conference

3     this evening.  You got charged last week.  I'm going to give

4     you like a ten-minute break to get your ducks in a row.  We'll

5     do the charge conference sitting at the defense table at the

6     back.  So if the government can just turn around and the

7     defense can stay where they are, and we can take down that

8     screen, that will be helpful.

9          The one issue that Mr. Diaz raised this morning -- I

10    think we probably can dispose of this evening.

11         Does the government want to be heard on Government

12    Exhibit 35?  First, I want to start with Mr. Diaz.

13         Mr. Diaz, what's your objection to 35?

14         THE DEFENDANT:  Your Honor, this is -- on the Rule

15    403, I think it's prejudicial.

16         THE COURT:  Okay.  That's all you need to say.

17         All right.  Government, what's your response?

18         MR. NESSIM:  Your Honor, we believe the probative

19    value far outweighs it's prejudicial effect.

20         THE COURT:  Tell me why.

21         MR. NESSIM:  The witness who will bring this exhibit

22    in is the manager of the New Jersey apartment building where we

23    allege that the defendant lived with his mother.  She will

24    testify that he was banned from the building.  They actually

25    took legal action against his mother initially to evict her

1    because they believed he was living there.  And they said after

2    they were sure that he was living there and took that action,

3    it went to mediation in which they agreed not to evict her in

4    return for him not living there, that he was banned from the

5    building --

6            THE COURT:  Why is it relevant that he was banned from

7    the building?  I understand the relevance of the building found

8    out that he was living there, told the mother, you got to get

9    him out of here for whatever reason.  I presume that was not

10   because he was a sex-offender, but just because he wasn't on

11   the lease.

12           MR. NESSIM:  That's right, at least initially.  And I

13   think the testimony was that he wasn't on the lease, and that

14   was the issue.

15           It's relevant for several reasons.  First, it

16   corroborates the witnesses' statements regarding seeing the

17   defendant at the building, their belief that he was living

18   there.  She's also going to testify that she saw him on

19   surveillance videos.

20           THE COURT:  I understand why the surveillance video

21   may be admissible.  It's the piece of this which I understand

22   Mr. Diaz to be objecting to -- although I'm not a hundred

23   percent sure -- is the handwritten Salvador Diaz banned from

24   building, son of apartment 307, boyfriend of apartment 822.

25   The bottom piece, I'm not --

1           Do you object to the bottom piece of it and you object

2    to the surveillance picture itself?

3           (Continued on next page)

```
1            MR. DIAZ:  No, the whole thing, the entire page.

2            THE COURT:  You object to the entire page?

3            MR. DIAZ:  The writing at the top and the bottom.

4            THE COURT:  OK.  Tell me what your objection, if

5    hypothetically, the handwriting at the top were redacted or

6    removed so that the only thing that would be in the exhibit is

7    the picture from the surveillance camera and then the

8    handwriting at the bottom that says, "Son of apartment 307,

9    boyfriend of Apartment 822," what is your objection?

10           MR. DIAZ:  Yeah, as long as the -- the handwriting on

11   the top of the page comes out, I have no objection.

12           THE COURT:  That's your objection.  So address that.

13           MR. NESSIM:   So we agree that the document is

14   relevant and it's relevant --

15           THE COURT:  I don't disagree that the document is

16   relevant.  Focus your argument on why from a 403 perspective,

17   the information at the very top is -- that it's probative value

18   outweighs its prejudicial import.

19           MR. NESSIM:  So the probative value of the text is

20   that it shows how the defendant even after he was banned

21   continued returning to the building and continued to returning

22   to the building with luggage and other things and indicated he

23   was still living there.  It helps to prove the fact he was

24   living there previously and continued to live there after the

25   fact.
```

1              THE COURT:  I understand that that piece is relevant.

2       But why isn't relevant that the building said, you cannot come

3       back in this building?

4              MR. NESSIM:  As I said, to go to the understanding of

5       the building, that he was living there, but it's also -- the

6       witness will testify that it's in the regular course of

7       business for the building when they have someone who they've

8       determined can no longer return to the building to create forms

9       like these, they've distributed with the security guards

10      they've posted in areas where the staff has access to.  So in a

11      prejudicial probative 403 balancing, I guess our argument is

12      the relevance is the fact that it's posted, the relevance is

13      the fact that he is banned.

14             THE COURT:  But why is that relevant?  It's relevant

15      the fact that he was living there.  The fact that the apartment

16      building wanted him out, why is that relevant to your charge?

17      I entirely agree that the fact that he was living there.  So

18      the fact that they have their knickers twisted about it, all

19      that's relevant.  Why is the fact that they banned him

20      relevant?

21             MR. NESSIM:  It just completes the story of that

22      understanding.  It's just further proof of their belief, they

23      just took it to the next step by banning him.

24             THE COURT:  I think in the context of this case, the

25      fact -- the language that says he was banned from the building

1   is the prejudicial import outweighs its probative value.  I'm

2   not going to let you put that in, but, again, you can work with

3   your witness.  The rest of this that they investigated and they

4   confirmed that he was living in the apartment and they found

5   out that his mom was living in 307, that his girlfriend was

6   living in 822, all of that is relevant.  It's just the ultimate

7   fact that they then banned him from the building that I'm not

8   seeing the probative value.

9           MR. NESSIM:  Your Honor, just as a factual matter the

10  witness will testify that he was told he could not live there

11  because he wasn't on the lease leave.  They told them he could

12  not return.  He continued to return and they posted these in

13  the building.  Even after this point he continued to return.

14  As a factual matter, that is the facts of how this sort of

15  developed.  The banning from the building or telling him he

16  couldn't return is sort of an integral part of that story.

17          THE COURT:  Why is it more integral than just the

18  dates?  I get that he was told he couldn't live there because

19  he was not on the lease, maybe this is on some level how you

20  phrase it.  To me testimony that says they told him you cannot

21  live in this building because you're not on the lease is

22  different from a flyer that says Salvador Diaz is banned from

23  the building.  So maybe this is a nuance.

24          MR. NESSIM:  I think the difference is just it sort of

25  started as saying you cannot live here, you're not on the

1    lease, but in the face of sort of continued violations of that

2    statement, that policy developed to the point where flyers --

3    flyers were made for employees to make that fact clear.  So we

4    do think that it has an independent probative value for that

5    fact of just the next step there.

6               THE COURT:  But, again, why can't you scratch that

7    itch by testimony that his picture was given to the security

8    guards and they were informed that Mr. Diaz did not live in the

9    building and was not supposed to be living in the building.

10              MR. NESSIM:  We would prefer to admit the exhibit in

11   full.  I think that would go most of the way, but just to be

12   clear, is your ruling -- we can redact the Salvador Diaz banned

13   from the building, but is the witness supposed to avoid using

14   terms like we banned him from entering the building?

15              THE COURT:  Yes.  Prep the witness so that the

16   discussion of banning him as opposed to the discussion that the

17   security guard -- he was informed, he's not supposed to be in

18   the building because he's not on the lease.  I take it he can

19   still visit.  Did there come a point in time when he was told

20   he could not even visit the building?

21              MR. NESSIM:  Yes.

22              THE COURT:  I'm still not sure that that makes it more

23   probative.  There's a way to get all this testimony in to show

24   he was living in the building without -- I mean, the testimony

25   that he was banned from the building obviously didn't take

1  because he was still living in the building.  So other than

2  showing that he was stubborn and didn't do what he was told to

3  do, I'm not sure how that advances your burden of proof on an

4  element.

5          MR. NESSIM:  Understood, your Honor.  We would just

6  ask for some indulgence with leading this witness through this

7  area.

8          THE COURT:  Yes.

9          Mr. Diaz, do you understand what the government is

10 saying?  Because the witness would naturally, it's a woman,

11 right if she's just naturally telling her story, she's going to

12 get to the point to say you were banned from the building they

13 distributed flyers with your name on it saying you're banned

14 from the building because I don't want that testimony, that's

15 what you've objected to, they're going to lead the witness

16 through that, so I don't want to hear an objection on the

17 grounds that the government is leading, because they're

18 permitted to lead to get through that piece of this witness

19 witness's testimony?

20         MR. DIAZ:  I don't understand.  They're not allowed to

21 lead the witness.

22         THE COURT:  They're not normally allowed to lead.  In

23 this case, this is a ruling that is beneficial to you because

24 otherwise the witness is likely to blurt out that you were

25 banned from the building.

1          MR. DIAZ:  Yeah, but why can they just tell the

2     witness not to say that.  They already had other witnesses.

3     They told them not to say certain things that are not part of

4     the witness.

5          THE COURT:  Mr. Diaz, here's the thing.  I'm going to

6     allow them to lead, if you object to them leading and they quit

7     leading and she says that you were banned from the building

8     then you get what you got.  You objected to the remedy and you

9     may end up adducing testimony that is negative for you.  So I'm

10    just telling you I will allow them to lead.  If you object,

11    then they're not going to lead and you run the risk of getting

12    out exactly the testimony that you're trying to avoid.

13         MS. KELLMAN:  May we have just one minute, Judge.

14         THE COURT:  Sure.

15         MR. DIAZ:  In that event, I ask that you would

16    instruct them to tell the witness not to blurt this out.

17         THE COURT:  Mr. Diaz, they know what my ruling is.

18    The reason that they requested to lead her through it is

19    because based on all of their prep and the fact that you were,

20    in fact, banned from the building, there's a high degree of

21    likelihood that if they don't lead the witness, that's going to

22    come out.  So you've got my ruling, I'm not going to keep

23    arguing it.  OK.

24         MR. DIAZ:  Very well.

25         THE COURT:  Anything else that we can dispense of

1    before I give you ten minutes and we start talking about the

2    charge?

3              MS. TARLOW:  No, your Honor.

4              THE COURT:  Mr. Diaz, anything else from you?

5              MR. DIAZ:  All these photos from Government Exhibit

6    50.

7              THE COURT:  Government Exhibit 50.

8              MR. DIAZ:  Through 57 through 58.  I object to those

9    on relevance.

10             THE COURT:  All right.  What are these?

11             MR. NESSIM:  We might have gotten a little photo happy

12   and mark happy with these, your Honor, but they are photos of

13   the building in New Jersey where his mother and he live.

14             THE COURT:  Is this the one that we were just talking

15   about?

16             MR. DIAZ:  Yes.

17             MR. NESSIM:  This is the same building.  So they're

18   photos of the exterior and a few parts of the interior of the

19   building and also it's on a beachside location and there are a

20   few photos of the beach which we do not plan to admit.  Of

21   these, we plan to offer only four of these and they are sort of

22   a broad exterior photo of the building, a photo of the main

23   entrance to the building and a photo of the back entrance, both

24   from the interior and the exterior.

25             THE COURT:  And why are you putting the pictures of

1     the building in?

2             MR. NESSIM:  They're relevant because the witness from

3     this building will testify as to where she sits in relation to

4     the entrance, various physical spaces in the building,

5     observing the defendant on surveillance video enter into the

6     backdoor, enter into the backdoor at times when she wasn't on

7     the job, and otherwise accurate representations of the

8     apartment building where allege he lived for many months.

9             THE COURT:  What's your objection?

10            MR. DIAZ:  I don't see the relevance.

11            THE COURT:  Well, he's just explained the relevance.

12    Were you listening to him?

13            MR. DIAZ:  Yes.

14            THE COURT:  So respond to what he said.

15            MR. DIAZ:  Well, I don't think it proves what he was

16    trying to say.

17            MS. KELLMAN:  Can we have just a moment, Judge.

18            MR. DIAZ:  Looking through the picture, I may be able

19    to accept some of it, showing pictures of the entrances, but

20    that doesn't explain all the pictures -- of the 10 year-old

21    picture.

22            THE COURT:  Here's what we're going to do.  We'll do

23    them one by one tomorrow at trial.  So the government will

24    figure out exactly what they're going to put into evidence.  If

25    you're going to object, when they offer the document and I say,

1    Mr. Diaz, any objection, that's your opportunity to object.

2            MR. DIAZ:  Understood.

3            THE COURT:  If you say no objection and I admit it,

4    then it's too late, you don't get to go back.  There are no

5    backsies.  OK?  So we'll deal with them on a one-by-one basis

6    tomorrow.

7            Anything else?

8            MS. TARLOW:  Not from the from the government, your

9    Honor.

10           THE COURT:  10 minutes, and be ready to discuss the

11   charge.

12           (Recess)

13           THE COURT:  Everybody has a copy of the charge.  So

14   who has an objection or a suggestion?  What's the first page

15   that's affecting?

16           MR. NESSIM:  Our first page is eight.

17           THE COURT:  Your first page is eight.

18           MR. NESSIM:  I'm sorry.  Page five.  Excuse me.

19           THE COURT:  Mr. Diaz, do you have anything on the

20   charge before page 5?

21           MR. DIAZ:  No, I do not, your Honor.

22           MR. NESSIM:  Page 5.  So after.

23           THE COURT:  Just what line.

24           MR. NESSIM:  Between line 8 and 9, so before the

25   presumption of innocence, we would add that a small section be

1    added about consideration of punishment, we have preferred

2    language that we might have submitted that says, "I also

3    caution you that under your oath as jurors, you cannot allow to

4    enter into your deliberations any consideration of the

5    punishment that may be imposed upon a defendant if he is

6    convicted.  The duty of imposing sentence in the event of

7    conviction rests exclusively with the Court and the issue of

8    punishment may not affect your deliberations as to whether the

9    government has proven a defendant's guilt beyond a reasonable

10   doubt."

11           THE COURT:  Mr. Diaz.

12           MR. DIAZ:  No objection.

13           THE COURT:  Well, I object.  It's about a thousand

14   words to say don't consider punishment.  I'll add a sentence

15   that will be very short that will basically say don't consider

16   punishment.

17           Next.

18           So on page 6, the bracketed material on line 23.  So

19   far no documents have been shown to anyone to refresh their

20   recollection.  I'm sort of skeptical that that's going to

21   happen.  Do you anticipate that you're going to have witnesses

22   who are going to need to be refreshed?

23           MR. NESSIM:  We don't anticipate it.

24           THE COURT:  Mr. Diaz, I'm likely to drop that, unless

25   it becomes a live issue where someone puts a document in front

1    of you somebody, that will come out for the time charge.

2            Then on page 7, so far I haven't seen any

3    stipulations.  Are there any stipulations between the parties?

4            MS. KELLMAN:  No.

5            MR. NESSIM:  There are not.

6            THE COURT:  Is that likely to change?

7            MS. KELLMAN:  No.

8            THE COURT:  Mr. Diaz.

9            MR. DIAZ:  No, your Honor.

10           MS. KELLMAN:  It's instinct.  I'm sorry.

11           THE COURT:  That will come out.  Lines 15 through 19

12   will be deleted.

13           What's your next comment from the government?

14           MR. NESSIM:  We believe that Section K summary charts

15   should be omitted.  We don't plan to offer any summary charts.

16           THE COURT:  That was my next as well.

17           Are you going to have any charts, Mr. Diaz?

18           MR. DIAZ:  Charts?

19           THE COURT:  Charts.

20           MR. DIAZ:  No.

21           THE COURT:  Charts come out.  Redactions will stay in.

22   The brackets will come out because some of the documents have

23   been admitted in redacted form.  I noticed that, and I think

24   this is probably based on the fact that you got objections very

25   late.  You put a document in today that had -- that reflected

1   Mr. Diaz's New York driver's license number that was largely

2   redacted, but it's a white redaction so it doesn't look

3   redacted.  I don't know if that was intentional, but this talks

4   about sort of blacked out.

5          MR. NESSIM:  Most of our redactions are in white to

6   limit the imprints if something was redacted.

7          THE COURT:  Some make sense.  Whether it makes sense

8   for a driver's license number, you might want to think about

9   it.  I understand why the number is redacted down to the last

10  four digits but what it looks like is a bogus number.  When I

11  looked at it, I said that can't be right, but then I realized

12  it's a redaction.

13         MR. DIAZ:  Can we redact the whole thing.

14         THE COURT:  The whole driver's license number?

15         MR. DIAZ:  Yes.

16         THE COURT:  I assume you're going to use that for

17  proof of anything, the actual driver's license number?

18         MR. NESSIM:  That particular point actually we could

19  redact the whole number.  We could do that or we can take

20  another look at our exhibits and resubmit any that have been

21  redacted in that way with black redactions to indicate

22  something has been omitted.

23         THE COURT:  Make sure Mr. Diaz sees and that there's

24  no objection to it, and otherwise put it on the record that

25  you've changed the way that you're redacting them.

1          Page 11, Mr. Diaz, as you see under Section M, as in

2    Mary, there are two separate paragraphs.

3          MR. DIAZ:  OK.

4          THE COURT:  One that will be used if you do not

5    testify and one that will be used if you do testify.

6          MR. DIAZ:  Very well.

7          THE COURT:  Immediately after section M, I'm going to

8    insert the information that was just sent to you, the paragraph

9    about the defendant representing himself.  So it will be

10   whatever the next letter is.  I don't think it's going to be M

11   because we deleted some.

12         Any objections to this language?

13         MR. DIAZ:  No, Judge.

14         THE COURT:  Obviously on the last sentence if you

15   don't testify, that will come out.

16         Next issue or objection from the government.

17         MR. NESSIM:  Page 12, line 2.

18         MR. DIAZ:  Yes, I have something on page 11.

19         THE COURT:  What do you have?

20         MR. DIAZ:  Line 24.

21         THE COURT:  Line 24, yes.

22         MR. DIAZ:  I object to that on the grounds that that's

23   not an element of the offense.

24         THE COURT:  OK.  You have preserved your objection.

25   Your objection is overruled.

1          MR. NESSIM:  Line 2, we would ask, and this sort of

2    ties into an objection we have to the third element, the charge

3    for the third element, that we omit -- we change keep sex

4    offender updated and current to update his sex offender

5    registration to conform with the language of 2250.

6          THE COURT:  Can I see 2250.  I thought it requires

7    both, updated and current.  Hold on a second.

8          Fails to register or update.

9          MR. NESSIM:  I think it's 34 U.S.C. 2913, I think.

10         THE COURT:  Picks up the current requirement.

11         MR. NESSIM:  So we have some proposals of tweaks to

12   the third element that address our concern here.

13         THE COURT:  Any objection?

14         MR. DIAZ:  The same as before on line 4 and 5 about

15   the requirement to register to travel in interstate commerce.

16         THE COURT:  Same objection?

17         MR. DIAZ:  Anything in this document that deals with

18   that, I would object.

19         THE COURT:  You got it.  So you want to change on line

20   2 to just change it to "and keep his sex registration updated"?

21         MR. NESSIM:  Or "and update his registration," that's

22   not a strong preference.

23         THE COURT:  Say that again.

24         MR. NESSIM:  We don't have a strong preference between

25   the two.  The statute is -- let me just put it -- to register

 1    or update a registration.

 2              THE COURT:  To register or update.  Right.  So he

 3    knowingly failed to register or knowingly failed to keep his

 4    sex offender registration updated.

 5              MR. NESSIM:  Yes.

 6              THE COURT:  So I'll delete, "and current."

 7              Do you understand that, Mr. Diaz?

 8              MR. DIAZ:  I'm sorry?

 9              THE COURT:  So on line 2, page 12, I'm going to

10    delete, "and current."

11              MR. DIAZ:  Very well.  Yes, I do.

12              THE COURT:  OK.  Next is the objection to on line 4,

13    that he traveled in interstate commerce.  That objection is

14    overruled.

15              Next.

16              MS. KELLMAN:  Line 4 and 5.

17              THE COURT:  Yes.

18              MR. NESSIM:  Next is at the end of the second element

19    at line 7.

20              THE COURT:  On page.

21              MR. NESSIM:  On page 13, excuse me, we would ask a

22    line be added that the government is not required to prove that

23    he traveled in interstate commerce with the intent to evade

24    registration requirements.

25              THE COURT:  So I try not to charge what doesn't have

1    to be proven and try, instead to focus on what does have to be

2    proven.  So what would you like, tell me again where you want

3    this.

4         MR. NESSIM:  At the end of interstate commerce, our

5    concern is that because it's being charged as no consecutive

6    series of steps that the jury might be under the false

7    impression that they need to find the interstate commerce was

8    for the purpose of the third element, which is to not register.

9    So we just want to make clear to the jury that it's the facts

10   travel in interstate, there's no intent required for that

11   travel.

12        THE COURT:  Overruled.

13        Did you have something before then?

14        MR. DIAZ:  Well, I'm a little confused then.  Now he's

15   saying there's no requirement to travel.

16        THE COURT:  No, no, first off, I'm not adding what he

17   wants.  What he wanted was the travel doesn't have to be with

18   an intent to evade requirements.  That is a correct statement

19   of the law but I'm not adding it.  It's not necessary.

20        MR. DIAZ:  But do I object, again, to line 19 and the

21   whole --

22        THE COURT:  You object to the entirety of element two?

23        MR. DIAZ:  Element two.

24        THE COURT:  Your objection is overruled.

25        MR. DIAZ:  No one out of three?

1           THE COURT:  No one out of three.

2           MR. NESSIM:  Our next objection is to element three

3   starting on line 8.  We proposed some small modifications which

4   might be easier to see in this tracked changes document, and it

5   reflects the update and keep current language and it also seeks

6   the additional of the three-daytime to register and the failure

7   to register as well as the failure to update.

8           THE COURT:  But your change at the top doesn't make

9   any sense because there are two separate requirements, there's

10  a registration requirement and there's a keep current.  So to

11  me when you start talking about change in the failure to

12  register, it starts to become very confusing.  I sort of went

13  around and around on this in the drafting of how to make it

14  clean.

15          So he had a duty to register in New Jersey.  If the

16  jury finds that he moved to New Jersey, he had a duty to

17  register, period, end.  He never registered, that would satisfy

18  this obligation.  He separately had a duty to stay current,

19  which triggers, there's a three-day obligation there, but it

20  seems to me that putting that three-day obligation into the

21  failure to register is just to confuse things.

22          MR. NESSIM:  So I think that it is confusing and the

23  criminal enforcement provision doesn't totally square with the

24  sort of registry requirements provision in title 34.

25          So our understanding of what 2250 requires is it

1   criminalizes the failure to register or update a registration

2   as required by SORNA.

3          THE COURT:  I agree.

4          MR. NESSIM:  And we believe based on reading the

5   statutes and the provisions how they play together and the

6   attorney general guidelines under section 10, which is failure

7   to keep current and sort of explication of what that means and

8   changes of residency requirements that failure to register and

9   update within the meaning of 2250, has a distinct meaning from

10  the general registration requirements and keeping the

11  registration current as set forth in 2913.  I agree it's odd.

12         And in our reading the failure -- SORNA is implemented

13  by each jurisdiction setting up these sex offender registries.

14         THE COURT:  Correct.

15         MR. NESSIM:  Failure to register means you have an

16  obligation to register in a state which you have not had a

17  existing registration.  So you move to New Jersey, you need to

18  register there.  If he moved within New York State, you have a

19  duty to update your New York State registration.  Both of our

20  updates in our reading of 2913 fall within keeping the

21  registration current, and it's odd because current and updating

22  are synonyms generally.

23         But what subsection (c) asks for in 2913 is within

24  three business days of a change, you go to at least one

25  jurisdiction which you're required to register and inform that

1    jurisdiction of all changes required.  It doesn't specify

2    whether that's considered a new registration or an updated

3    registration.  The attorney general guidelines does seem to

4    draw the distinction between under keeping the registration

5    current to being a new registration in a state where you move

6    to anew and an updated registration in a state which your

7    registration exists but must be updated.

8         So our reading of it is the 2250 refers to whether

9    it's a new or existing registration that needs to be changed,

10   but both can fall within keeping the registration current,

11   meaning, I guess the failure to register can also fall within

12   the initial registration requirement.  It's not totally clear,

13   but we don't believe that the update in 2250 means exactly

14   current in 2913, if that makes sense.

15        THE COURT:  You don't believe that the "update" is the

16   same as "keep current"?

17        MR. NESSIM:  Right.  I think the one way that you can

18   satisfy your obligation to keep current is by filing a new

19   registration in the jurisdiction in which you did not

20   previously have reporting obligation.

21        THE COURT:  Right.

22        MR. NESSIM:  So the update in 2250 refers to a variety

23   of keeping current in which your obligation is just to update

24   your registration with the state.

25        THE COURT:  Right, but whether he would have satisfied

1  his obligation if he had registered in New Jersey, he might

2  have satisfied his obligation if he's an informed New York that

3  he had moved to New Jersey, because this seems to suggest that

4  that so long as he appears in one jurisdiction involved, he

5  satisfies his obligation.

6      MR. NESSIM:  Well, I think that's modified by sub (a),

7  which is the in general, and based on *Nichols* seems to say that

8  you have a registration obligation in only the jurisdictions

9  which you reside, are employed or are a student.  So if

10  New York was not one of those jurisdictions, then he wouldn't

11  have a duty to update his registration in New York.  If, for

12  example, he moved to New Jersey but continued working in

13  New York, he would have an obligation in both places and his

14  update in New York may have satisfied (c).

15      THE COURT:  But if we're going to charge this then we

16  have to charge all of that.  That was part of what I found to

17  be is the difficulty of it is, if he was working in New York,

18  as I've now seen the evidence and there's no declared

19  employment, but the jury could find, perhaps that he was

20  working and it wasn't on the form.  So I'm not -- I guess what

21  I'm saying is I'm not entirely sure that this makes it any

22  clearer or is really going to be particularly helpful to the

23  jury.  Your latter changes, I think sort of to reside refers to

24  a place that a person calls his home, even if the person has no

25  home or fixed address.  Is there any objection to that?  Do you

1    see that in the middle of the paragraph?

2          MR. DIAZ:  Yes, no objection.

3          THE COURT:  That I think makes sense and then sentence

4    at the end, "A person may reside in more than one place and

5    must include in his registration each place where he resides,"

6    is also a correct statement of law, any objection to that?

7          MR. DIAZ:  No, no objection.

8          MS. KELLMAN:  And I when I asked Mr. Santiago to work

9    on this, I wasn't aware that he was a state sex law prosecutor.

10         THE COURT:  There you go.

11         MR. DIAZ:  Your Honor, with respect to that, can we

12   spend some more time looking at that time and give back to you.

13         THE COURT:  No, this is the charge conference.  That's

14   why I gave you the charge before.  Admittedly, this wasn't in

15   it.

16         Any objection?

17         MR. DIAZ:  No, no objection, your Honor.

18         THE COURT:  I'm going to also add that.

19         So the only issue is whether at the very beginning of

20   that section, I add at the end of the first sentence, "Within

21   three business days of the change."  That I will not make

22   because there's no change.  I mean the sentence doesn't work

23   that way.  So under federal law, "A sex offender must register

24   in each state which he resides, is employed, and is a student

25   within three business days of the change," what does that refer

1    to?  What you really mean is any change in those things, but

2    that's exactly what the next paragraph discusses and discusses

3    it, I think more clearly.

4         MR. NESSIM:  I think the concern is there's no timing

5    requirement for a failure to register there, which I think

6    whether it's a new registration or updated recommending

7    restoration, that keeping the registration current three-day

8    language would apply to both.  So maybe it's to move up the

9    clearer language and keeping in a registration updated -- the

10   keeping the registration current requirements would map on to

11   both a new or updated registration assuming you need to make

12   one or the other.

13        THE COURT:  Agreed.

14        MR. NESSIM:  So I guess our concern is -- and maybe

15   it's not phrased properly and maybe it needs some of the

16   supporting language that's now in the section that follows --

17   but that the jury shouldn't be under the false impression that

18   if you're making a new registration you have an unlimited

19   amount to time to do that.

20        THE COURT:  Understood.  That may require a second

21   sentence to get to that.

22        And the obligation to register is within three days,

23   right, under the currency obligation, under 2913, the

24   obligation to register in the state where you live, work, or go

25   to school is before completing a sentence of imprisonment and

that's not really relevant here because that was done.  There's

no contest that he did not register upon completing it.  So the

issue is he has satisfied his initial registration requirement.

            MR. NESSIM:  Right, it would be the same sub (c), "A

sex offender shall not later than three business days after his

change."

            (Continued on next page)

```
1            THE COURT:  Your failure to register, you're not

2    proving a failure to register.  This case is not about a

3    failure register.  It's bout a failure to update.  You've just

4    proved he registered.  He did his initial registration.  I

5    mean, if anything, the failure to register should be this:  He

6    was required to initially register before pleading his sentence

7    -- which the government has just proved to a fairly well that

8    he did.

9            THE DEFENDANT:  And kept it up later while I lived in

10   New York.

11           THE COURT:  You don't get brownie points for that.

12   Because then you quit --

13           THE DEFENDANT:  But I wasn't living there anymore.

14           THE COURT:  Go ahead.

15           MR. NESSIM:  So, 2250 requires failure to register,

16   failure to update registration, which unfortunately doesn't

17   square perfectly with keeping current.  But we are charging a

18   failure to register, because it's a failure to register in the

19   new jurisdiction.  Failure to register in New Jersey, that's a

20   sub --

21           THE COURT:  But that's really the same thing as the

22   failure to update his registration, right?  Because that update

23   is due -- whether it was due -- you're saying he didn't

24   register in New Jersey.  He also didn't update his registration

25   by registering in New Jersey.
```

1           MR. NESSIM:  So, I think the question is trying to

2     talk about a national sex-offender registration, or does it

3     require registration in each jurisdiction?  So, there's a way

4     of thinking about registering as if each new jurisdiction is a

5     new registration.  And while you are keeping your registration

6     current within the meaning of 2250 -- and the attorney general

7     guidelines, which I'm trying to pull up, under keeping the

8     registration current, in effect, registering a new -- it's not

9     initial registration; it's registration current.  And, it is

10    confusing.  Keeping the registration current -- I'm reading

11    this from my phone if that's okay.

12          THE COURT:  Uh-huh.

13          MR. NESSIM:  The change of residence section, there's

14    a section, sub (a).

15          THE COURT:  What regulation is this?

16          MR. NESSIM:  So, this is the national --

17          THE COURT:  CFR what?

18          MR. NESSIM:  It's the smart guidelines --

19          THE COURT:  The smart guidelines?

20          MR. NESSIM:  Yes.  National Guideline for Sex-offender

21    Registration.  I have the cite back in my office.  But I will

22    inform the Court and parties as soon as I'm back there.

23          But it discusses some of these terms.  And under Roman

24    numeral V, keeping the registration current, there's a section

25    on changes of name, residence, employment or school attendance.

1    And if you go to that section -- we're happy to put this in a

2    letter if that would be better.

3            THE COURT:  Well, go ahead.

4            MR. NESSIM:  Okay.  So, on page 49, keeping the

5    registration current section begins, and it states that under

6    residence jurisdiction or changes of name, residence,

7    employment or school attendance, "Each jurisdiction must

8    require a sex-offender who enters the jurisdiction to reside or

9    who is registered in the jurisdiction as a resident and changes

10   his or her name or place of residence within the jurisdiction

11   to appear in person to register or update the registration

12   within three the business days.  Also, each jurisdiction in

13   which a sex-offender is registered must" -- and then it lays

14   out other requirements.

15           So, the attorney general guidelines, which sort of

16   delegates the interpretation process too, seems to draw this

17   distinction between the same, keeping registration current,

18   changing residence, sex-offender moving to a new state is

19   registering.  A sex-offender who is in his existing state is

20   updating.

21           THE COURT:  Except you're charging him with failing to

22   update based on the fact that he did not register in New

23   Jersey, right?  That's the theory of your case.

24           MR. NESSIM:  I think the theory of our case is we're

25   charging him with failure to register by not updating in New

 1    Jersey.

 2              THE COURT:  Correct.  That's what I just said.

 3              MR. NESSIM:  Well, but failing to register, not to

 4    update.  It's the failure to register promptly --

 5              THE COURT:  So, you don't want the failure to update?

 6              The problem is, as a factual matter in this case, it's

 7    the same thing.  My law clerk and I have discussed this ad

 8    nauseam.  Right?  In your particular fact scenario, it's really

 9    the same thing.

10              Now, you are right that the statute says both.  And

11    so, I can charge both.  But, I'm not sure what you're getting

12    out of this.  But, okay.  Here is what I will do.  I understand

13    your point.  I'm going to add a sentence after -- it will be on

14    my version of the charge, Mr. Diaz, the version with numbered

15    lines.  It will be after line 13, on page 13.  I'm going to add

16    a sentence that says that:  If the state of residence,

17    employment or education changes, the sex-offender has three

18    days to register in the new location.

19              No objection to that, correct?

20              THE DEFENDANT:  No objection.

21              THE COURT:  Okay.  That scratches that itch.  All

22    right.  Again, I have a feeling that we're going to end up with

23    notes from the jury on this, but I can't say that what we've

24    got here is not right.  I think it is right.  It is a

25    metaphysical difference in this case, at best.

1              Okay.  Any objection to the red changes, Mr. Diaz, in

2      the failure to update section?

3              Actually, what I would like to say is:  Federal law

4      also requires a sex-offender to promptly update his

5      registration.  Three days strikes me as promptly.

6              Any objection?

7              THE DEFENDANT:  But isn't it more accurate just to say

8      "three days."  Promptly, they may indicate one day or two days.

9              THE COURT:  Well, that's the next sentence.  So,

10     promptly would mean:  This means that the sex-offender must

11     report any change of name, residence, etc., within three

12     business days of the change.

13             MR. NESSIM:  No objection to "promptly."

14             THE COURT:  Okay.  What's the next?

15             MR. NESSIM:  On the omission of the current language

16     that exists --

17             THE COURT:  Yes.

18             MR. NESSIM:  -- we'd like to admit that to better

19     conform to 2250.

20             THE COURT:  Right.  So, I'm accepting your proposal.

21             What's the government's next change?

22             MR. NESSIM:  Page 14, at line 16.  We'd like to add,

23     "Ignorance of the law is not a defense."

24             THE COURT:  A, you've proven fairly well that he's

25     aware of the law.  So, it's not necessary.  And he's not

1    defending --

2            Mr. Diaz, is your defense going to be you were unaware

3    that you were supposed to be registered?

4            THE DEFENDANT:  No.

5            THE COURT:  I didn't think so.  If he changes his

6    defense, I'll consider it.  But that's not his defense.

7            His defense is that he's in the army and he was in the

8    navy.

9            THE DEFENDANT:  Well, you know part of my defense is

10   that -- I put in the motion, but you threw it out.  Is there is

11   no venue --

12           THE COURT:  We're about to get to venue.

13           THE DEFENDANT:  Yeah.  Well, I see that.  But there is

14   no venue in this district, and interstate travel is not part of

15   the elements for a federal offender.  It's corroborated by

16   every case.

17           THE COURT:  Well, not every case.  But I understand

18   your argument.  I have rejected that argument.

19           THE DEFENDANT:  I just wanted to throw it in.  Maybe

20   you change your mind.

21           THE COURT:  Not likely.

22           MR. NESSIM:  Very briefly.

23           He is suggesting cross, you know, things like -- this

24   isn't a federal form, sort of suggesting that it might be what

25   state requires, but not the federal one, to the extent that

1    that continues or becomes a more sizable defense, we think it's

2    appropriate under those circumstances as well.

3           THE COURT:  All right.  Well, you can reraise the

4    issue after the other case is in.  First of all, I think all of

5    those are, for the most part -- the question wasn't

6    well-phrased, so the objection was sustained.  I think he did

7    get in that these were state forms, and they are indeed state

8    forms.

9           Okay.  Venue.  The reason that venue is in brackets,

10   Mr. Diaz, is that I always raise this with the defendant and

11   give them the opportunity to say that they do not want the jury

12   charged on venue.  And the reason I do that is venue only has

13   to be proven by a preponderance of the evidence, which is a

14   lower standard of proof.  So, some defense attorneys don't

15   particularly want the jury to be charged on what is a lower

16   standard of proof out of concern that the jury may get confused

17   and actually apply that lower standard of proof to the entire

18   case.  But it's entirely up to you.  If you want venue charged,

19   and given the fact that your defense that I'm not letting you

20   raise is in part based on venue, I assume you do want it.  But

21   it's up to you.

22          You want me to charge the jury on venue or not?

23          THE DEFENDANT:  Yes, your Honor.

24          THE COURT:  Okay.  So, venue will stay in.

25          THE DEFENDANT:  I mean, I think that you should

1   address the difference between preponderance of the evidence

2   and reasonable doubt.

3            THE COURT:  You've got the charge.  This is how I

4   stress it.  You've read it.  It's a paragraph -- or it's not a

5   paragraph.  But I say that it's a different standard.  I tell

6   them what the preponderance standard is.

7            THE DEFENDANT:  You might have to tell me sometimes.

8            THE COURT:  Well, read it.  You can read.  It's on

9   page 15.  I'll read it.

10           THE COURT:  Anything else from the government?

11           MR. NESSIM:  One more thing.

12           At line 13, after variance --

13           THE COURT:  What page?

14           MR. NESSIM:  On page 15.  Sorry.

15           We would ask that we add in the section regarding

16  statements of the defendant.  We're introducing statements he

17  made post-arrest.  Sort of, you're not to consider entertaining

18  these statements whether or not you approve of them.  we have

19  proposed language, which I'm happy to read or submit.

20           THE COURT:  Okay.

21           MR. NESSIM:  And the last few bullet points are more

22  accurate depending on the arguments raised by defense.

23           THE COURT:  Yeah.  I don't see any of those being real

24  issues in this case.

25           THE DEFENDANT:  It's just vague.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1              THE COURT:  Okay.  So, Mr. Diaz, the proposal is to

2    charge the jury -- this is the government's proposal, "There

3    has been evidence that the defendant made certain statements."

4              THE DEFENDANT:  Okay.

5              THE COURT:  Do you have any objection to that?

6              THE DEFENDANT:  No, I do not.

7              THE COURT:  All right.  Then it says, "Evidence of

8    these statements was properly admitted in this case and may be

9    properly considered by you."

10             That's really just a restatement of the fact that I

11   allowed the statements in.

12             THE DEFENDANT:  Right.

13             THE COURT:  So, you don't have an objection to that

14   sentence, do you?

15             THE DEFENDANT:  No.

16             THE COURT:  Next sentence, "You are to give the

17   evidence of such statements such weight as you feel it deserves

18   in light of all of the evidence."

19             That basically says:  Take it for what it's worth.

20             Any objection to that?

21             THE DEFENDANT:  Now, that's what I have a little bit

22   of trouble with because it seems like it's unnecessary to begin

23   with.

24             Well, no.  I find that correct because it says, "In

25   light of evidence."  But over here, then --

```
1              THE COURT:  We haven't gotten there yet.

2              Do you have any objection to that sentence?

3              THE DEFENDANT:  No.  No objection.

4              THE COURT:  Okay.  Then the next sentence --

5              THE DEFENDANT:  Wait.  I'm sorry.  Maybe it's

6   properly.  I have some objection to the way that -- so, I don't

7   think it's properly admitted.

8              THE COURT:  Well, you didn't even move to suppress

9   your statements.  There was no motion to suppress in this case.

10             THE DEFENDANT:  I did.

11             THE COURT:  No.  There was no motion to suppress.  I

12  mean, I presume you were Mirandized.  Were you --

13             THE DEFENDANT:  Well, no.  No.  You're right?

14             THE COURT:  Is the evidence that he was Mirandized?

15             MS. KELLMAN:  Yes.

16             MR. NESSIM:  Yes, your Honor.

17             THE DEFENDANT:  No the issue was -- the evidence was

18  suppressed.  Part of the --

19             THE COURT:  That's a different problem.

20             Okay.  So, frankly, I guess I'm not sure why anything

21  more than evidence of these statements was properly admitted in

22  this case and may be --

23             THE DEFENDANT:  Considered.

24             THE COURT:  And may be considered by you.  Why do we

25  need anything more than that?
```

 1                 MR. NESSIM:  Yeah, that's fine.

 2                 THE COURT:  So, we'll just stop it there.

 3                 So, the charge will be:  There has been evidence that

 4       the defendant made certain statements.  Evidence of these

 5       statements was properly admitted in this case and may be

 6       considered by you.

 7                 MS. KELLMAN:  That's good.

 8                 THE COURT:  And I'll put that -- you want that after

 9       variance?  Is that where you're proposing?

10                 MR. NESSIM:  It's our proposal.  But we --

11                 THE COURT:  That's fine.  Okay.  Anything further?

12       Any more additions?

13                 MR. NESSIM:  Not from us.

14                 THE COURT:  How about you, Mr. Diaz?  Any other

15       objections or proposals?

16                 THE DEFENDANT:  Well, I'm still back on this part

17       about the language in there.

18                 THE COURT:  "In there" doesn't mean anything.  You

19       have to give me a page and a line.

20                 THE DEFENDANT:  Well, I'm sorry.

21                 THE COURT:  What page?

22                 THE DEFENDANT:  Page 15, paragraph line 5.

23                 THE COURT:  Yes.  This is the trial one.

24                 THE DEFENDANT:  Right.  Because now it's saying that

25       travel interstate began or continued in the southern district

1    of New York?

2              THE COURT:  Correct.

3              THE DEFENDANT:  And, again, that's that's going back

4    to the law, is that --

5              THE COURT:  You don't think that's a correct statement

6    of the law?

7              THE DEFENDANT:  No.  Because there was nothing illegal

8    about leaving New York.

9              THE COURT:  About leaving New York?

10             THE DEFENDANT:  Correct.

11             THE COURT:  That is correct.  There was nothing

12   illegal about leaving New York.

13             JUROR:  So, how can they claim that my travel began in

14   New York and -- within the context of venue, where is the

15   evidence in that, that I did anything illegal in New York,

16   which I didn't?

17             THE COURT:  Well, in this particular case, what I'm

18   charging the jury is that if your interstate commerce, that is

19   your interstate movement, began, ended or traveled through this

20   state, this district, then venue in this district is proper.

21   That's my ruling.

22             THE DEFENDANT:  Okay.  I understand.

23             THE COURT:  Okay.

24             MR. NESSIM:  Your Honor, I said there was nothing

25   further, and there isn't.  But just to flag for the record that

1   in response to defense arguments for evidence, we might request

2   ultimately to add charges on particular investigative

3   techniques not being required, the preparation of witnesses

4   being a normal part of litigation, how to call witnesses, being

5   equally available to both sides, and how to weigh character

6   evidence.

7              THE COURT:  Okay.  And if the case takes that sort of

8   a turn, we'll discuss that before the --

9              THE DEFENDANT:  Well, your Honor.

10             THE COURT:  -- before the charge is final, final,

11  final.

12             Yes.

13             THE DEFENDANT:  Back on that.  I do find -- back on

14  line five of page of 15 -- well, line six -- I do object to the

15  fact that it says that the interstate commerce began, continued

16  or -- because as I said, I don't believe that that is the law.

17             THE COURT:  Okay.

18             THE DEFENDANT:  So, I do object to that.

19             THE COURT:  You've already objected, and I've already

20  overruled your objection.

21             THE DEFENDANT:  All right.  Very well.

22             THE COURT:  So, on line 18, I've bracketed off -- the

23  exhibits are going to be loaded onto a laptop.  You have so few

24  documents.  Is there any reason why we can't give them to them

25  in a binder?  Jurors have trouble finding the exhibits on a

1     laptop.

2              MR. NESSIM:  We can give them a binder.

3              Any objection to that in the way of proceeding,

4     Mr. Diaz?

5              THE DEFENDANT:  No.

6              THE COURT:  What that's going to mean is, the

7     government probably -- if you can get it to him, sort of

8     tomorrow or before lunch -- is going to give you the binder

9     that will be given to the jury and is going to go back into the

10    jury room with the jury.  You need to look through the binder

11    of documents carefully.  Make sure everything that they've got

12    in there has actually been admitted into evidence and that the

13    redactions that have been discussed are, in fact, made on the

14    documents that are in the binder, because that's what the jury

15    is going to have.  Okay?

16             THE DEFENDANT:  Very well.

17             THE COURT:  Okay.  So, we'll just change that to say

18    we're just sending the old-fashioned way.

19             Anything else from the government?

20             MR. NESSIM:  No.

21             THE COURT:  Anything else from the defense, Mr. Diaz?

22             THE DEFENDANT:  No, Your Honor.

23             THE COURT:  Okay.  That's it.  We'll get you another

24    version either tonight or first thing in the morning.  But it

25    will be red-lined against this version, so you'll be able to

1     see the changes that are made.

2              Do you think we're going to finish by lunch?

3              MR. NESSIM:  I think if we don't, it will be

4     immediately after lunch.  There's a good chance we'll finish by

5     lunch.

6              THE COURT:  Okay.  I'll ask you again tomorrow, but

7     assuming you testify, do you have a sense of how long your

8     testimony is going to be?

9              THE DEFENDANT:  No more than an hour or two, maybe.

10             THE COURT:  An hour is a very long time.  I can't

11    imagine you're going to talk for an hour.

12             THE DEFENDANT:  Not the way I talk.

13             THE COURT:  I know you talk slowly, but still.

14             THE DEFENDANT:  I can't guess at this because I have

15    no experience.

16             THE COURT:  Okay.  Except that, if you're going to

17    testify, Mr. Diaz, you really need to sort of rough out what

18    you're going to say.

19             THE DEFENDANT:  Yes.

20             THE COURT:  Because I'm not going to allow an

21    unstructured, unorganized, two-hour monologue in front of the

22    jury.  Okay?  And as indicated, you need to start each

23    paragraph with a topic sentence --

24             THE DEFENDANT:  Topic sentence.

25             THE COURT:  -- so that the government knows what

1    you're about to say.

2              THE DEFENDANT:  Very well.

3              THE COURT:  So, for example, you opened on you were a

4    CPO in the navy, everybody understood you to be an expert in

5    communications.  So, if you're testifying, you might say:  Now

6    I'm going to talk about my experience in the navy.  Then they

7    know that that's what you're about to talk about.  Okay?

8              THE DEFENDANT:  Very well.

9              MS. KELLMAN:  Just one minute, your Honor.

10             THE COURT:  Let me finish my thought.  Then I can give

11   you as much as time as you want.

12             So, my plan then is for everybody to -- even if

13   Mr. Diaz testifies tomorrow, I think there's a better than even

14   possibility that you can sum up tomorrow.  So, that would be my

15   goal, to have you sum up tomorrow.  Depending on what time we

16   finish, we'll either break or I'll charge him.  But my guess is

17   I'm going to charge him Wednesday morning.

18             MS. KELLMAN:  Judge Ammons has a plan for me Wednesday

19   morning at 10 o'clock.

20             THE COURT:  If all we're doing is charging the jury.

21   I don't think that will be a problem.

22             MS. KELLMAN:  One question.  In terms of

23   cross-examination, if Mr. Diaz were to testify, would the

24   government be entitled to cross-examine him about the

25   underlying sexual offense?

1          THE COURT:  Do you want to be heard on that?

2          MR. NESSIM:  Your Honor, when you said we could not

3   bring in his prior offense, we did leave the door open as to

4   whether if he misrepresents the factual circumstances of that

5   conviction, whether we could cross-examine him on that.

6          THE COURT:  Correct.

7          MR. NESSIM:  If he does do that, we might pursue that

8   line of cross.  Also if, you know, he talks about his career in

9   the navy, and how decorated it was, then we may also

10  cross-examine him on the fact that he was dishonorably

11  discharged.

12         THE COURT:  He was dishonorably discharged because of

13  this offense, right?

14         MR. NESSIM:  Right.  I think we otherwise plan to -- I

15  mean obviously abide by the order, but there are those areas I

16  think we might --

17         THE COURT:  Okay.  So, what I'm hearing the government

18  saying is that if he opens the door, they're going to want to

19  go through it.  But if his testimony doesn't relate to the

20  underlying facts of the offense are, then it's typically -- I

21  mean, I've excluded it for good reason.  I think the

22  particulars of it are more prejudicial than probative on the

23  issue of his propensity for telling the truth, which is why it

24  would come in.  But if he opens the door, I'm going to allow

25  them to walk through it.

1            All right.  See you all tomorrow.  Please be here at

2  9:15.  If anything comes up, let Joe know, so that I can come

3  up early so that we can get the jury in the box by 9:30.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                        Page

 ALISON ERNST

Direct By Mr. Nessim . . . . . . . . . . . . .48
Cross By The Defendant . . . . . . . . . . . .74
KELLY ROURKE

Direct By Ms. Tarlow . . . . . . . . . . . . .81
Cross By The Defendant . . . . . . . . . . . .86
PABLO RIOS

Direct By Ms. Tarlow . . . . . . . . . . . . .92

                   GOVERNMENT EXHIBITS

Exhibit No.                                     Received

 1   . . . . . . . . . . . . . . . . . . . .55

 2, 3, 4, 6 - 13, 62   . . . . . . . . . . . .61
 5, 27 and 28 . . . . . . . . . . . . . . . .83
 14, 15, 16, 17, 19 . . . . . . . . . . . . .94