UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                              17 CR 227 (VEC)

SALVADOR DIAZ,

         Defendant.
                                      Trial
------------------------------x

                                      New York, N.Y.
                                      February 26, 2019
                                      9:30 a.m.

Before:

                    HON. VALERIE E. CAPRONI,

                                      District Judge
                                      -and a Jury-

                         APPEARANCES

GEOFFREY S. BERMAN
    United States Attorney for the
    Southern District of New York
BY:  ELINOR TARLOW
    DANIEL NESSIM
    REBEKAH DONALESKI
    Assistant United States Attorneys

Salvador Diaz, Pro Se Defendant

SUSAN G. KELLMAN
CARLOS SANTIAGO
    Standby Attorneys for Pro Se Defendant

Also Present:  Madison Dunbar, Paralegal Specialist
              U.S. Marshal Nicholas A. Ricigliano

```
 1   J2QLDIA1
```

 2          MR. NESSIM:  Good morning, your Honor.  Daniel Nessim,

 3   Eleanor Tarlow and Rebekah Donaleski, for the government.

 4   Joining us at counsel table is a paralegal in our office,

 5   Madison Dunbar.  And soon to be at counsel table is

 6   Investigator Nicholas Ricigliano of the marshal service.

 7          THE COURT:  Good morning.

 8          THE DEFENDANT:  Good morning, your Honor.  Salvador

 9   Diaz, representing myself.

10          THE COURT:  Good morning, Mr. Diaz.

11          MS. KELLMAN:  Good morning, your Honor.  Susan Kellman

12   and Carlos Santiago.

13          THE COURT:  Good morning.  Please be seated.

14          Okay.  I sent you a revised charge last night.  I've

15   got one change to that.

16          But before I get to my change, does anybody have any

17   objections or comments?

18          MR. NESSIM:  Not from the government.

19          THE COURT:  Okay.  Mr. Diaz?

20          THE DEFENDANT:  Not from the defense, your Honor.

21          THE COURT:  Okay.  Hang on.  Let me just finish

22   logging in.

23          Okay.  I think on rereading it, I'm concerned that, as

24   it is written, that the two theories, essentially meld into

25   one.  So, what I'm proposing is the following:  On page 14 of

1    the redline version that was sent to you last night --

2             You found it, Mr. Diaz?

3             THE DEFENDANT:  They're looking.  I don't have

4    anything because I couldn't bring my computer.

5             THE COURT:  Do you have it?

6             THE DEFENDANT:  Thank you.

7             THE COURT:  Page 14.

8             You got it?

9             THE DEFENDANT:  Yes.

10            THE COURT:  Okay.  Insert on line three after the word

11   "student" --

12            You got it, Mr. Diaz?

13            THE DEFENDANT:  Yes.

14            THE COURT:  "And must do so within three business days

15   of beginning to reside, becoming employed, or becoming a

16   student in that state."  Then, delete the entire new sentence.

17            MS. KELLMAN:  Sorry.  Delete from this place down to

18   sex-offender registry?

19            THE COURT:  No.  Down to "three days of the change."

20            MS. KELLMAN:  Got it.  Okay.

21            THE COURT:  So, the first sentence will read as

22   follows:

23            Under federal law, a sex-offender must register in

24   each state in which he resides, is employed and is a student,

25   and must do so within three business days of beginning to

1   reside, becoming employed, or becoming a student in that

2   state."

3           Then the next sentence will be "to register means,"

4   etc.

5           Any objection?

6           MR. NESSIM:  No, Your Honor.

7           THE DEFENDANT:  No, Your Honor.

8           MS. KELLMAN:  I have one question.

9           Should it be "and" or "or" in the very beginning of

10  the sentence?

11          THE COURT:  It's "and."  It's conjunctive.  They have

12  to register -- so, if you live in New Jersey but work in New

13  York, you have to be registered in both places.

14          Yes, Mr. Diaz.

15          THE DEFENDANT:  The way it reads, it shouldn't be "and

16  is a student."  It should be "or is a student."

17          THE COURT:  It's "and is a student."

18          It would be unusual but you could envision a situation

19  where you reside in Connecticut, you go to school in New York,

20  and you're employed in -- there's got to be another little

21  state out there somewhere -- Massachusetts.  You'd have to

22  register in all three.

23          THE DEFENDANT:  Correct.

24          THE COURT:  Correct.  So, it's "and."  It's

25  conjunctive.  But in the second clause it's disjunctive because

1    it may not change in all three.

2              Mr. Diaz, I'm not sure that I heard from you.  Do you

3    have any objection?

4              THE DEFENDANT:  No objection.

5              THE COURT:  Any objection to the verdict form, which

6    was also sent to you last night?

7              MR. NESSIM:  No, Your Honor.

8              THE COURT:  Mr. Diaz?

9              THE DEFENDANT:  It's fine.  No objection, your Honor.

10             THE COURT:  Okay.  All right.  Anything else?  We

11   don't have a full jury yet.  But anything else that we need to

12   talk about?

13             MR. NESSIM:  Not from us.

14             THE COURT:  Mr. Diaz?

15             THE DEFENDANT:  No, Your Honor.

16             THE COURT:  Okay.  What's the story with the AV?  Is

17   it working or not working?

18             MR. NESSIM:  It's not working.  I think we've reached

19   out to AV.  Hopefully we'll get it fixed by the time the jury

20   gets here.  And we'll keep the Court updated.

21             THE COURT:  I just heard the door close, so the jury

22   might be here.

23             MR. NESSIM:  Okay.

24             THE COURT:  Is that AV?  Come on.

25             MR. NESSIM:  And then also, your Honor, we've provided

1   a copy of the exhibits that we would send back to the jury for

2   them to review.

3          THE COURT:  Okay.

4          MR. NESSIM:  And, your Honor, one more thing.

5          THE COURT:  Yes.

6          MR. NESSIM:  Just for the record, I mentioned a reg

7   last night, just for the cite of it.  I think we've moved past

8   it.  But it's 73 Federal Register 38030.

9          THE COURT:  You don't have a CFR cite?

10          MR. NESSIM:  It wasn't in CFR.  It's guidance.

11          THE COURT:  Oh, it's guidance.  So, it's not even

12   really binding.

13          MR. NESSIM:  It's the final guidelines promulgated by

14   the --

15          THE COURT:  Are they binding?  Guidelines aren't

16   usually binding.

17          MS. KELLMAN:  Well, that's just the Supreme Court's

18   view.

19          THE COURT:  It's my view.

20          MR. NESSIM:  It's the same guidelines that make

21   classes of sex-offenders retroactive, which is the issue.

22   Westlaw 2008WL, 259-4934.

23          THE COURT:  Okay.

24          MR. NESSIM:  Your Honor, there's an issue that we'd

25   like to address.

1          THE COURT:  All right.

2          MR. NESSIM:  We just learned that a witness of ours,

3   the document custodian for the Burlington County Board of

4   Elections.  We instructed him to go to a witness room on the

5   third floor of the courthouse.  It appears that he was in the

6   fourth floor lobby area here.  And he's apparently, despite

7   instructions otherwise, struck up what we understand to be a

8   brief conversation with juror number two.  According to the

9   witness, they were discussing Netflix, and it was about a

10  minute long.

11         We wanted to bring this to the Court's attention and I

12  guess inquire further.

13         THE COURT:  All right.

14         Mr. Diaz, you want to be heard?

15         THE DEFENDANT:  Well, my suggestion, your Honor, is

16  that we should come to the witness -- find out what the

17  communication was.

18         THE COURT:  Okay.  Is the witness here?

19         MR. NESSIM:  He's in the building.  We can produce

20  him.

21         THE COURT:  Can you get him up here?

22         MR. NESSIM:  Yeah.

23         THE COURT:  What's your understanding of how the

24  witness figured out that he was talking to a juror?

25         MR. NESSIM:  I think that the marshal service came and

1    saw them speaking and grabbed the witness and asked, what are

2    you doing, in effect.  So, I don't think the witness knew that

3    it was a juror.  I think he was just striking up conversation

4    with someone who was waiting.

5             THE COURT:  Is this the witness?

6             MR. NESSIM:  Yes.  This is Charles Johnson.

7             THE COURT:  Mr. Johnson, can you take the witness

8    stand.

9             THE WITNESS:  Yes, ma'am.

10            THE COURT:  Can you swear him in?

11   CHARLES FRANCIS JOHNSON,

12        called as a witness by the Court,

13        having been duly sworn, testified as follows:

14   BY THE COURT:

15   Q.  Okay.  Mr. Johnson, I understand you had an encounter with

16   someone who may be on the jury?

17   A.  Yes, ma'am.

18   Q.  Can you tell me what happened?

19   A.  We were just sitting outside talking about record stores

20   and electronic stores, CDs and things like that.

21   Q.  How did you come to start a conversation with this person?

22   A.  We were the only two sitting there.

23   Q.  Where were you sitting?

24   A.  Right outside the door on the bench.

25   Q.  Out here on the --

1   A.   Yeah.   Right outside in the hallway.   We both got here

2   early, so we were just sitting there just talking to each

3   other.   That's all.

4   Q.   Okay.   And you talked about?

5   A.   We never talked about a case.   I said, you're a juror, I'm

6   a witness, so that's all that was said.

7   Q.   When did you learn that he was a juror?

8   A.   When he was sitting next to me waiting.

9   Q.   Did you continue to chat after that?

10  A.   Just about the electronics and record stores, because I was

11  asking him what kind of electronic stores are in New York

12  because I don't know of any out here.

13  Q.   Okay.

14  A.   And that was it.   P.C. Richard and Best Buy.

15  Q.   And did he say, I'm a juror in this case?

16  A.   I had asked him if he was.

17  Q.   Uh-huh.   And he said, yes, I'm a juror?

18  A.   I believe he did, yes.

19  Q.   And you said, I'm here, I'm a witness?

20  A.   Yes, ma'am.

21  Q.   Okay.

22  A.   And that was it.

23  Q.   Okay.

24          THE COURT:   Does the government have any questions for

25  him?

1          MR. NESSIM:  No, Your Honor.

2          THE COURT:  Mr. Diaz, do you have any questions for

3   him?

4          THE DEFENDANT:  No, Your Honor.

5          THE COURT:  Okay.  Let me ask you to step back out of

6   the courtroom.

7          THE WITNESS:  Sure.

8          THE COURT:  Okay.  Do the parties want me to inquire

9   of Juror No. 2?

10          MS. KELLMAN:  Yes, please.

11          Judge, before the jury comes out, Mr. Diaz wants you

12   to ask the jurors if you spoke to any other jurors about the

13   conversation.

14          MR. NESSIM:  Your Honor, speaking on Juror No. 2, I

15   think that the report that Juror No. 2 is based on our agents

16   viewing him.  I'm not entirely sure it was Juror No. 2.  I

17   think that's our understanding.  But I'm not sure if there is a

18   way to --

19          THE COURT:  Can you bring the witness back?

20          MR. NESSIM:  Yes.

21          THE COURT:  Mr. Johnson.

22          THE WITNESS:  Yes, ma'am.

23          THE COURT:  Can you tell me more about the person you

24   were talking to, what did he look like, about how old is he?

25          THE WITNESS:  It was actually several, honestly.

1    After we were talking for a little while, a few more jurors had

2    shown up.  There was a woman -- a black woman was sitting down.

3    We were all talking about electronic stores and stuff.  They

4    actually carried on conversation about stuff because they're

5    from New York, and I'm not.

6           But he was a white male.  I don't know.  Middle aged

7    white male.  No, he was I guess a little older.

8           THE COURT:  You just described half the jury.

9           THE WITNESS:  If you want me to go -- I can point him

10   out to you.

11          THE COURT:  No.  That's okay.

12          And then other individuals joined in the conversation?

13          THE WITNESS:  Just the one woman.  There was another

14   juror -- well, I shouldn't say juror.  I don't know who they

15   were.  I didn't specify.  I didn't ask who they were.  I just

16   assumed who they were.  There was a woman sitting behind me.

17   She was reading, didn't join the conversation at all.  Like I

18   said, the other woman, they were talking -- or all three of us

19   were talking, like I said, about electronic stores and CDs.  We

20   were talking about eight tracks and VHS.

21          THE COURT:  Oldies but goodies.

22          THE WITNESS:  Yes.  I guess we're all from around that

23   time.

24          THE COURT:  Okay.  Let me ask you to step back out.

25          ^(Witness excused)

1           THE DEFENDANT:  May I?

2           THE COURT:  Yes, Mr. Diaz.

3           THE DEFENDANT:  In total, how many witnesses did he

4    talk to?

5           THE COURT:  I think what we're going to do is talk to

6    each juror, because he has no idea.

7           THE DEFENDANT:  Very well.

8           THE COURT:  Okay.

9           MS. KELLMAN:  And I would note, Judge, that there was

10   no conversation about Netflix, which was apparently reported to

11   the government.

12          THE COURT:  Well, electronics.

13          Netflix specifically?

14          MR. NESSIM:  It was second-hand reporting.

15          THE COURT:  I'm not concerned about that.  It's the

16   fact that there was a conversation between the juror and a

17   witness, and the juror was instructed not to talk to a witness.

18   And, therefore, that's my concern.

19          So, why don't we start with Juror No. 1.

20          (Juror No. 1 present)

21          THE COURT:  Have a seat right there.

22          DEPUTY CLERK:  State your name.

23          JUROR:  James Irwin.

24   BY THE COURT:

25   Q.  Mr. Irwin, did you arrive early today, by chance?

1   A.   Yes.

2   Q.   Were you waiting out in the area of the elevator lobby

3   before we started?

4   A.   Yes.

5   Q.   Did you have a conversation with a gentleman with a beard

6   and earrings?

7   A.   Yes.

8   Q.   About electronic stores?

9   A.   Yes.

10  Q.   Were you aware that he was a witness in the case?

11  A.   He mentioned that.

12  Q.   Do you remember me telling you that you can't have any

13  conversation with the witnesses?

14  A.   I didn't say anything.  I knew to stay away from that.  We

15  stayed with electronics.

16  Q.   Got it.  So, you didn't talk about the case at all?

17  A.   No.

18  Q.   Okay.  Have you talked with anybody else around you when

19  you were having a conversation with this gentleman?

20  A.   I -- I really wasn't paying attention.

21  Q.   You don't recall?

22  A.   No.

23  Q.   And did you talk to anybody else about what you talked

24  about with the witness?

25  A.   No.  Like I said, you said don't talk about anything like

1    that.

2    Q.  Okay.  So, you didn't talk about the case.

3    A.  Nothing.

4    Q.  Let me ask you to step back in the jury room.

5             (Juror excused)

6             THE COURT:  Government want to be heard?

7             MR. NESSIM:  Not at this time your Honor.

8             THE COURT:  Mr. Diaz?

9             THE DEFENDANT:  No, Your Honor.

10            MS. KELLMAN:  Maybe just a little bit, your Honor.

11            This witness said that he understood that you had

12   instructed him not to talk to anybody.  The witness then

13   identifies himself as a witness --

14            THE COURT:  Do you want to excuse Juror No. 1 and

15   replace him with alternate number one?

16            MS. KELLMAN:  Yes, your Honor.  That's what Mr. Diaz

17   wants.

18            THE COURT:  Mr. Diaz, is that what you want?

19            THE DEFENDANT:  Yes, your Honor.

20            THE COURT:  See, Mr. Diaz, this is why representing

21   yourself is a problem.  I'm being incredibly gracious in

22   allowing Ms. Kellman to talk.

23            THE DEFENDANT:  I know that, your Honor.  I appreciate

24   it.  And I'm grateful --

25            THE COURT:  What she said, right?

1           THE DEFENDANT:  Exactly.

2           THE COURT:  Does the government want to be heard?

3           MR. NESSIM:  Your Honor, this was a de minimis

4   conversation.  The witness believed that he was abiding by the

5   court's instructions --

6           THE COURT:  The juror believed.

7           MR. NESSIM:  The juror.  Excuse me.

8           The juror believed that he was abiding by the Court's

9   instructions in not discussing the case.  It was a brief casual

10  conversation.  The juror can't even recall who was there.  It

11  was in passing.  It was really -- it's a regrettable

12  conversation, but it really is de minimis, and we don't believe

13  that it warrants dismissing Juror No. 1.

14          THE COURT:  Okay.  Mr. Diaz, the government is arguing

15  that it was de minimis and doesn't warrant dismissing Juror No.

16  1.

17          MS. KELLMAN:  May I, Judge?

18          THE COURT:  No.

19          MS. KELLMAN:  Can I have a minute then?

20          THE DEFENDANT:  Your Honor, they did not follow the

21  Court's instructions.  He was strictly notified by the Court

22  not to talk to any witnesses.  No matter what subject, he was

23  not allowed to talk to the witness.  So, because of that, we

24  think he should be removed.

25          THE COURT:  Here's my view.  I agree with the

1    government that it is de minimis and that the likelihood of

2    this having an impact on anything is infinitesimal and small.

3    He had a conversation with a witness, which, in and of itself,

4    he might feel kindly to the witness, thinks he's a good guy,

5    whatever, it just introduces an element into the case that

6    there's just no need for.  So, I'm inclined to dismiss Juror

7    No. 1 and replace him with Alternate No. 1.

8                MS. KELLMAN:  Thank you, Judge.

9                THE DEFENDANT:  Thank you, your Honor.

10               THE COURT:  Does anybody see a need to voir dire

11   further the jury?  I think we have found the individual who had

12   a conversation with the witness.

13               MR. NESSIM:  No, Your Honor, we don't.

14               THE DEFENDANT:  My only concern is that he said he

15   talked to -- there were other jurors there.  Maybe we should

16   talk to those jurors.  Juror No. 2?

17               THE COURT:  Well, there's no rhyme or reason to Juror

18   No. 2.  This was Juror No. 1.  As it turns out, that was the

19   person.  I can bring the other jurors in one by one and ask

20   them whether they observed or had conversation with the guy

21   from arriving early.

22               THE DEFENDANT:  I think probably the easiest way would

23   be just to ask Juror No. 1 if there were other people involved

24   in the conversation.

25               THE COURT:  I asked him that; he said no.  He said he

1    doesn't know.  He said if other people were around, he doesn't

2    know.

3           THE DEFENDANT:  Because based on what the witness

4    said, he said initially there were only two there, and he

5    started a conversation with them.  And then the second time he

6    said that there were numerous people there and they were

7    actually talking about the tapes or the music around New York

8    City, and they brought in the conversation because of that.

9           THE COURT:  I think you're filling in a lot more than

10   the witness actually said.  He said there were other people

11   around.  But let me look.

12          He said, "After we were talking for a little while, a

13   few more jurors had shown up.  There was a woman -- a black

14   woman was sitting down.  We were all talking about electronic

15   stores."

16          THE DEFENDANT:  So, that right there, he said, we were

17   all around.

18          THE COURT:  It's not clear that anyone else knew that

19   he was a witness though.

20          THE DEFENDANT:  That's correct.  I agree with that.

21   But one of them knew.

22          THE COURT:  Okay.  So, part of the question is:  Are

23   we making a bigger deal out of what is essentially a nothing

24   issue than it's worth?

25          Do you want me to inquire further, Mr. Diaz?

1          THE DEFENDANT:  I simply wanted that juror, the third

2    juror that was in the conversation, if we can inquire of that

3    juror.

4          THE COURT:  We don't know which juror that is.  In

5    order to find that juror, we're going to have to inquire of all

6    of the jurors.

7          THE DEFENDANT:  All right.  So, can we ask Juror No. 1

8    about who it was?

9          THE COURT:  I asked Juror No. 1; he doesn't know.

10         THE DEFENDANT:  Oh.  Very well then.  Okay.

11         THE COURT:  What do you want me to do?  Do you want me

12   to inquire from the other jurors or not?

13         THE DEFENDANT:  No.  Just Juror No. 1.

14         THE COURT:  I'm going to excuse Juror No. 1.

15         Bring out Juror No. 1.  Have him bring his stuff with.

16         MR. NESSIM:  For the record, your Honor, we assume

17   this will not be a part of the defense's cross of the witness,

18   because that would taint the entire jury, to the extent there

19   is a taint to be had.

20         THE COURT:  Do you want to be heard, Mr. Diaz?  You're

21   not going to cross-examine the witness?

22         THE DEFENDANT:  No.

23         (Juror present)

24         THE COURT:  Okay.  Mr. Irwin, I am confident you

25   didn't intend to do anything wrong.  But the fact is, you had a

1   conversation with a witness, so we're going to excuse you with

2   the thanks of the Court.

3              Did you talk about the fact that you had a

4   conversation with a witness with any of the other jurors?

5              JUROR:  I don't see how the conversation -- I just

6   asked him was he a juror while I was waiting for the elevator.

7              THE COURT:  Right.

8              JUROR:  And then he said no, he was a witness.

9              THE COURT:  Right.

10             JUROR:  And so, that was that.

11             THE COURT:  I understand that.  But, Mr. Irwin, you

12  were instructed not to talk to anyone, not to witnesses, not to

13  the parties, not anyone?

14             JUROR:  But if he was a juror, I was the only one

15  there.  I was the first one there.  I didn't find the right

16  spot where the elevator was.  So, I asked him, is this the

17  area.

18             THE COURT:  Mr. Irwin, again, no one is being critical

19  of you, but because it's critical that our jurors not have

20  contact with the witnesses, we're going to excuse you.  It's no

21  reflection on you.  And you, again, have the thanks of the

22  Court.  You need to return to central.

23             JUROR:  I got to go back to the pool?

24             THE COURT:  No.  You're excused.  Your jury service is

25  complete.

1          JUROR:  Okay.

2          THE COURT:  Thank you.

3          JUROR:  You're welcome.  What can I say?  There's

4    nobody there.  How am I supposed to know where to go in?

5          THE COURT:  But he told you he was a witness.

6          JUROR:  I said, are you a juror.  And he says no, I'm

7    a witness.  But there was no place to go.

8          THE COURT:  Again, I'm not being critical.  Things

9    like this happen.  That's why we have alternate jurors.

10         JUROR:  I didn't say anything about the case.

11         THE COURT:  I understand is that.

12         JUROR:  Okay.

13         THE COURT:  Okay.  So, Alternate No. 1 will become

14   Juror No. 1.

15         DEPUTY CLERK:  Ken Okamoto.

16         THE COURT:  Okay.  Are we ready to bring out the jury

17   now?

18         THE DEFENDANT:  Yes, your Honor.

19         MR. NESSIM:  Yes, your Honor.

20         THE COURT:  Is your next witness on this floor?  You

21   can put her on the front pew.

22         (In open court; jury present)

23         THE COURT:  Good morning, everybody.

24         THE JURY:  Good morning.

25         THE COURT:  I apologize for keeping you waiting.  We

1   were working in the courtroom.  As you may know, we've excused

2   one juror.  Don't concern yourself with what happened to Juror

3   No. 1.

4           With that, call your next witness.

5           MR. NESSIM:  Government calls Sabrina Obreiter.

6   SABRINA OBREITER,

7       called as a witness by the Government,

8       having been duly sworn, testified as follows:

9   DIRECT EXAMINATION

10  BY MR. NESSIM:

11  Q.  Good morning, Ms. Obreiter?

12  A.  Good morning.

13  Q.  Where do you work?

14  A.  Oceanpointe Towers.

15  Q.  What is Oceanpointe Towers?

16  A.  Federally subsidized building for elderly and disabled.

17  Q.  What type of building is it?

18  A.  Apartment building.

19  Q.  And what does federally subsidized mean?

20  A.  Means for low-income housing.

21  Q.  How many units are there in the building?

22  A.  151.

23  Q.  What is the address of Oceanpointe Towers?

24  A.  10 Pavilion Avenue, Long Branch, New Jersey 07740.

25  Q.  What is your title at Oceanpointe Towers?

```
 1   A.  Community manager.

 2   Q.  And what are your duties and responsibilities as a

 3   community manager?

 4   A.  I maintain the building.  I do payroll.  I pay invoices

 5   out.  I do leases.  I do move-ins and move-outs.

 6   Q.  How long have you worked at the building?

 7   A.  17 years.

 8   Q.  Where, if anywhere, did you work before Oceanpointe Towers?

 9   A.  I worked at Middle Road Village in New Jersey.

10   Q.  For how long?

11   A.  Eleven years.

12   Q.  And what type of role did you have there?

13   A.  That was a subsidized housing for medium income housing.

14   Q.  Were your responsibilities similar to your current

15   responsibilities?

16   A.  Yes.

17   Q.  I'm showing you what's been marked for identification as

18   Government Exhibits 50, 53, 55, and 57.  Take a look at these

19   and let me know once you've reviewed them.

20   A.  Okay.

21   Q.  Do you recognize those documents?

22   A.  Yes.

23   Q.  Generally speaking, what are they?

24   A.  Two pictures of the front entrance of the building and two

25   pictures of the back entrance of the building.
```

1    Q.  When you say "the building," what building are you

2    referring to?

3    A.  Oceanpointe Towers.

4    Q.  Are they fair and accurate representation of Oceanpointe

5    Tours or parts of Oceanpointe Towers?

6    A.  Yes.

7              MR. NESSIM:  Your Honor, the government offers

8    Government Exhibits 50, 53, 55 and 57 into evidence.

9              THE COURT:  Any objection?

10             THE DEFENDANT:  No, Your Honor.

11             THE COURT:  All right.  50, 53, 55 and 57 are

12   received.

13             (Government's Exhibits 50, 53, 55, 57 received in

14   evidence)

15             MR. NESSIM:  Ms. Dunbar, please publish Government

16   Exhibit 57 to the jury.

17   BY MR. NESSIM:

18   Q.  Ms. Obreiter, what is this?

19   A.  The front entrance of the building.

20   Q.  So, where is the front entrance located in this photo?

21   A.  It's located where the white van is.  And the person

22   walking with the blue jacket.

23   Q.  Okay.

24             MR. NESSIM:  Ms. Dunbar, please publish Government

25   Exhibit 55 to the jury.

 1  Q.  And what is this a photo of?

 2  A.  This is the actual front entrance.

 3          THE COURT:  So, that's the ramp we saw before going

 4  right to left?

 5          THE WITNESS:  Correct.

 6          THE COURT:  Okay.

 7  BY MR. NESSIM:

 8  Q.  Where is your office located within the apartment complex?

 9  A.  It's a hard to see, but where the 52 is on the van, that

10  window starts my office.

11          THE COURT:  Where the circle is now on the screen?

12          THE WITNESS:  Correct.

13          THE COURT:  So, that's the window of your office?

14          THE WITNESS:  One of the windows of my office.

15  BY MR. NESSIM:

16  Q.  And does it continue further offscreen?

17  A.  Yes.  I have three more windows.

18  Q.  And what are your working hours?

19  A.  Unlimited.  I'm salaried.  But I come in at 8:30, leave at

20  5:00 on most days.

21  Q.  How often, if at all, do you observe residents during your

22  working hours?

23  A.  Periodically.  My desk faces one of the windows out, and I

24  do have a monitor with cameras.

25  Q.  There are surveillance cameras at Oceanpointe Towers?

1   A.  Yes.

2   Q.  How many cameras are there?

3   A.  16.

4   Q.  Generally speaking, what areas of the building do they

5   capture?

6   A.  Front entrance, back entrance, lobby, community room, game

7   room, most all the common areas on the first floor.

8   Q.  And you mentioned you have a monitor.  Where is that

9   monitor located?

10  A.  We actually have two:  One in my office and one in my

11  assistant's office.

12  Q.  And are all the surveillance videos on that monitor?

13  A.  All except for one.  One is to surveil the security guards.

14  Q.  Are you familiar with an individual named Salvador Diaz?

15  A.  Yes, I am.

16  Q.  Do you see Salvador Diaz in the courtroom today?

17  A.  Yes, I do.

18  Q.  Can you please identify an article of clothing that he is

19  wearing and where he's sitting in the courtroom?

20  A.  He's sitting last row with a gray dark jacket.

21          THE COURT:  Last row inside the well, or of the

22  courtroom.

23          THE WITNESS:  Inside the well.

24          THE COURT:  Witness has identified the defendant.

25  BY MR. NESSIM:

1    Q.  How did you first meet the defendant?

2    A.  His mom applied for housing in my building.

3    Q.  What is his mother's name?

4    A.  Gladys Rodriguez.

5    Q.  I'm showing you what's been marked for identification as

6    Government Exhibits 32, 33 and 34.  Please take a look and let

7    me know once you've had a chance to review them.

8    A.  Okay.

9    Q.  Do you recognize these documents?

10   A.  Yes, I do.

11   Q.  Are these documents part of an Oceanpointe Towers tenant

12   file?

13   A.  Yes.

14   Q.  Is it in the normal practice of Oceanpointe Towers to

15   create these records?

16   A.  Yes.

17   Q.  Is it in the regular practice of Oceanpointe Towers to

18   maintain these records?

19   A.  Yes.

20   Q.  Were these documents made at or near the time of the

21   information or events described within them?

22   A.  Yes.

23   Q.  And were they made by someone with knowledge of that

24   information, or based on information relayed from someone with

25   knowledge?

1    A.   Knowledge --

2    Q.   Knowledge about the information that's described?

3    A.   Correct.

4              MR. NESSIM:  Your Honor, the government offers

5    Government Exhibits 32, 33 and 34.

6              THE COURT:  Any objection?

7              THE DEFENDANT:  No, Your Honor.

8              THE COURT:  All right.  Government Exhibits 32, 33 and

9    34 are received.

10             (Government's Exhibits 32, 33 and 34 received in

11   evidence)

12             MR. NESSIM:  Ms. Dunbar, please publish Government

13   Exhibit 32 for the jury.

14   Q.   Ms. Obreiter, what is this?

15   A.   Application for assistance.

16   Q.   And what is an application for assistance?

17   A.   It's an application someone would feel out to apply for

18   housing at my facility.

19   Q.   Who fills out an application for assistance?

20   A.   The applicant, or someone that would assist them.

21   Q.   And what do you do once you receive an application?

22   A.   I review the application to make sure everything is

23   completed and then I sign off on it and I send the applicant a

24   notice of preliminary waitlist letter.

25   Q.   Is there a waitlist at Oceanpointe Towers?

1    A.  Yes, there is.

2    Q.  Approximately how long is the waitlist?

3    A.  Three to five years.

4           MR. NESSIM:  Ms. Dunbar, please zoom in to the top

5    half of Government Exhibit 32.

6    Q.  Whose application is this?

7    A.  Gladys Rodriguez.

8    Q.  Please read what is listed as Ms. Rodriguez's address?

9    A.  52 Arden Street, 5A; New York, NY 10040.

10          MR. NESSIM:  Ms. Dunbar, please zoom in to the bottom

11   half of this exhibit.

12   Q.  Who did Ms. Rodriguez list as alternative for emergency

13   contact?

14   A.  Margarita Rodriguez and Salvador Diaz.

15   Q.  And what are the relationships of those individuals to Ms.

16   Rodriguez?

17   A.  Margarita is the daughter and Salvador is the son.

18   Q.  What is recorded as the daughter's address -- Margarita's

19   address?

20   A.  243 Purdue Avenue; Pemberton, New York, NY 08068.

21   Q.  You said "Prudent."  Is that -- did you mean that?

22   A.  Purr due.  I'm so sorry.

23   Q.  What is recorded as Mr. Diaz's address?

24   A.  52 Arden, New York, NY 10040.

25   Q.  Thank you.

1            MR. NESSIM:  Ms. Dunbar, please publish Government

2    Exhibit 33.

3    Q.  Ms. Obreiter, what is this?

4    A.  This is an application conversation log.

5    Q.  And what is an applicant conversation log?

6    A.  We fill this out from the beginning of when they apply and

7    during that process up until they're ready to move in.

8    Q.  And which applicant does this log relate to?

9    A.  Gladys Rodriguez.

10   Q.  Who made the records in this log?

11   A.  I did.

12   Q.  How do you know?

13   A.  I initialed them.

14   Q.  When did Ms. Rodriguez apply for housing at Oceanpointe

15   Towers?

16   A.  May 12th, 2012.

17   Q.  When did she come in to process her application?

18   A.  May 16th, 2014.

19   Q.  What accounts for the approximately two-year delay?

20   A.  Waitlist.

21   Q.  Was Ms. Rodriguez eventually approved to lease at

22   Oceanpointe Towers?

23   A.  Yes.

24   Q.  Which apartment did she move into?

25   A.  She moved into apartment 307.

1   Q.  How was that particular apartment selected?

2   A.  We actually offered two units, 517 and 307, and was told

3   that they wanted 307 because it was closer to the son's

4   girlfriend's apartment.

5   Q.  Who was the son's girlfriend?

6   A.  Salvador Diaz.

7   Q.  Who is the son?

8   A.  Salvador Diaz.

9   Q.  And who was the girlfriend?

10  A.  Nina Cavalanski.

11  Q.  And was she a resident at Oceanpointe Towers?

12  A.  Yes.

13  Q.  Who made the request that the apartment be moved?

14  A.  Mr. Diaz.

15  Q.  How do you know that?

16  A.  He was in the meeting at the time when we were processing

17  the application and offering the apartment.

18  Q.  Were you in the meeting as well?

19  A.  Yes.

20  Q.  And how many bedrooms are there in apartment 307?

21  A.  One.

22  Q.  Who was on the lease of apartment 307?

23  A.  Gladys Rodriguez.

24  Q.  And was there anyone else on the lease?

25  A.  No.

1   Q.  What happened on September 23rd, 2014?

2   A.  We had the move-in process done for apartment 307.

3   Q.  And what is the move-in process?

4   A.  We do lease signing, document signing.  Usually takes about

5   an hour.

6              MR. NESSIM:  Ms. Dunbar, please publish Government

7   Exhibit 34 for the jury.

8   Q.  Ms. Obreiter, what is this?

9   A.  This is a spare key authorization for nonresidents, guests,

10  family.

11  Q.  And who fills out the information in these forms?

12  A.  The resident and the guest.

13  Q.  Which resident was seeking an additional key here?

14  A.  Salvador Diaz.

15  Q.  And to be clear, what is --

16             THE DEFENDANT:  Objection, your Honor.

17             THE COURT:  Overruled.

18  BY MR. NESSIM:

19  Q.  What is the key being sought?

20  A.  I'm sorry?

21  Q.  What is the key?  What key does this give you?

22  A.  It's a key fob.  And it actually works the front door, the

23  back door and the gates between the hours of 8:00 and 5:00.

24  Q.  Are those limitations for all of the entrance points that

25  you just described or just --

```
 1   A.  Just for guests.

 2   Q.  And so, the front door and the back door --

 3   A.  Are unlimited access.

 4   Q.  And the gate you mentioned is from?

 5   A.  Gated from 8:00 a.m. to 5:00 p.m.

 6   Q.  And what is the gate?

 7   A.  An entrance gate for cars to come in.

 8   Q.  Is there pedestrian access to the building?

 9   A.  Yes.

10   Q.  Is access through the pedestrian access limited?

11   A.  No.

12           THE COURT:  So, guests can't bring a car in after 5:00

13   o'clock or before 8:00?

14           THE WITNESS:  Correct.

15           THE COURT:  With their guest fob?

16           THE WITNESS:  Correct.

17   BY MR. NESSIM:

18   Q.  But they can get into the building any time?

19   A.  Correct.

20   Q.  Who was this key fob for?

21   A.  Salvador Diaz.

22   Q.  What is listed as Mr. Diaz's address?

23   A.  52 Arden Street, Apartment 5A; New York, NY 10040.

24   Q.  Is the form signed?

25   A.  Yes.
```

```
 1   Q.  Can you read the signature?

 2   A.  Yes, I can.

 3   Q.  Can you read it out loud?

 4   A.  Gladys Rodriguez, 10/1/2014.  Salvador Diaz, 10/1/2014.

 5   Q.  Did Mr. Diaz, in fact, obtain a key fob?

 6   A.  Yes, he did.

 7   Q.  How do you know that?

 8   A.  Because we coded it with a key fob number at the top of the

 9   form.

10   Q.  Where is that number?

11   A.  Right next to her name:  18504.

12   Q.  Do you know the date that he obtained a key fob?

13   A.  October 1st, 2014.

14   Q.  How do you know that?

15   A.  That's the date that it was signed.  And that's when we

16   released the keys.

17   Q.  After his mother moved in, did you continue to see the

18   defendant?

19   A.  Yes.

20   Q.  Approximately how often?

21   A.  Two to three times a week.

22   Q.  And where were you when you would see the defendant?

23   A.  In my office.

24   Q.  How would you see him?

25   A.  Through the windows in the front of my office where the
```

1    surveillance monitor is on my wall.

2    Q.  And is the surveillance monitor on your wall, is that live

3    feed or is that historical feed?

4    A.  It's live feed.

5    Q.  How long are those records restored for?

6    A.  Two weeks.

7    Q.  When you saw the defendant, was he ever carrying anything

8    with him?

9    A.  Suitcase.

10   Q.  He was on occasion or --

11   A.  Most of the time.

12   Q.  Did there come a time when you asked an employee to speak

13   with the defendant's mother?

14   A.  Yes, I did.

15   Q.  Why did you do that?

16   A.  I felt that someone was staying in the apartment that was

17   not on the lease.

18   Q.  And why does it matter if someone's staying in the

19   apartment who's not on the lease?

20   A.  It's a HUD subsidized building and because of that, HUD is

21   paying 70 percent of the rent.  So, whoever is on a lease is

22   legally in the unit, and anyone else is illegally in the unit.

23   And HUD does not like that.

24   Q.  What is HUD?

25   A.  HUD is Housing and Urban Development.

1   Q.  And what is that, generally speaking?

2   A.  It's a federal government subsidized program for low-income

3   housing.

4   Q.  And is there an amount of time that someone who's not on

5   the lease is allowed to be in the apartment?

6   A.  The residents have a 30-day guest pass.

7   Q.  And how is that 30 days calculated?

8   A.  Just based on, you know, two weeks here, three weeks here.

9   Just observing the lobby and the building.

10  Q.  When you say "30 days," that's 30 days out of how much

11  time?

12  A.  Oh, out of a whole year.

13  Q.  And what directions did you give your employee at this

14  time?

15  A.  I don't understand.

16  Q.  You testified a moment ago that you directed an employee to

17  reach out to Ms. Rodriguez?

18  A.  Yes.

19  Q.  What did you tell that employee?

20  A.  I asked the employee to please go up to the apartment,

21  speak with Ms. Rodriguez and ask if the son was living in the

22  apartment.

23  Q.  After your employee spoke with the defendant's mother, did

24  you continue to see him at Oceanpointe Towers?

25  A.  Yes.

1  Q.  Does Oceanpointe Towers have a recertification process?

2  A.  Yes, we do.  Once a year, we do lease renewals.

3  Q.  And how does that recertification process work?

4  A.  120 days in advance we will send a letter to the residence,

5  advising them that they need to come in during their

6  appointment and bring in their income, assets and expenses so

7  we could determine their rent again.

8  Q.  Could the rent change as a result of the recertification

9  process?

10 A.  Yes.  Absolutely.

11 Q.  And you said "120 days before."  120 days before what?

12 A.  In advance to the date of the month that they moved in.

13 Q.  You testified a few minutes ago that Ms. Rodriguez moved

14 in, in September of 2014?

15 A.  Correct.

16 Q.  When did her recertification process begin?

17 A.  May of 2015.

18 Q.  And did you meet with Ms. Rodriguez as part of the

19 recertification?

20 A.  Yes, I did.

21 Q.  Was Mr. Diaz there?

22 A.  Yes, he was.

23 Q.  What, if anything, did you tell Mr. Diaz at that meeting?

24 A.  I did explain that guests can only stay in the unit up to

25 30 days in any given year; after that, they either need to move

1    in or leave the unit.

2    Q.  And why did you tell him that?

3    A.  Because we continued to see him coming into the building.

4    Q.  And what did you believe about what he was doing in the

5    building?

6    A.  I thought he was coming in after hours when I was not there

7    and leaving before I got in in the morning to stay in the unit.

8    Q.  And what did that tell you that he was doing in the

9    building?

10   A.  He was illegally staying in the apartment.

11   Q.  You believed he was living there?

12   A.  Absolutely.

13   Q.  And what else did you tell Mr. Diaz at this meeting, if

14   anything?

15   A.  I told him that there were options, that if he wanted to

16   stay in the building, he would either have to apply and go on

17   the lease; or another option, without having to use any income,

18   he would have to become a live-in aid.

19   Q.  So, let's talk about the first option.

20          What did you tell Mr. Diaz he would need to do to get

21   on the lease?

22   A.  In order to qualify for housing, you'd have to provide

23   income, assets, expenses, five years worth of landlord

24   reference, and we do a credit check and a background check.

25   Q.  And the second option, live-in aid?

1    A.   A live-in aid, we do not ask for any kind of income, assets

2    or expenses.   The only thing we require is a landlord reference

3    for five years and a background check.

4    Q.   And what happened next?   How did Mr. Diaz respond to that?

5    A.   He wanted to wait.   He was a little surprised that he had

6    to do all that in order to get on a lease.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  Do you remember anything else about his reaction?

2    A.  I don't believe that he wanted to get involved at that

3    level with a credit, background, and landlord reference.

4              MR. DIAZ:  Judge --

5              THE COURT:  I'm sorry.  You're objecting?

6              MR. DIAZ:  Yes, your Honor.

7              THE COURT:  Sustained.

8              Rephrase the question.

9    BY MR. NESSIM:

10   Q.  What do you remember about the defendant's reaction to

11   those options?

12   A.  He did not want to continue --

13             THE COURT:  What did he say, as best as you recall?

14   A.  As best I recall, he asked why we had to do a background

15   check.

16   Q.  Did he go forward with either of options that you presented

17   to him?

18   A.  No, he did not.

19             THE COURT:  Did he deny that he was living in the

20   apartment?

21             THE WITNESS:  Yes, he did.

22   Q.  After that conversation, did you continue to see the

23   defendant at Oceanpointe Towers?

24   A.  Yes, I did.

25   Q.  Approximately how often?

1    A.  Two to three times a week.

2    Q.  Did there come a time when the defendant was captured on

3    surveillance footage at Oceanpointe Towers?

4    A.  Yes, there was.

5    Q.  What did the surveillance footage show?

6    A.  It showed him coming into the building after hours carrying

7    suitcases.

8    Q.  When you say "after hours," what do you mean by that?

9    A.  After my hour, which would be after 5:00.

10   Q.  And where was he located in this video?

11   A.  In the back entrance of the building.

12          MR. NESSIM:  Ms. Dunbar, can we please publish

13   Government Exhibits 50 and 53 side by side.

14   Q.  What are these photos?

15   A.  The one to the left is the outside view of the back

16   entrance of our building.  The one to the right is the inside

17   view looking out to the back entrance of the building.

18   Q.  Using these photos, can you describe where you observed the

19   defendant in a surveillance footage?

20   A.  To the right photo I observed him in a vestibule in between

21   both doors, coming in from the outside.

22   Q.  How did you find the defendant on the footage?

23   A.  We were researching an incident that occurred at the back

24   entrance and came across his photo at that time.

25   Q.  I'm sorry, just to back up.  On the right photo you said

1   between the two doors?

2   A.  Correct.

3   Q.  So sort of --

4   A.  We call that a vestibule.

5   Q.  And did you review the footage of other days?

6   A.  Yes, we did.

7   Q.  What did you find, if anything?

8   A.  We would see him coming in after hours.

9   Q.  And this happened after you had had the conversation with

10  the defendant and his mother about the formal options of

11  getting on the lease?

12  A.  Yes.

13  Q.  Did you contact an attorney after seeing the defendant

14  continuing to enter the building?

15  A.  Yes, we did.

16  Q.  Did the building take formal action against defendant's

17  mother?

18  A.  Yes, we sent out a notice to cease to the resident.

19  Q.  What is a notice to cease?

20  A.  A notice to cease is a very severe warning notice giving

21  you ten days to stop what you are doing.

22  Q.  And why did you send the notice to cease?

23  A.  Because we wanted to advise her that he could not stay in

24  the building.

25  Q.  And did you take any other formal action?

1   A.  Yes, when we noticed that things were not improving, we

2   sent a notice to quit, which is a final notice, you have to

3   stop.

4   Q.  Did you ultimately evict Ms. Rodriguez?

5   A.  No, we did not.

6   Q.  Why not?

7   A.  Because we went into mediation through the courts and we

8   were told that he would no longer be in the building.

9   Q.  After the building decided not to evict Ms. Rodriguez, was

10  Mr. Diaz permitted to come back to Oceanpointe Towers?

11          MR. DIAZ:  Object, your Honor.

12          THE WITNESS:  No, he was not.

13          THE COURT:  Overruled.

14  Q.  Did Mr. Diaz ever return to the building after that point?

15  A.  Yes, he did.

16  Q.  How do you know that?

17  A.  Because we continued to review the surveillance cameras.

18          MR. NESSIM:  Ms. Dunbar, can we take down the screens

19  for the jury and just show for the witness, the Court, and

20  defense counsel, Government Exhibit 35.

21  Q.  Before we turn to this, Ms. Obreiter, you testified that

22  you saw the defendant on surveillance footage coming in after

23  hours.  Did you also ever see him coming in after hours -- did

24  you ever see him leaving in the mornings?

25  A.  Yes, we would see him leaving prior to us coming into work

1   on the surveillance cameras.

2   Q.  And what time would that be?

3   A.  6 a.m., 7 a.m.

4   Q.  And at that time you observed him doing what exactly?

5   A.  Leaving the building.

6   Q.  I've shown you a document that's been marked for

7   identification as Government Exhibit 35.  Do you see the

8   document before you?

9   A.  Yes.

10  Q.  Are documents like these made in the ordinary course of

11  business at Oceanpointe Towers?

12  A.  Yes.

13  Q.  Do you distribute these documents to security guards so

14  they know who is and who is not permitted to come into the

15  building?

16  A.  Yes, we do.

17  Q.  Was it the regular practice of Oceanpointe Towers to make

18  these records when someone is not permitted to come into the

19  building?

20  A.  Yes, it is.

21  Q.  Was the record made by someone with personal knowledge of

22  the information that's included in the document?

23  A.  Yes, yes, it was.

24          MR. NESSIM:  Your Honor, at this time the government

25  offers Government Exhibit 35.

1                    THE COURT:  Any objection to 35?

2                    MS. KELLMAN:  Can we have just a minute, Judge?

3                    MR. DIAZ:  No objection.

4                    THE COURT:  35 is received.

5                    (Government Exhibit 35 received in evidence)

6                    MR. NESSIM:  Ms. Dunbar, please publish Government

7       Exhibit 35 for the jury.

8       BY MR. NESSIM:

9       Q.  Ms. Obreiter, do you distribute this flyer to security

10      guards in the building?

11      A.  Yes, I did.

12      Q.  Why did you do that?

13      A.  Because this person was not permitted in our building.

14      Q.  Is this photograph from the building surveillance footage?

15      A.  Yes, it was.

16      Q.  Directing your attention to the photograph, what, if

17      anything, does it appear the defendant is carrying?

18      A.  It looks like he's carrying a suit hook and suitcase on his

19      back, backpack suitcase.

20      Q.  And I should have asked this before.  Do you recognize that

21      individual?

22      A.  Yes, I do.

23      Q.  Who is that?

24      A.  Salvador Diaz.

25                    MR. NESSIM:  No further questions.

 1          THE COURT:  Mr. Diaz.

 2   CROSS-EXAMINATION

 3   BY MR. DIAZ:

 4   Q.  Good morning, Ms. Obreiter.

 5   A.  Good morning.

 6   Q.  Obviously we've met before, have we not?

 7   A.  Yes, we have.

 8   Q.  All right.  You said that my mother moved into the

 9   towers --

10   A.  Yes.

11   Q.  -- November 1, November 1, 2014; is that correct?

12   A.  I don't believe that is the correct date that she moved in.

13   Q.  I'm sorry, September.

14   A.  September 23, 2014.

15   Q.  And you said that you saw me coming into her apartment

16   about two, three times a week?

17   A.  Yes.

18   Q.  Can you specify which, more or less what time of the year

19   that was in, was it all the time?

20   A.  Pretty regularly.

21   Q.  And at what time did you tell me that I was doing something

22   illegal?

23   A.  When we started the recertification process.

24   Q.  Which was when?

25   A.  Which was in 2015, May.

1    Q.  In May 2015.

2           The video that you showed here in video No. 35, what

3    is the date on that?

4    A.  I'm sorry, I think --

5    Q.  Exhibit 35.

6           MS. KELLMAN:  Your Honor, can we get that up on the

7    screen?

8           THE WITNESS:  Don't think I have 35.

9           THE COURT:  Can you put it on the screen.

10   Q.  It showed me entering the building?

11   A.  I'm so sorry.  They didn't give me that copy.

12          THE COURT:  It's on the screen.

13   A.  Yes.

14   Q.  What is the date on there?

15   A.  The date we printed that off was September 11, 2017.

16   Q.  So you waited from 2015 -- you waited more than two years

17   to take evidence of someone that was living in the building

18   illegally?

19   A.  Just the photograph.

20   Q.  Well, you mentioned that you had access to the video

21   before, did you not?

22   A.  Yes, you had access to it.

23   Q.  And you saw me coming in and going several times, two,

24   three times a week?

25   A.  Correct.

1   Q.   Continuously from 2015 -- from 2014, when my mother moved

2   in until 2017?

3   A.   Correct.

4   Q.   And this is the first time you had one picture of evidence

5   that I'm entering the building or leaving the building?

6   A.   Yes, we verbally told the guards that you are not permitted

7   in the building.

8   Q.   Look at the picture.  Am I entering or leaving the

9   building?

10  A.   You are leaving the building.

11  Q.   I am leaving the building?

12  A.   Yes.

13  Q.   It looks to me that that's entering the building because

14  you can see the door outside.  This picture has been redacted.

15  If you look at the picture on the left side my figure, that's

16  the entrance lobby?

17          MR. NESSIM:  Objection.  The defendant is testifying.

18          THE COURT:  You have to phrase that as a question,

19  isn't it true that --

20  Q.   Does it appear to you --

21          THE COURT:  Go ahead.

22  Q.   Isn't it true that the lobby on the left side of my figure

23  shows that that's where the entrance is?

24  A.   The picture actually shows behind your head is my office

25  door which is inside the lobby.  The camera is located against

1    the wall facing the entrance door.

2    Q.  And you stated your working hours are from 8:30?

3    A.  My working hours are unlimited because I'm salary, but my

4    scheduled hours are 8:30 to 5:00.

5    Q.  Do you ever arrive at your building at work before 8:00?

6    A.  On occasion, yes.

7    Q.  6:00?

8    A.  Not usually.

9    Q.  But you mentioned that all your observation of me coming to

10   the building was after hours?

11   A.  Well, when we noticed it on the surveillance camera, we did

12   notice after hours.

13   Q.  But we don't have any evidence of that here, do we?

14   A.  I don't have it here.  I'm not sure if the prosecutors had

15   that.

16   Q.  Now, going back to the beginning, when we moved in, when my

17   mother moved in, do you remember the condition of my mother?

18   A.  Yes.

19   Q.  Do you know her age?

20   A.  I know she's over 80.

21   Q.  She's over 80.  What was her physical, mental condition?

22   Did you ever get a chance to observe that?

23   A.  I wouldn't know her mental condition.  Physically she was

24   able to walk into the office.

25   Q.  Did you not many times get a notice from the police coming

1  in to pick her up because she had fallen down out in the

2  driveway?

3  A.  I did not know about that.  The police never notified us of

4  that.

5  Q.  Did you ever get ambulance or medical emergencies coming

6  into her apartment and break down the door because she was not

7  responding or sick or other alarms?

8  A.  Not while I was on duty.

9  Q.  So when did you actually officially approach me to tell me

10  that I was living in the building illegally?

11  A.  We actually had staff go up to your mom's apartment and

12  advise her that she couldn't have guests stay past 30 days.

13  Q.  You did advise her of that.  But did you ever make any

14  effort -- did you attempt any legal -- through legal methods to

15  remove her of the building because of this?

16  A.  Yes, we did.

17  Q.  You did.  When did you do that?

18  A.  We started that in 2016.

19  Q.  In 2016?

20  A.  Yes.

21  Q.  What steps did you take?

22  A.  We contacted our attorney.

23          MS. KELLMAN:  Just a minute.

24  Q.  So were you able to remove her legally based on -- you took

25  legal action to remove her from the building?

1    A.  We didn't remove her based on legal actions.

2    Q.  But you did take legal action to remove her from the

3    building?

4    A.  To attempt to remove her, yes.

5    Q.  And you were not successful?

6    A.  I'm sorry?

7    Q.  You were not successful from removing her from the

8    building?

9    A.  I wouldn't call it not successful.  We go through courts

10   and we do what's called a mediation through the courts.  So

11   it's based on the court's judgment.

12   Q.  I understand that.  What was the court's judgment?  Did you

13   present enough evidence to have her removed from the building?

14   A.  No, we did not have enough to have her removed.

15   Q.  So she stayed in the building?

16   A.  Yes, she did.

17   Q.  Wasn't it a fact that the reason she was allowed to stay

18   because there was -- she had done nothing illegal?

19   A.  The reason she was allowed to stay was a promise that you

20   would not be in the unit.

21   Q.  Do you have that in writing somewhere?

22   A.  The attorneys would have it and it's in her file.

23   Q.  But you don't have it present here, do you?

24   A.  I'm not sure if the prosecutor has that information handy.

25   Q.  So every year you mention that when my mother was -- needed

1   to update her file, the yearly renewal notice, you saw me

2   there?

3   A.  I saw you in 2015.

4   Q.  In 2015.  And 2016?

5   A.  I don't recall that.

6   Q.  When you saw me on those times, you asked me if I was

7   living in the building; did you not?

8   A.  Yes, I did.

9   Q.  And what did I say?

10  A.  You said no.

11  Q.  Did I ever tell you why -- the reason why I was seen many

12  times in the building when you addressed me about it?

13  A.  I don't recall.

14  Q.  When you asked me, I never mentioned the reason why I was

15  seeing my mother many times?

16  A.  I -- I would just assume that you were seeing her because

17  it was your mom.

18  Q.  Well, you mentioned before that you explained to me the two

19  reasons why I was filing those forms that you requested that I

20  file, whether as -- what were the conditions under which a

21  person could move in?

22  A.  I'm sorry.  I don't understand the question.

23  Q.  You mentioned before that a person that was not arrested

24  and could make an application to stay in certain apartments

25  under two conditions?

1    A.  Yes, correct.

2    Q.  What were those two conditions?

3    A.  You would either have to apply for housing on the lease and

4    qualify for housing or you would come in as a live-in aide and

5    you would have no rights to the apartment.  So if the resident

6    were to go into a nursing home or pass away, that you would

7    have to leave the unit.

8    Q.  And you asked me if I -- well, you testified that you asked

9    me to apply for those things, either one of those?

10   A.  Correct.

11   Q.  And at that time I didn't explain to you the reason why I

12   was trying to do -- see my mother?

13   A.  Well, to apply you mean?

14   Q.  Yes.

15   A.  You didn't give me a reason, you just told me not at this

16   time.

17          MS. KELLMAN:  Can we have a minute, Judge?

18   Q.  Did I at any time tell you my mother was disabled?

19          MR. NESSIM:  Objection.

20          THE COURT:  Sustained.

21   Q.  How many times did I tell you that during all this time I

22   seeing that I was visiting my mother because she was ill, she

23   was 82 years old, she had mental health problem?

24          MR. NESSIM:  Objection.

25          THE COURT:  Sustained.

1   Q.  In all of our conversations, you don't recall any time when

2   I told you about my mother?

3              MR. NESSIM:  Objection.

4              THE COURT:  Sustained.

5              Why don't you come up?

1           (At sidebar)

2           THE COURT:  You get credit for trying to rephrase the

3   question a number of times.

4           I'm sustaining their objection because you can't

5   adduce your own hearsay.  They can adduce things you've said

6   because those are admissions against your interest.  You can't

7   adduce what she told you because then you're trying to get your

8   statements into evidence on your behalf, and the rules don't

9   work that way.  That's why I'm sustaining the objection.  It's

10  not a problem that you weren't phrasing the question

11  differently each time, but you cannot get out from her what you

12  told her.  OK?

13          If you want to get that information into evidence you

14  have to get it in a different way.

15          MR. DIAZ:  Very well.

16          THE COURT:  You can step back.

17          MR. DIAZ:  Thank you.

18          (Continued on next page)

19

20

21

22

23

24

25

```
 1              (In open court)

 2   BY MR. DIAZ:

 3   Q.  Is my mother currently living in the building?

 4   A.  No.

 5   Q.  When did she move out?

 6   A.  I don't have that information right --

 7   Q.  Do you know why she moved out?

 8   A.  We were having some issues with her coming down all hours

 9   of the day and night knocking on residents' doors looking for

10   her bus.

11              MS. KELLMAN:  I missed that last word.

12              THE COURT:  Looking for her bus.

13              THE WITNESS:  Her bus, transportation bus.

14   Q.  Transportation to where?

15   A.  To a day center.

16   Q.  She was under care at a day center?

17              MR. NESSIM:  Objection.

18              THE COURT:  Sustained.  We're getting pretty far

19   afield.

20   Q.  So from that, can you tell us -- you're saying that her

21   condition had deteriorated basically?

22   A.  Yes.

23   Q.  And she needed --

24              MR. NESSIM:  Objection.

25   Q.  - external assistance?
```

1    THE COURT:  Overruled.

2    THE WITNESS:  Can I answer that?  I'm sorry.

3    THE COURT:  Yes, you can answer.

4    A.  She needed assistance, yes.

5    Q.  So now, do you know where she's living now?

6    A.  I do not.

7    MR. DIAZ:  Very well.  That's all, your Honor.  No

8    more questions.

9    THE COURT:  Thank you.  Any redirect?

10   MR. NESSIM:  Briefly, your Honor.

11   REDIRECT EXAMINATION

12   BY MR. NESSIM:

13   Q.  Do you remember Mr. Diaz asked you some questions about the

14   timeline that you observed him and you described legal action

15   that was taken?

16   A.  Yes.

17   Q.  Approximately when did you turn to an attorney?

18   A.  It was in 2016.

19   Q.  And why did you turn to an attorney at that time?

20   A.  There are certain procedures that we have to do.  It's not

21   something we can do in a day, in a week, in a month.  It

22   usually takes several months for the whole process to go

23   through.

24   Q.  What was the reason you decided to reach out to an

25   attorney, what did you believe, if anything?

1   A.  I believe she had him living in the unit.

2          MR. NESSIM:  Ms. Dunbar, can we please publish

3   Government Exhibit 35.

4   Q.  Do you remember Mr. Diaz asked you questions about the date

5   of this printout?

6   A.  Yes.

7   Q.  And you testified on direct examination that this printout

8   was made after the conclusion of that legal action; is that

9   right?

10  A.  Yes.

11  Q.  Why was this printout created?

12  A.  It was given to the guards to advise them that Mr. Diaz was

13  not permitted in the building.

14  Q.  Was there a specific incident -- did you continue -- why

15  did create this form?

16  A.  We felt he was still coming into the building, whether it

17  was with his mom or with his girlfriend.

18         THE COURT:  After there was an agreement that he would

19  not?

20         THE WITNESS:  Correct.

21         MR. NESSIM:  Ms. Dunbar, you can take that down,

22  please.

23  Q.  You heard the defendant ask you some questions about his

24  mother's health.  You testified on direct examination that you

25  told him about being a live-in aide.  What would being a

1    live-in aide allow the defendant to do?

2    A.   A live-in aide would come in, they wouldn't have to

3    disclose any of their income, but they would have no rights to

4    the apartment.  If the resident went into a nursing home or

5    rehabilitation for two months, that live-in aide would need to

6    leave the building.  They're only there to assist and aid the

7    resident.

8    Q.   Are there live-in aides that do assist residents or health

9    or other issues?

10   A.   Yes.

11   Q.   Did the defendant want to become a live-in aide?

12   A.   Not that I was aware of.

13   Q.   Did he ever try to become a live-in aide?

14   A.   No, not at all.

15   Q.   And the defendant mentioned that you asked him several

16   times that he was living if he was living in the building and

17   he told you he was not.  When he told you that, did you believe

18   him?

19   A.   I did not.

20   Q.   Why not?

21   A.   Just from the evidence that I had and the fact that I've

22   been doing this for over 30 years and I kind of know when

23   people are not following the rules.

24            MR. NESSIM:  One moment, your Honor.

25            Nothing further for this witness.

1           THE COURT:  OK.  Any recross?

2           MR. DIAZ:  Yes, please.

3    RECROSS EXAMINATION

4    BY MR. DIAZ:

5    Q.  You said that when you discussed the issue of my ability to

6    live in the building as a live-in aide.  I didn't express an

7    intention of living in the building; is that correct?

8    A.  You requested information to move in.

9    Q.  I requested information -- when you approached me, you

10   asked me -- you told me that I was living in the building and I

11   said I was not living in the building; is that correct?

12          MR. NESSIM:  Objection.

13          THE WITNESS:  Yes.

14          THE COURT:  Sustained.

15   Q.  Did I admit to you that I was living in the building when

16   you asked me that?

17          MR. NESSIM:  Objection.

18          THE COURT:  Sustained.

19   Q.  When I denied to you living in the building --

20          MR. NESSIM:  Objection.

21          THE COURT:  Sustained.

22          MR. DIAZ:  Just give me a minute.

23   Q.  Did I ever file an application to live in the building?

24   A.  No.

25   Q.  Looking at the picture -- in all that time you say you saw

1  me coming in the building and you deduced that I was living in

2  the building because I was there too many times that you saw

3  me, do you have any evidence of that?  Do you have a log of all

4  these records that you're saying?

5  A.  No, I don't keep a log.

6  Q.  You have one picture showing me coming in the building in

7  September 2017?

8        MR. NESSIM:  Objection.

9        THE COURT:  Overruled.

10        Don't argue with the witness, just ask her a question.

11  Q.  But you did not have any other evidence in writing or in

12  log that I was there as you claim over time -- you don't have

13  any pictures of those or videos?

14  A.  No, we did not save them.

15        MR. DIAZ:  No more questions, your Honor.

16        THE COURT:  OK.

17        MR. NESSIM:  No redirect.

18        THE COURT:  You can step down.

19        (Witness excused)

20        THE COURT:  Call your next witness.

21        MR. NESSIM:  The government calls Ron Hamilton.

22   JAMES R. HAMILTON, JR.,

23      called as a witness by the Government,

24      having been duly sworn, testified as follows:

25        THE COURT:  Mr. Nessim, pull the mic down a little

```
 1   bit.

 2   DIRECT EXAMINATION

 3   BY MR. NESSIM:

 4   Q.  Good morning, Mr. Hamilton.

 5   A.  Good morning.

 6   Q.  Where do you work?

 7   A.  Navy Federal Credit Union.

 8   Q.  What is the Navy Federal Credit Union?

 9   A.  It's a DOD-based credit union, the largest in the world.

10   Q.  What is DOD?

11   A.  Department of the Defense.  That's our field membership.

12          THE COURT:  Your field membership is the largest of

13   all credit unions?

14          THE WITNESS:  We are the largest credit union in the

15   world.  Our field membership are DOD personnel and their

16   families.

17   Q.  So Navy Federal Credit Union is only available to DOD

18   personnel?

19   A.  DOD personnel, their families, relatives, first-party

20   relatives and anyone that resides in the same household as a

21   member.

22   Q.  And what is your title at the Navy Federal Credit Union?

23   A.  Senior investigator.

24   Q.  How long have you worked for the Navy Federal Credit Union?

25   A.  21 and a half years.
```

1    Q.  And what are some of your duties and responsibilities as a

2    senior investigator?

3    A.  I investigate fraud claims from members, any fraud

4    committed against a credit union either by outside parties or

5    internal fraud.  I'm a custodian of record for the credit union

6    to testify in civil and criminal matters.

7    Q.  Mr. Hamilton, I'm handing you four documents that have been

8    marked for identification as Government Exhibits 38A, 38B, 38C,

9    and 38D.  Why don't you take a moment to take a look at these

10   and let me know once you have a chance to review them.

11   A.  OK.

12   Q.  Do you recognize these documents?

13   A.  I do.

14   Q.  What are they?

15   A.  These are statements of account, monthly statements.

16   Q.  Where is the account hosted?

17   A.  It's at Navy Federal Credit Union.

18   Q.  And are these records maintained by Navy Federal Credit

19   Union?

20   A.  They are.

21   Q.  How do you know that?

22   A.  These -- these are stored in as an electronic version of a

23   paper mail statement that we send to our account holders.  We

24   hold them in a database for access.

25   Q.  Is the creation of these records in the regular practice of

1    the Navy Federal Credit Union?

2    A.   Yes.

3    Q.   And were these records made at or near the time of the

4    information they described they describe?

5    A.   Yes.

6    Q.   Were they made by electronic system or by a person?

7    A.   They're electronic.

8    Q.   And what does the electronic system record?

9    A.   The electronic system records between the time period

10   typically a month.  They're monthly statements of the account

11   holder's activity in their -- whatever accounts they have at

12   the credit union.

13              MR. NESSIM:  Your Honor, the government offers

14   Government Exhibits 38A, 38B, 38C, and 38D into evidence.

15              THE COURT:  Any objection?

16              MR. DIAZ:  No, your Honor.

17              THE COURT:  38A, B, C, and D are received.

18              (Government Exhibits 38A-38D received in evidence)

19              MR. NESSIM:  Ms. Dunbar, please publish Government

20   Exhibit 38A for the jury.  Let's zoom into the top of the

21   document.

22   BY MR. NESSIM:

23   Q.   Mr. Hamilton, whose statement is this?

24   A.   Salvador Diaz.

25   Q.   And what is the statement period?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1   A.   June 20, 2014, through July 19, 2014.

 2   Q.   Can you please read the address listed for Mr. Diaz?

 3   A.   52 Arden Street, Apartment 5A, New York, New York 10040.

 4          MR. NESSIM:   Ms. Dunbar, please publish Government

 5   Exhibit 38B for the jury.   Let's zoom into the top of the

 6   document.

 7   Q.   Whose bank account statement is this?

 8   A.   Salvador Diaz.

 9   Q.   What is the statement period?

10   A.   October 20, 2014, through November 19, 2014.

11   Q.   Can you please read the address listed?

12   A.   10 Pavilion Avenue, Apartment 307, Long Branch, New Jersey

13   00740.

14          MR. NESSIM:   Ms. Dunbar, can we please turn to page 58

15   of 38B, and similarly highlight the top of the exhibit.

16   BY MR. NESSIM:

17   Q.   Mr. Hamilton, what is the statement period of this page?

18   A.   September 20, 2016, through October 19, 2016.

19   Q.   And is this also a statement of Mr. Diaz's?

20   A.   It is.

21   Q.   What is the address listed?

22   A.   10 Pavilion Avenue, Apartment 307, Long Branch, New Jersey

23   07740.

24          MR. NESSIM:   Ms. Dunbar, please publish Government

25   Exhibit 38C for the jury and similarly highlight the top of the
```

1    document.

2    Q.   Whose bank statement is 38C?

3    A.   Salvador Diaz.

4    Q.   What is the statement period on this page of statement?

5    A.   October 20, 2016, through November 19, 2016.

6    Q.   And what is listed as Mr. Diaz's address?

7    A.   243 Purdue Avenue, Pemberton, New Jersey 08068.

8            MR. NESSIM:   Ms. Dunbar, please turn to page 4 of this

9    exhibit and let's highlight the top of it, or zoom into the top

10   of it.

11   Q.   Mr. Hamilton, what is the statement period of this

12   statement?

13   A.   November 20, 2016, through December 19, 2016.

14   Q.   And what's the address recorded for Mr. Diaz?

15   A.   243 Purdue Avenue, Pemberton, New Jersey 08068.

16           MR. NESSIM:   Ms. Dunbar, please publish Government

17   Exhibit 38D for the jury and let's also zoom into the top of

18   the document.

19   Q.   Whose statement is recorded in Government Exhibit 38D?

20   A.   Salvador Diaz.

21   Q.   What is the statement period?

22   A.   December 20, 2016, through January 19, 2017.

23   Q.   And what's the address listed?

24   A.   11076 Atlantic Road, Temperanceville, Virginia 23442.

25           MR. NESSIM:   Thank you.

```
 1              THE COURT:  Hang on a second.  Mr. Diaz, you've got to
 2    keep your voice down when you're conferring.
 3              Go ahead.
 4              MR. DIAZ:  I beg your pardon, your Honor.
 5              MR. NESSIM:  Ms. Dunbar, you can take that exhibit
 6    down.  Thank you.
 7    BY MR. NESSIM:
 8    Q.  Mr. Hamilton, how does that an address get changed in the
 9    Navy Federal Credit Union system?
10    A.  An address can get changed by a member calling in a member
11    visiting a branch office or a member signing in online to their
12    account access and requesting a change of address.
13    Q.  In all those scenarios you just described, who is the
14    individual or individuals who request the change?
15    A.  The account holder.
16              MR. NESSIM:   Thank you.  No further questions.
17              THE COURT:  Mr. Diaz.
18              MR. DIAZ:  No questions, your Honor.
19              THE COURT:  Thank you so much, Mr. Hamilton.  You can
20    step down.
21              (Witness excused)
22              THE COURT:  Is your next witness going to be a similar
23    length?
24              MR. NESSIM:  Yes, your Honor.
25              THE COURT:  Call your next witness.
```

 1              MS. TARLOW:  Charles Johnson.

 2    CHARLES F. JOHNSON,

 3         called as a witness by the Government,

 4         having been duly sworn, testified as follows:

 5              THE COURT:  Pull the mic down so it's in front of you,

 6    please.

 7    DIRECT EXAMINATION

 8    BY MS. TARLOW:

 9    Q.  Good morning, Mr. Johnson.

10    A.  Good morning.

11    Q.  Where do you work?

12    A.  I work at the Burlington County, Superintendent of

13    Elections in New Jersey.

14    Q.  What is your title?

15    A.  Deputy registrar.

16    Q.  How long have you worked for the Superintendent of

17    Elections?

18    A.  About two and a half years.

19    Q.  What are some of your duties and responsibilities as a

20    deputy registrar?

21    A.  Registering voters, changing their voter profile, their

22    party, their name, their address.

23    Q.  Do you also maintain records associated with those voter

24    registration documents?

25    A.  Yes, we do.  We store them.

1  Q.  What are some of the requirements for an individual to be

2  eligible to vote in Burlington County?

3  A.  They must be a Burlington County resident, 18 years of age

4  or older, not on probation or parole, and you must be a U.S.

5  citizen.

6  Q.  Does the Superintendent of Elections maintain records

7  associated with registered voters?

8  A.  Yes, we do.

9  Q.  Have you reviewed records maintained by the Superintendent

10  of Elections for an individual named Salvador Diaz?

11  A.  Yes, I have.

12          MS. TARLOW:  Ms. Dunbar, will you please put on the

13  witness's screen, Government Exhibit 45.

14  Q.  Do you recognize this document?

15  A.  Yes, I do.

16  Q.  What is it?

17  A.  It's a voter registration application.

18  Q.  And where is this particular form maintained?

19  A.  It was in a box on a shelf in our storage room.

20  Q.  Is the retention of this type of form in the regular

21  practice of the Superintendent of Elections?

22  A.  Yes, it is.

23  Q.  Was this form created at or near the time that the

24  activities reflected therein took place?

25  A.  Yes, it was.

1    Q.  Are was it made by someone with knowledge of the facts

2    described or based on information transmitted by someone with

3    that knowledge?

4    A.  Yes, it was.

5            MS. TARLOW:  Your Honor, the government offers

6    Government Exhibit 45 into evidence.

7            THE COURT:  Any objection?

8            MR. DIAZ:  No objection.

9            THE COURT:  45 is received.

10           (Government Exhibit 45 received in evidence)

11   Q.  Mr. Johnson, what, if any, information is provided on

12   section 3 of this document?

13   A.  Section 3 is last name.

14   Q.  And what is the last name?

15   A.  Diaz.

16   Q.  And what is the first name of the individual?

17   A.  Salvador.

18   Q.  What, if any, information is provided on section 5 of this

19   document?

20   A.  New Jersey driver's license number.

21   Q.  Directing your attention to section 6 of this form, what is

22   the category of information requested?

23   A.  The home address.

24   Q.  What did the applicant write?

25   A.  243 Purdue Avenue, Pemberton, Burlington County, New Jersey

1    08068.

2    Q.   Turning your attention to section 8 of this form, what is

3    the category of information requested?

4    A.   It was the last address registered.

5    Q.   And what, if anything, is written in this section?

6    A.   52 Arden Street, Apartment 5A, New York, New York 10040.

7    Q.   Now, turning your attention to the section of the form that

8    begins with, "Declaration, I swear or affirm," what is the

9    second bullet point?

10   A.   I live at the above address.

11   Q.   Who, if anyone's, name is signed in the signature section

12   of this form?

13   A.   Salvador Diaz.

14   Q.   What is the date?

15   A.   July 26, 2016.

16   Q.   What is on the top left of this form?

17   A.   There is a label that we adhere to the form once we are

18   done processing for filing purposes.

19   Q.   And what address is listed?

20   A.   243 Purdue Avenue, Pemberton, New Jersey 08068.

21   Q.   Why would that address be listed?

22   A.   Because that the address the voter listed as his home

23   address.

24   Q.   Turning your attention to the next page of this document,

25   and the next page, what is this document?

1    A.   That's a voter profile printed from the computer screen

2    after we already input the information into the computer.

3    Q.   And where does that information come from that generates

4    this document?

5    A.   From the voter registration application.

6    Q.   Whose name is listed on this voter profile?

7    A.   Salvador Diaz.

8    Q.   What is the address listed?

9    A.   243 Purdue Avenue, Pemberton, New Jersey 08068.

10              MS. TARLOW:  May I have one moment, your Honor?

11              THE COURT:  Yes.

12              MS. TARLOW:  No further questions, your Honor.

13              Mr. Diaz.

14              MR. DIAZ:  No questions, your Honor.

15              THE COURT:  Thank you, Mr. Johnson.  Please step down.

16              (Witness excused)

17              THE WITNESS:  Thank you.

18              THE COURT:  You have a very short witness.

19              MR. NESSIM:  The government calls Joseph Mazza.

20     JOSEPH MAZZA,

21         called as a witness by the Government,

22         having been duly sworn, testified as follows:

23              THE COURT:  Good morning.

24              THE WITNESS:  Good morning.

25    DIRECT EXAMINATION

1   BY MR. NESSIM:

2   Q.   Good morning, Mr. Mazzo.

3   A.   Good morning.

4   Q.   Where do you work?

5   A.   I work for the New Jersey Motor Vehicle Commission as a

6   state investigator.

7   Q.   What is the New Jersey Motor Vehicle Commission?

8   A.   The Motor Vehicle Commission is a state agency that is

9   responsible for issuing driver's licenses, vehicle

10  registration, vehicle titles and vehicle inspections, and

11  maintaining all those records in the New Jersey Motor Vehicle

12  Comprehensive Database.

13  Q.   What is the Comprehensive Database?

14  A.   It is the database where all motor vehicle records, past

15  and present, are stored and kept.

16  Q.   How long have you worked for the Motor Vehicle Commission?

17  A.   I've been with the Motor Vehicle Commission for six and a

18  half years now, and prior to that I was a police officer at

19  Monmouth County, New Jersey, retiring as a lieutenant after 25

20  years.

21  Q.   What are some of your duties and responsibilities in your

22  current role?  I think you mentioned some of them -- fraud

23  investigation?

24  A.   Right.

25  Q.   Any others?

1   A.   Currently we're responsible basically for protecting the

2   interest of the Motor Vehicle Commission where the records are

3   concerned, where the integrity and the information in the comp

4   system is concerned through our internal audit responsibilities

5   as well as handling internal investigations with either

6   employee situations or fraud situations with the many documents

7   that come into our agencies.

8   Q.   In the course of your job, have you become familiar with

9   the process of obtaining a driver's license in New Jersey?

10  A.   Yes, I have.

11  Q.   And registering a vehicle in New Jersey?

12  A.   Yes.

13  Q.   What, if any, residency requirements are there for an

14  individual to obtain a driver's license in New Jersey?

15  A.   Residency requirements are a document within the last 90

16  days mailed to an individual, which could be a bank statement,

17  a utility bill, a lease could be used as well, tax bill, all

18  issued within the last 90 days, along with a social security

19  card.

20  Q.   And why do you require a document you just described with a

21  New Jersey address?

22  A.   Only residents of New Jersey can obtain a New Jersey motor

23  vehicle license.

24  Q.   Mr. Mazzo, I'm handing you documents that have been marked

25  for identification as Government Exhibit 63 and 64.  Take a

1    look at these and let me know once you've had a chance to

2    review them.

3    A.  OK.

4    Q.  Do you recognize these documents?

5    A.  Yes, I do.

6    Q.  What are they?

7    A.  They are records obtained from the comp system concerning

8    an individual driver history as well as their registration

9    history.  Their vehicle registration history.  Excuse me.

10   Q.  Are these records maintained by the New Jersey Commission

11   on Motor Vehicles?

12   A.  Yes, they are.

13   Q.  Is the creation of these records in the regular practice of

14   the commission?

15   A.  Yes, it is.

16   Q.  Were these records made at or near the time of the events

17   described within them?

18   A.  Yes, they are.

19   Q.  And were they made by someone with knowledge of the

20   information or information obtained by someone with that

21   knowledge?

22   A.  The records themselves are gleaned from information that

23   individuals submit on applications to the commission.

24          MR. NESSIM:  Your Honor, the government offers

25   Government Exhibits 63 and 64 into evidence.

```
1              THE COURT:  Any objection?

2              MR. DIAZ:  None, your Honor.

3              THE COURT:  63 and 64 are received.

4              (Government Exhibits 63 and 64 received in evidence)

5              MR. NESSIM:  Ms. Dunbar, please publish Government

6    Exhibit 63 for the jury, and let's zoom into the top half of

7    the page.

8    BY MR. NESSIM:

9    Q.  Mr. Mazzo, what is this?

10   A.  This is a screen capture of a driver inquiry on a motor

11   vehicle license issued in New Jersey in the comp system.

12             THE COURT:  I'm sorry.  Are you saying com system or

13   comp?

14             THE WITNESS:  Comp system, C-O-M-P.  It's the

15   comprehensive system.  It's commonly known as the comp system.

16             THE COURT:  Got it.

17   Q.  Who is the individual associated with this driver's

18   license?

19   A.  It is a Salvador Diaz.

20   Q.  And what is the address associated with Mr. Diaz's license?

21   A.  No. 243 Purdue Avenue in Pemberton, New Jersey.

22   Q.  And is this license active or expired?

23   A.  This license is currently active with an expiration date in

24   2023.

25             MR. NESSIM:  Ms. Dunbar, let's turn to page 3 of this
```

1   exhibit.  And let's zoom in to the top.

2   BY MR. NESSIM:

3   Q.  Mr. Mazzo, what is this?

4   A.  This is an application for an examination permit which is

5   the first step in obtaining a driver's license in New Jersey.

6   Q.  And who provides the information contained in these

7   applications?

8   A.  The individual making the application at the agency at the

9   time.

10  Q.  Is this application signed?

11  A.  Yes, it is.

12  Q.  Can you please read the signature?

13  A.  Yes.  It reads as Salvador Diaz.

14  Q.  What is the date that the application was filled out?

15  A.  It was filled out on January 13 of 2015.

16  Q.  And what's the address provided?

17  A.  The address is also 243 Purdue Avenue in Pemberton,

18  New Jersey as well.

19          MR. NESSIM:  Ms. Dunbar, let's turn to page 9 of

20  Government Exhibit 63.  Let's zoom into the portion of the page

21  that has text.

22  Q.  Mr. Mazzo, what is this?

23  A.  This is the actual application for a driver's license,

24  which is the next step after filing for and receiving the

25  examination permit.

1  Q.  Who fills out the information contained in the application?

2  A.  Again, the individual making the application to the

3  commission at that time.

4  Q.  What is the name of this applicant?

5  A.  It's again Salvador Diaz.

6  Q.  And is it signed?

7  A.  It is, in fact.

8  Q.  Can you read the signature?

9  A.  Salvador Diaz as well.

10  Q.  What's the date of this application?

11  A.  It is also January 13 of 2015, and it's marked for an

12  initial driver's license.

13          MR. NESSIM:  Ms. Dunbar, can you please publish

14  Government Exhibit 64 for the jury.  Let's zoom into the top

15  half of the page.

16  Q.  Mr. Mazzo, what is this?

17  A.  This is the registration inquiry screen from the comp

18  system.

19  Q.  A registration information inquiry for what sort of

20  registration?

21  A.  For a vehicle registration, excuse me.

22  Q.  Who is the individual associated with this registration?

23  A.  It is also Salvador Diaz.

24  Q.  And is this vehicle active -- is this registration active

25  or expired?

1  A.  This registration expired in December of 2015.

2  Q.  And what is listed as Mr. Diaz's registered address?

3  A.  Again, 243 Purdue Avenue in Pemberton, New Jersey.

4         MR. NESSIM:  Ms. Dunbar, please turn to page 5 of this

5  exhibit.

6  Q.  Mr. Mazzo, what is this?

7  A.  That is also a screen capture for a registration inquiry

8  from the comp system.

9  Q.  And whose vehicle registration information is this?

10 A.  It is, again, Salvador Diaz.

11 Q.  Is this registration active or expired?

12 A.  This registration is active with an expiration date of May

13 of 2019.

14 Q.  What is listed as Mr. Diaz's registered address?

15 A.  Again, it appears to be No. 243 Purdue in Pemberton,

16 New Jersey.

17 Q.  Does Mr. Diaz have other vehicles registered in New Jersey?

18 A.  When I was going through the records there appeared to be

19 one other current vehicle and I believe there was a total in

20 the history of seven vehicles in total that were past

21 registrations.

22         MR. NESSIM:  Thank you.  One moment, your Honor.

23         No further questions.

24         THE COURT:  Mr. Diaz.

25         MR. DIAZ:  No questions, your Honor.

1        THE COURT:  OK.  Thank you, Mr. Mazzo, you can step

2    down.

3        (Witness excused)

4        THE WITNESS:  Thank you, ma'am.

5        THE COURT:  OK.  I think this is probably a good time

6    for us to take a morning break.  So we're going to break at

7    11:15.  That clock is wrong.  It's actually about 11:10, and

8    bring you back out here at 11:25.

9        Don't discuss the case, enjoy your break, and I'll

10   bring you back at 11:25.  Leave your books on your seat,

11   please.

12        (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Jury not present)

 2              THE COURT:  Please be seated.  That's four.

 3              And as I recall, you have two witness.

 4              MS. TARLOW:  Yes, your Honor. we have two additional

 5    witnesses.

 6              THE COURT:  Who are the next two and how long are they

 7    going to be?

 8              MS. TARLOW:  We will be calling Michael Acquaviva, who

 9    will be approximately five to ten minutes and Deputy United

10    States Marshal Sherri Annon, who will be approximately 20

11    minutes.

12              THE COURT:  That's going to take us until noon about,

13    and then the government rests, right?

14              MS. TARLOW:  Yes, your Honor.

15              THE COURT:  What's the current defense thinking about

16    a case?

17              MR. DIAZ:  I'm trying to ask for another offer of

18    proof.  I obviously haven't done this before on the Acquaviva

19    witness.

20              THE COURT:  Who is Acquaviva?

21              MS. TARLOW:  He's a representative from the Monmouth

22    County Prosecutor's office and he will testify as to reviewing

23    sex offender registration records in New Jersey.

24              THE COURT:  So he's going to be the witness that's

25    going to say that there's no New Jersey registration.
```

1          MS. TARLOW:  Yes, your Honor.

2          THE COURT:  No, don't sit down because I had a

3    question for you as well.  You asked me for an offer of proof.

4    You now know.

5          What is the current thinking of the defense of whether

6    there is going to be a defense case?

7          MR. DIAZ:  There is probably not.

8          THE COURT:  Probably not.

9          MR. DIAZ:  Most likely not.

10         THE COURT:  Most likely not.

11         So here's what my plan is then.  My plan is going to

12    be to give the jury a longer than normal lunch break, assuming

13    you rest, Mr. Diaz rests and we're done at around noon, let's

14    say a little after noon to give time for argument, I'm going to

15    give the jury a slightly longer break.

16         How long do you think your summation is going to be?

17         MS. TARLOW:  Approximately 30 minutes, your Honor.

18         THE COURT:  Mr. Diaz, do you have a sense of how long

19    your summation is going to be?

20         MR. DIAZ:  I'm going to follow her suggestion, 30

21    minutes.

22         THE COURT:  That's a good rule of thumb.  That means

23    I'm going to charge the jury today.  So what I'm going to do is

24    I'm going to give you about an hour and a half for lunch.  That

25    should be enough for you to confer on what you plan to say.  So

 1        for now you've got about ten minutes of your break left.

 2             MS. KELLMAN:  Your Honor, can I ask one question, not

 3        being the lawyer, is this jury told not to use the cafeteria

 4        downstairs?

 5             THE COURT:  Yes.

 6             MS. KELLMAN:  OK.  Good to know.

 7             THE COURT:  You told them.

 8             THE DEPUTY CLERK:  Yes, across the street.

 9             MS. KELLMAN:  They've been told they can use the

10        cafeteria across the street?

11             THE COURT:  I will affirmatively tell them.

12             MS. KELLMAN:  Exactly.  Thank you.

13             (Recess)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Call your next witness.
 2              MR. NESSIM:  Government calls Michael Acquaviva.
 3   MICHAEL ACQUAVIVA,
 4        called as a witness by the Government,
 5        having been duly sworn, testified as follows:
 6   DIRECT EXAMINATION
 7   BY MR. NESSIM:
 8   Q.  Good morning.
 9   A.  Good morning.
10   Q.  Where do you work?
11   A.  Monmouth County prosecutor's office in New Jersey.
12   Q.  Is Long Branch, New Jersey in Monmouth County?
13   A.  Yes.
14   Q.  What unit are you in?
15   A.  Currently I'm in the financial crimes public corporation
16   bureau.
17   Q.  How long have you been in that bureau?
18   A.  Since November 1st of 2018.
19   Q.  Were you previously in a different bureau?
20   A.  Yes.
21   Q.  What bureau is that?
22   A.  The Megan's Law Unit.
23   Q.  What is the Megan's Law Unit?
24   A.  The Megan's Law Unit for the Monmouth County prosecutor's
25   office conducts criminal investigations for noncompliant
```

1   registered sex-offenders.  The unit also assist in local

2   municipalities in registering registered sex-offenders on an

3   as-needed basis.

4   Q.  And how long did you spend with the Megan's Law Bureau?

5   A.  I was in that unit for four years, from November of '14 --

6   2014, until my transfer in November of 2018.

7   Q.  And what was your title at the Megan's Law Bureau?

8   A.  Detective.

9   Q.  And what were some of your specific responsibilities in

10  that role?

11  A.  My responsibilities were to conduct criminal investigations

12  regarding noncompliant registered sex-offenders, as well as

13  assist the local municipality with the registration of

14  registered sex-offenders when they needed assistance.

15  Q.  Through the course of your work in the Megan's Law Bureau,

16  did you become familiar with the sex-offender registration

17  requirements in New Jersey?

18          THE COURT:  Mr. Diaz, seriously, you've got to keep

19  your voice down, because the jury has to be able to hear the

20  question; okay?

21          Repeat the question, please.

22  BY MR. NESSIM:

23  Q.  During the course of your work with the Megan's Law Bureau,

24  did you become familiar with the sex-offender registration

25  requirements in New Jersey?

1   A.   Yes.

2   Q.   What is a sex-offender required to do if they move to New

3   Jersey?

4   A.   They are required to notify the municipality where they're

5   moving to within 48 hours and they are to go to that

6   municipality and register.

7          THE COURT:   Remember, when we heard about New York

8   law, and I said that's the New York law, it's different than

9   federal law.   You just heard about New Jersey law.   That's also

10  a little different than the federal law.   And I'll charge you

11  on what the federal law is when I give you your final charge.

12         Go ahead.

13  BY MR. NESSIM:

14  Q.   You mentioned registration at a local municipality.

15         What does someone have to physically do to register?

16  A.   They physically have to go to the municipality and meet

17  with the representative from that department.   It's usually a

18  detective that will -- what we call take the Megan's law

19  registration.   Then they have to fill out the paperwork.   That

20  paperwork consists of providing their name, address, social

21  security number, date of birth, all of their pertinent

22  information, including where they live -- I already said that.

23  Where they work, the car they drive, any tattoos they may have,

24  if they're on parole or probation, they log that information.

25  They're also required to provide fingerprints and photographs.

1   Q.   And how are those forms processed?

2   A.   Those forms are processed on a computer program called a

3   Offender Watch.  That's the program that's used in New Jersey

4   to record that paperwork for a registered sex-offender.

5   Q.   And what information -- is all that information included on

6   a Offender Watch?

7   A.   Correct.  All that information is included when an offender

8   comes into the municipal police station to register.  It's

9   basically different screens you would click into, to make sure

10  that it all gets populated.  And then that paperwork will then

11  be printed out when it's finalized, and the offender will sign

12  it and make sure everything's correct.

13  Q.   What geographic area does the Offender Watch System cover?

14  A.   The Offender Watch System covers about 70 percent of the

15  United States.  It covers New Jersey on a whole, but it also

16  covers other states that are part of the system.  The last I

17  checked, the company boasts that they cover 70 percent of the

18  United States.

19  Q.   And who has access to the Offender Watch System?

20  A.   Those who have access are designated.  And what I mean by

21  that is the local municipal detective or officer assigned for

22  Megan's Law registration would be allowed to go into the

23  system, as well as people from the county.  Like where I work,

24  in that unit, we have access to it.  Not every law enforcement

25  officer will have access to that because it's sensitive and

1   that's how it's set up.  Every officer in the department can't

2   go into that system to view what's in there.

3   Q.  Is there any other database of sex-offenders registered in

4   New Jersey?

5   A.  No.

6   Q.  There's no database available to the public?

7   A.  Oh.  Yes.  There's a database they call -- it's a New

8   Jersey Sex Offender Registry.  That is located through the New

9   Jersey state police website.

10        When a registered sex-offender is -- it's basically

11   decided on by the Court.  So, there are court rules of how a

12   registered sex-offender, if they're going to be published or

13   not.  Published or not means that you'll be able to go into the

14   New Jersey Sex Offender Registry, state police website, and

15   view that offender.  That's how the public can see where the

16   offenders live and pictures of them and things like that.

17   Q.  And why is that information made available to the public?

18   A.  It's made available to the public for public safety.  For

19   example, if there's an incident where somebody's hanging around

20   a bus stop or, you know, seen on the campus of a school, people

21   can go to that registry to see who their registered

22   sex-offenders are in the area and view their photo.  And if

23   that person is on there, they can notify the local police

24   department.

25   Q.  In the course of preparing to testify today, have you

1   reviewed the Offender Watch System for any records related to

2   Mr. Diaz?

3   A.  Yes, I did.

4   Q.  What, if anything, have you found?

5   A.  Nothing.

6   Q.  How recently did you review the search the Offender Watch

7   System for records relating to Mr. Diaz?

8   A.  I did last week and also in November of 2018, when I was

9   preparing for this trial.

10  Q.  If a registration had been made, would it be on the

11  Offender Watch System?

12  A.  Yes.

13  Q.  And is that true if the registration was made in Monmouth

14  County or any other county in New Jersey?

15  A.  Anywhere in New Jersey, yes, it would be on that system.

16          MR. NESSIM:  One moment, your Honor.

17  BY MR. NESSIM:

18  Q.  So, there's no record of Salvador Diaz registering as a

19  sex-offender in New Jersey?

20  A.  No.

21          MR. NESSIM:  No further questions.

22          THE COURT:  Mr. Diaz.

23          THE DEFENDANT:  No questions.

24          THE COURT:  All right.  Thank you.  You can step down.

25          THE WITNESS:  Thank you, your Honor.

1           THE COURT:  Call your next witness.

2           MS. TARLOW:  The government calls Sherri Annan.

3   SHERRI ANNAN,

4       called as a witness by the Government,

5       having been duly sworn, testified as follows:

6   DIRECT EXAMINATION

7   BY MS. TARLOW:

8   Q.  Good morning, Ms. Annan.

9   A.  Good morning.

10  Q.  Where do you work?

11  A.  I work in Eastern District of Virginia, Norfolk division.

12  Q.  What agency do you work for?

13  A.  I work for the United States Marshals Service.

14  Q.  And what is the United States Marshal Service?

15  A.  It's a federal law enforcement agency.  We do judicial

16  security, court security.  We also do federal warrants, state

17  warrants, sex-offender investigations and missing children

18  investigations.

19  Q.  And when you say "federal warrants," what does that mean?

20  A.  When somebody is arrested and they are sentenced to prison,

21  upon their release, they are on supervision.  If they violate

22  those conditions, then a warrant is issued.  And the marshal

23  service, we are the ones responsible for locating them.  We

24  also assist other federal agencies.

25  Q.  What is your title at the United States Marshals Service?

1  A.  I'm a deputy United States marshal.

2  Q.  How long have you been with the United States Marshal

3  Service?

4  A.  For 18 years.

5  Q.  What are some of your duties and responsibilities as a

6  deputy United States marshal?

7  A.  I do court security.  I also do federal warrants and assist

8  state and locals with their fugitive arrests, as well as

9  sex-offender investigations and locating missing children.

10  Q.  Are you familiar with an individual named Salvador Diaz?

11  A.  Yes, I am.

12  Q.  How are you familiar with him?

13  A.  I received what's called a collateral lead request,

14  assistance from New York, to locate possibly locate Mr. Diaz in

15  the eastern district of Virginia in the eastern shore area of

16  Virginia.

17  Q.  What is a collateral lead request?

18  A.  A collateral lead request is a request from one district to

19  another to locate somebody if they've crossed into their

20  jurisdiction.  So, the responsibility is to assist in locating

21  that person.

22  Q.  And why were you trying to locate Mr. Diaz?

23  A.  According to the collateral lead request, Mr. Diaz was

24  required to register as a sex-offender, and according to the

25  records, he had not registered in the state of Virginia.

1   Q.  Was there a warrant for Mr. Diaz's arrest?

2   A.  Yes.

3   Q.  Ms. Annan, when I ask you a question, make sure you respond

4   slowly so that the court reporter can take it down.

5   A.  Yes.

6   Q.  Did you, in fact, arrest Mr. Diaz?

7   A.  I did.

8   Q.  Do you recognize Mr. Diaz in the courtroom?

9   A.  I do.

10  Q.  Can you please identify where Mr. Diaz is seated?

11  A.  He is seated at the last table, wearing a gray suit;

12  Hispanic male sitting at the defendant table.

13          THE COURT:  Immediately to her left?

14          THE WITNESS:  Yes.

15          THE COURT:  Identified for the record Salvador Diaz.

16          MS. KELLMAN:  I think we're on her right.

17          THE COURT:  My left, her right.

18          THE WITNESS:  Yes.

19  BY MS. TARLOW:

20  Q.  When did you arrest Mr. Diaz?

21  A.  January 27th of 2017.

22  Q.  Where did you arrest Mr. Diaz?

23  A.  At 11076 Atlantic Road in Temperanceville, Virginia.

24  Q.  Can you please describe the location where Mr. Diaz was

25  arrested?

1   A.  It was located at the end of a field on what appeared to be

2   a one-storey trailer/manufactured home that was at the end of a

3   field with trees in the background.

4   Q.  Ms. Annan, I'm now showing you a photograph that's been

5   marked for identification as Government Exhibit 22.

6          Do you recognize this photograph?

7   A.  I do.

8   Q.  What does it depict?

9   A.  A dirt road leading to down to -- along a field, which

10  would lead directly to where the trailer is.  If you're looking

11  down at that, the trailer is actually to the right of the road.

12  Q.  And that's the trailer where you testified earlier that you

13  arrested the defendant?

14  A.  Yes, it is.

15  Q.  Is the photograph an accurate and fair depiction of the

16  scene on the day that you were there?

17  A.  Yes, it is.

18          MS. TARLOW:  Your Honor, the government offers

19  Government Exhibit 22 into evidence.

20          THE COURT:  Any objection?

21          THE DEFENDANT:  No objection.

22          THE COURT:  22 is received.

23          (Government's Exhibit 22 received in evidence)

24  BY MS. TARLOW:

25  Q.  Ms. Annan, taking a look at this photograph, can you please

1  describe where the defendant's trailer is located?

2  A.  If you're looking down the dirt road to the right, beyond

3  the crane, that yellow crane or farm equipment was not there on

4  the day of the arrest.  But just beyond that, you can see the

5  roof of the side of the trailer.

6  Q.  What did you do when you first arrived there?

7  A.  We basically -- I was with another deputy, a trooper and

8  three other officers.  And we basically made sure that we had

9  all the areas covered, identified a vehicle that I knew that

10  was associated with Mr. Diaz.  So, at that time we basically

11  covered the trailer, and I knocked on the front door.

12  Q.  Who, if anyone, answered the front door?

13  A.  Mr. Diaz did.

14  Q.  How did you the know that it was Mr. Diaz?

15  A.  I had been provided, through that collateral lead request,

16  a picture of what Mr. Diaz looked like.

17  Q.  And did the person you observed match the picture that you

18  had previously received?

19  A.  It did.

20  Q.  Did there come a time when you advised Mr. Diaz of his

21  Miranda rights?

22  A.  I did.

23  Q.  What, if anything, did he then do with respect to his

24  Miranda rights?

25  A.  I read him the rights.  He acknowledged that he understood

1   them.  He signed them and he agreed to speak with me.

2   Q.  Ms. Annan, I'm showing you a document marked for

3   identification as Government Exhibit 26.

4          Do you recognize this document?

5   A.  I do.

6   Q.  And what is it.

7   A.  Waiver of rights.

8   Q.  How do you know that?

9   A.  I signed it, and it's my handwriting.

10          MS. TARLOW:  Your Honor, the government offers

11   Government Exhibit 26 into evidence.

12          THE COURT:  Any objection?

13          THE DEFENDANT:  No, Your Honor.

14          THE COURT:  All right.  26 is received.

15          (Government's Exhibit 26 received in evidence)

16          MS. TARLOW:  Please publish 26 to the jury.

17   Q.  Ms. Annan, what is the address that's listed on this

18   document?

19   A.  11076 Atlantic Road, Temperanceville, Virginia.

20   Q.  Is that the same address that you testified earlier as to

21   where you found the defendant?

22   A.  Yes.

23   Q.  Whose name is printed in the middle of the form?

24   A.  Salvador Diaz.

25   Q.  Please read the name signed on the bottom right on this

1    form?

2    A.   Salvador Diaz.

3    Q.   And whose name is signed on the bottom left of the

4    document?

5    A.   My name.

6    Q.   What is the date on which this form was signed?

7    A.   1/27/2017.

8    Q.   After Mr. Diaz waived his Miranda rights, what, if

9    anything, did he state about whether he had previously

10   registered as a sex-offender?

11   A.   He stated he had previously registered as a sex-offender in

12   the state of New York.

13   Q.   What, if anything, did he say about whether he left New

14   York?

15   A.   He stated he left New York sometime in 2014 and at that

16   time he moved with his mother and his sister in New Jersey.

17   Q.   What, if anything, did Mr. Diaz say about whether he

18   resided in other locations?

19   A.   He stated that he also, in the summer of 2015 or 2016,

20   resided at a campground, the Chincoteague camp ground, in

21   eastern shore area of Virginia beach.

22   Q.   What, if anything, did Mr. Diaz say about his current

23   address?

24   A.   He lived at the address that we arrested him at, 11076

25   Atlantic Road and he had been there for a couple of months.

1  Q.  What, if anything, did Mr. Diaz say about whether he was

2  currently required to register as a sex-offender?

3  A.  He stated that he knew he was required to register.

4  Q.  Did there come a time when you attempted to leave

5  Mr. Diaz's home?

6  A.  Yes.

7  Q.  What happened then?

8  A.  When we came down that dirt road, we had several vehicles.

9  The last vehicle -- the road was very muddy.  The last vehicle

10  of our four vehicles got stuck on that road.  So, we had to

11  call tow truck to come get that vehicle out of the away.  That

12  was the only way in.  We had already gone around looking for

13  another way out of that area.  We could not locate another way.

14  So, we were basically waiting for the tow truck to remove that

15  vehicle so that we could also then depart.

16  Q.  What, if anything, did Mr. Diaz say in response to that

17  situation?

18  A.  At that moment the tow truck, as it was taking the vehicle

19  away, we were standing outside, and he stated:  I thought that

20  I was far enough back that you wouldn't be able to find me

21  here.  Words to those effect.

22  Q.  What was his tone at that time?

23  A.  I thought it was serious.

24  Q.  Did he appear to be joking?

25  A.  No.

1          MS. TARLOW:  One moment, your Honor.

2          No further questions.

3          THE COURT:  Okay.  Mr. Diaz.

4    CROSS-EXAMINATION

5    BY THE DEFENDANT:

6    Q.  Good morning, Ms. Annan.

7    A.  Good morning.

8    Q.  When you stated -- that statement that I made, could you

9    repeat that again?

10          THE COURT:  Which one?

11          THE DEFENDANT:  Outside.

12          THE WITNESS:  Outside, it was basically, I thought I

13   was far enough back here that nobody would be able to find me

14   out here.

15   Q.  Who was there listening to me and you?

16   A.  I believe Deputy Newton may have been there and one of the

17   troopers might have also been standing there.  But I think at

18   that time we were all getting ready to depart.

19   Q.  Was I free to do anything?  Was I in handcuffs?

20   A.  At that point in time, yes.

21   Q.  Yes.  And the officers that were there were armed?

22   A.  They would have had their weapons on them, but not out of

23   the holster.

24   Q.  No.  No.  But they had weapons with them?

25   A.  Yes.

1   Q.  And did any of them -- didn't one of those people laugh or

2   anything about that, about the comment that I made?

3   A.  I don't recall that.

4   Q.  Very well.

5           THE DEFENDANT:  That is all, your Honor.  No more

6   questions.

7           THE COURT:  Any redirect?

8           MS. TARLOW:  No, Your Honor.

9           THE COURT:  Thank you.

10          THE WITNESS:  Thank you.

11          THE COURT:  Call your next witness.

12          MS. TARLOW:  Your Honor.  The government rests.

13          THE COURT:  Okay.  Ladies and gentlemen, that's the

14  point where we always take a break.  While it's very close to

15  lunchtime, I am not sending you to lunch yet.  So, please go

16  back to the jury room.  Just hang.  Don't discuss the case.

17  And don't leave the jury room.  This should not be a long

18  break.

19          (Jury not present)

20          THE COURT:  Okay.  Mr. Diaz, you have a motion?

21          THE DEFENDANT:  Yes, your Honor.

22          At this time I would move, pursuant to Rule 29A, for

23  judgment of acquittal because the government has failed to

24  offer sufficient evidence to sustain a conviction.

25          THE COURT:  You want to say anything more than that?

```
 1              THE DEFENDANT:  No.

 2              THE COURT:  That motion is denied.  There's more than

 3   sufficient evidence that will sustain a conviction.

 4              All right.  Mr. Diaz, now that -- yes?

 5              THE DEFENDANT:  I would like them to order the

 6   transcript -- to order the transcript of yesterday and today.

 7   Is that possible?

 8              THE COURT:  By when?

 9              THE DEFENDANT:  Well, at least we could have yesterday

10   and by the end of the day.  If possible, we'd like to have the

11   transcript for the rest of the day.

12              THE COURT:  Were you -- did you order daily copy?

13              MS. TARLOW:  Yes, your Honor.  We ordered yesterday's

14   transcript.

15              THE COURT:  Okay.  So, that should have already

16   happened.  Yes.

17              THE DEFENDANT:  Very well.  Thank you.

18              THE COURT:  Mr. Diaz, the government has now rested.

19   It's now your turn.

20              Are you going to put on a case?

21              THE DEFENDANT:  No, Your Honor.  Defense rests.

22              THE COURT:  Okay.  Mr. Diaz, I just need to make sure

23   that you understand that you have a constitutional right to

24   testify if you want to.  You can't be forced to testify, but

25   it's up to you whether you're going to testify or not.
```

```
 1            You should obviously consult with your standby
 2   counsel, but at the end of the day, it's your decision whether
 3   you're going to testify or not.
 4            Do you understand that?
 5            THE DEFENDANT:  I understand.
 6            THE COURT:  Do you wish to testify?
 7            THE DEFENDANT:  No, Your Honor.
 8            THE COURT:  Here's what we're going to do.  I'm going
 9   to say, Mr. Diaz; you're going stand up and say, the defense
10   rests; I'm then going to send them to lunch; I'm going to give
11   you all an hour; I'm going to bring everybody back at 1:30, and
12   so that's when we'll start.  Okay?
13            Let's get the jury.
14            (In open court; jury present)
15            THE COURT:  Okay.  Mr. Diaz.
16            THE DEFENDANT:  The defense rests, your Honor.
17            THE COURT:  Okay.  Thank you.
18            All right.  Ladies and gentlemen, that means both
19   sides have rested.  You've heard all the evidence you're going
20   to hear in this case.  We're going to break for lunch now.  And
21   I'm going to give you a somewhat longer lunch break than I
22   ordinarily would.  So, we're going to break for lunch until
23   1:30.
24            What will happen when you come back from lunch is the
25   government will sum up, the defense will sum up, the government
```

1  will do a rebuttal summation.  They get to go first and last

2  because they have the burden of proof.  I'll charge you, and

3  then you'll start deliberations.  That's the scheduler for the

4  balance of the day.

5       Let me remind you that you can go anywhere you want to

6  for lunch today -- and you're going to have about an hour and a

7  half, so there's time to go wherever you want to go.  Where you

8  cannot go is the cafeteria that is in this building.  It's the

9  most convenient, but you can't use it; okay?  please be back on

10  time so that we can start right at 1:30.

11       Let me also remind you, you're not likely to run into

12  witnesses that testified here.  But if you did, do not talk to

13  them.  Ignore them.  Don't wave at them, smile at them,

14  anything.  Same with the parties, the lawyers, etc.  So, if you

15  see any of the parties or witnesses, don't talk to them.

16       And don't talk about the case among yourselves.  You

17  got a little bit more to go before you go back there to start

18  deliberating.  Do not talk about the case at this point.

19       So, have a wonderful lunch.  I'll see you again at

20  1:30.  Please don't be late.

21       THE COURT:  Anything before I leave?

22       MS. TARLOW:  Not from the government, your Honor.

23       THE COURT:  Mr. Diaz?

24       THE DEFENDANT:  No, Your Honor.

25       THE COURT:  Give the jury just a couple minutes to

1    clear.  See you all at 1:30.

2              (Luncheon recess)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        AFTERNOON SESSION

 2                             1:30 p.m.

 3             (Jury not present)

 4             THE COURT:  Please be seated, everybody.

 5             I'm told there's an issue.

 6             MS. TARLOW:  Yes, your Honor.  During the intervening

 7   lunch break, defense counsel sent the government additional

 8   proposed redactions to certain exhibits that have already been

 9   admitted.  Defense counsel had opportunity to make redactions

10   to those exhibits.  And our concern is that the jury has

11   already seen those exhibits and if they see them in a changed,

12   redacted form, they may appear to have been tampered with.

13             THE COURT:  What's the nature of the changes?

14             MS. TARLOW:  The nature of the changes include the

15   defendant's phone number, his driver's license number, his

16   New Jersey driver's license number, which is relevant because

17   it appears in multiple -- different documents and his voter

18   registration application, as well as his -- his vehicle

19   registration documents.  And the defense counsel did not object

20   to the current form of the exhibits when they were offered into

21   evidence.

22             THE COURT:  OK.

23             Mr. Diaz.

24             MR. DIAZ:  May I?

25             THE COURT:  Yes.
```

1              (Mr. Diaz conferred with Ms. Kellman)

2              THE COURT:  I think I just heard Mr. Diaz in his

3    normal soft tone saying he doesn't care.

4              MS. KELLMAN:  He could care less.

5              THE COURT:  Mr. Diaz, do you want to push it or not.

6              MR. DIAZ:  Is that the only issue, that phone number?

7              MS. KELLMAN:  No, that's the only one I've gotten to.

8    Maybe he wants to call them.

9              THE COURT:  Here's the thing, I got a jury waiting so

10   snap-a-doodle.  What's your objection?

11             MR. DIAZ:  I have no objection over this one.  Let me

12   see the next one.

13             THE COURT:  What exhibit is it?

14             MS. KELLMAN:  Government Exhibit 32, it's the phone

15   number.

16             MR. DIAZ:  I have no objection over it.

17             MS. KELLMAN:  And Government Exhibit 63 is your

18   license number.

19             MR. DIAZ:  No objection over that.

20             THE COURT:  OK.

21             MS. KELLMAN:  So he doesn't object.

22             THE COURT:  Objection is withdrawn.  Let's get the

23   jury out.

24             Who is summing up?

25             MS. TARLOW:  I am, your Honor.

1          THE COURT:  Mr. Diaz, fair warning, during

2    Ms. Tarlow's summation you cannot be talking to Ms. Kellman.

3          (Jury present)

4          THE COURT:  Please be seated.

5          As I told you, we finished all the testimony and all

6    the evidence before lunch, and so now we're going to listen to

7    summations.  The government gets to go first and last because

8    they have the burden of proof and Ms. Tarlow is going to sum up

9    first.  Remember what they say is just intended to help you put

10   all the evidence together.  What they say is not evidence.

11         Ms. Tarlow.

12         MS. TARLOW:  Ladies and gentlemen, at the beginning of

13   this trial we told you that this was a case about a sex

14   offender who failed to comply with the law, a sex offender who

15   moved from New York to New Jersey, who made sure that all of

16   his personal affairs were in order, but who failed to do the

17   one thing that he was required by law for the public's benefit,

18   the one thing that he knew he was required to do:  To register

19   as a sex offender in New Jersey, and he failed to do that month

20   after month after month.  That is exactly what the evidence

21   showed.

22         Over the last few days you've seen and you've heard

23   the government's evidence.  This summation is our chance to go

24   through that evidence that you heard about in bits and pieces

25   and to show you how it all fits together, to explain how it

1   shows that the defendant is guilty.

2          And ladies and gentlemen, the proof is in, it is

3   clear, it is simple.  Salvador Diaz, the defendant, knowingly

4   failed to register as a sex offender in New Jersey.  Salvador

5   Diaz is guilty of the crime charged in the indictment.

6          I'm going to do a few things today in the summation.

7   First, I'm going to talk briefly about the law, then I'm going

8   to talk about how the government has proved beyond a reasonable

9   doubt that the defendant is guilty of the crime charged in the

10  indictment.

11         Let me first talk briefly about the law.  At the end

12  of these summations Judge Caproni will instruct you on the law.

13  Her instructions control.  To help you put the evidence in

14  context, I'm going to briefly summarize the law for you.

15         As you're already aware, the defendant is charged with

16  knowingly failing to register as a sex offender or to update

17  his sex offender registration.  That crime has three elements:

18  First, the defendant was required to register as a sex offender

19  under federal law; second, the defendant traveled in interstate

20  commerce; and third, the defendant knowingly failed to register

21  as a sex offender or knowingly failed to keep his sex offender

22  registration updated as required by federal law.

23         Let's talk about how the government proved to you

24  beyond a reasonable doubt that all three of these elements are

25  met.  Ladies and gentlemen, there's no real dispute that the

1    government has proven the first element of this crime.  In 2000,

2    the defendant was convicted of violating Article 120 of the

3    Uniform Code of Military Justice.  At the beginning of this

4    trial, you were shown a certified copy of a document that

5    records his conviction.  I expect that Judge Caproni will

6    instruct you that this crime is a sex offense, and as a result

7    of his conviction, he was required to register under federal

8    law as a sex offender.  So that first element that the

9    defendant was required to register as a sex offender, that's

10   met.

11          Let's talk about the next two elements.  To do that

12   we'll need to take a step back and we're going to talk about

13   the background of this case.  You heard that after the

14   defendant was released from prison, he registered as a sex

15   offender in New York.  He confirmed that he was residing at a

16   particular location in Manhattan, 52 Arden Street for years.

17   The last time that the defendant verified his address at that

18   location was on March 27, 2014.  On that date, he signed an

19   annual address verification form confirming that he resided at

20   52 Arden Street, Apartment 5A, but then he just stopped.

21          In 2015 and 2016, annual address verification forms

22   were sent to the defendant at the 52 Arden Street address.

23   These forms were returned as undeliverable and unsigned.  Why?

24   Because the defendant wasn't living there anymore.  And how do

25   you know the defendant left his address at 52 Arden Street?

1   Pablo Rios, a property manager for that apartment building

2   testified that the defendant resided there with his mother,

3   Gladys Rodriguez until 2014.  Mr. Rios showed you documents

4   that were kept in a file for that apartment.

5          You saw Government Exhibits 14 through Government

6   Exhibit 17, which were lease renewal forms that listed the

7   defendant and his mother as tenants of an apartment at 52 Arden

8   Street.  And you saw Government Exhibit 19, a document entitled

9   Apartment Vacancy Report, which indicated that the 52 Arden

10  Street apartment had been vacated by December 31, 2014.

11  Mr. Rios also testified that when an apartment is vacated, an

12  inspection is performed, and that a vacancy report would not be

13  generated if any tenant remained in the apartment.

14         So where did the defendant go after he left his last

15  registered address in Manhattan?  He moved to New Jersey, first

16  to live with his mother at Oceanpointe Towers, an apartment

17  complex at 10 Pavilion Avenue in Long Branch, New Jersey, and

18  then to live with his sister, at an apartment located at 243

19  Purdue Avenue in Pemberton, New Jersey.

20         How do you know that?  Well, we've proved it in

21  multiple ways.  We have the defendant's own statements, we have

22  witness testimony, and we have a trail of documents that the

23  defendant left in his wake showing that he moved to New Jersey.

24         At the time of his arrest, the defendant did not

25  dispute this.  You heard from Deputy Marshal Annon, that after

1    she arrested the defendant, he said that he left his last

2    registered address in New York in 2014, he first moved in with

3    his mother and then he lived with his sister in New Jersey.

4    Let's take each of those residences in turn, starting with the

5    residence where the defendant's mother moved after they left 52

6    Arden Street.  How do you know that the defendant also lived

7    there?  You heard testimony from Sabrina Obreiter, a property

8    manager at Oceanpointe Towers.  Ms. Obreiter testified that the

9    defendant's mother began renting an apartment there in

10   September 2014.  Ms. Obreiter showed you Government Exhibit 33

11   which listed Mrs. Rodriguez move-in date as September 23, 2014.

12            The defendant was not formally on the lease, but he

13   was issued a key fob on October 1, 2014.  That key fob allowed

14   him 24-7 access to that apartment.  Ms. Obreiter testified that

15   after the defendant's mother moved in, she would see the

16   defendant approximately two to three times a week, walking in

17   and out of Oceanpointe Towers.  That was just while

18   Ms. Obreiter was sitting at her desk casually observing

19   residents coming into and out of the building.

20            And Ms. Obreiter observed the defendant residing at

21   that apartment building.  You'll remember that she told you

22   about a strict policy at Oceanpointe Towers that guests cannot

23   reside there for 30 days or more.  She told the defendant about

24   that policy.  She told him he had to stop living there unless

25   he either became a tenant or he became a live-in aide for his

1    mother.  She also informed him that in either of those cases,

2    he had to undergo a background check.  The defendant didn't

3    want a background check and he never followed up.  But he also

4    didn't stop staying at Oceanpointe Towers.

5          Ms. Obreiter later observed on violation videos that

6    the defendant had been sneaking into the video after 5 p.m. and

7    leaving before 8 a.m.  He was trying to avoid her and anyone

8    else who might suspect that he was still living there.

9          Ms. Obreiter also told you that in 2016 she went to

10   significant lengths to make sure that the defendant was not

11   living at the apartment.  She asked that her lawyer send the

12   defendant's mother a notice informing her that she would be

13   evicted if the defendant continued to reside there.

14         So where did the defendant go next?  Another address

15   in New Jersey.

16         I told you earlier that there were some documents

17   which track the defendant's movements.  So let's take a look at

18   some of them.  You were shown several of the defendant's

19   banking statements, you saw that each of those banking

20   statements listed a specific address, an address where the

21   defendant lived.  And by looking at those banking statements,

22   we can recreate a timeline of his movements.  So until

23   October 2014, the defendant's banking statement listed 52 Arden

24   Street as his address.  That's consistent with what we know

25   from the defendant's own annual verification forms that he sent

to the New York State Sex Offender Registry, and it's
consistent with the lease renewal forms which listed the
defendant as a tenant at that address.

But in October 2014, the defendant's banking
statements start to list a new address, the defendant's address
as 10 Pavilion Avenue, Apartment 307, that's the address of
Oceanpointe Towers, where the defendant's mother signed a
lease.  And as you'll recall, that's the same month that the
defendant was given his key fob to access the building 24-7.

But that wasn't the defendant's final stop in
New Jersey, and it's not his final address change on his
banking statements.  Let's fast-forward two years to
October 2016.  The defendant's banking statements start to list
a new address in New Jersey, 243 Purdue Avenue.  Why was that?
Well, you'll remember that Ms. Obreiter told you that in 2016
the apartment building began to take legal action to evict the
defendant's mother because they believed he was living at
Oceanpointe Towers, the jig was up, the defendant was caught,
he couldn't keep staying there, he couldn't keep getting his
mail there.

And what is 243 Purdue Avenue?  It's the defendant's
sister's home.  Remember that you saw a document, the
defendant's mother provided when she moved into Oceanpointe
Towers.  That document listed her daughter, Margarita Rodriguez
as an emergency contact.  And it listed her daughter's home

address as 243 Purdue Avenue.  So how do you know that the

defendant was living at all of these places?  Well, first, it's

common sense.  It's common sense that the defendant would want

to receive important financial documents at his home address.

The defendant made sure that when he moved from place to place,

he kept his banking information up to date.  It's also

consistent with the defendant's own statements.  He told Deputy

Marshal Sherri Annon that after leaving New York he first moved

in with his mother and then he lived with his sister in

New Jersey.  And it's consistent with the defendant's actions.

        As you'll recall, there was one final address listed

for the defendant on his banking statements.  In December 2016,

the defendant listed an address in Virginia, 11076 Atlantic

Road.  That's where he was arrested.  That's where he was

living at that time.  And so we can use these banking

statements to track the defendant's movements from New York to

10 Pavilion Avenue to 243 Purdue Avenue and finally to Virginia

where he was arrested.

        These banking statements are not the only documents

showing that the defendant resided in New Jersey.  You heard

about several other ways that the defendant moved his personal

affairs from New York to New Jersey.  You saw document after

document in which the defendant himself stated that 243 Purdue

Avenue was his home address.  You saw Government Exhibit 63 and

64, which are records from the New Jersey Motor Vehicle

Commission.  Those records show that the defendant obtained a
New Jersey driver's license in January 2015.  Again, the
defendant listed his residence, the 243 Purdue Avenue address.

        And you saw that the defendant registered several
vehicles in New Jersey, and again, he listed his address as 243
Purdue Avenue.

        You also were shown Government Exhibit 45, which
includes the defendant's application to vote in New Jersey in
July 2016.  The defendant listed his home address as 243 Purdue
Avenue.  And on that form, the defendant was required to swear
or affirm that I live at the above address.  What did the
defendant do yet again?  The defendant signed his name, the
defendant swore that he lived at the New Jersey address.

        What does all of this evidence tell you?  It tells you
that he traveled in interstate commerce from one state to
another, that he moved from New York to New Jersey.  These are
his own statements, ladies and gentlemen, his own actions, his
own representations that his home was in New Jersey.  The
second element of this crime is met.

        So let's now talk about the last element for the
offense charged, which is that the defendant knowingly failed
to register or update his registration.  How do you know that
the defendant was aware of these requirements, that he knew he
was required to register and keep his address updated at any
state where he resided?  Because you saw document after

document after document that spelled out those requirements,

and you saw that the defendant signed those documents, he

acknowledged that he understood what was required of him as a

sex offender.

Let's talk about just a few of those documents.  You

saw Government Exhibit 2, a form that was given to the

defendant.  That form was labeled Acknowledgment of Convicted

Sex Offender Registration Requirements.  That form explicitly

advises the defendant that he was required to register as a sex

offender in any state where he resided.  What did the defendant

do?  He signed that form.  He acknowledged those requirements.

How else do you know that he was aware that he was

required to register in New Jersey?  Well, in 2010, before he

moved to New Jersey, he was provided with two more forms by the

NYPD.  He was given a New York State sex offender registration

form, that form advised him that if he moves to another state,

he must register as a sex offender.  That form included a

signature line for the defendant to acknowledge that he

understood his registration requirements.  What did the

defendant do?  He signed the form, he acknowledged those

requirements.

He also was given a form that had written in a big,

bold letters, "Top Ten Ways Registered Sex Offenders Avoid

Arrest for Failure to Register."  That form reminds sex

offenders not once, but twice that you must actually live at

1    your registry address because the crime of failure to register

2    is a felony charge.  What did the defendant do?  He signed the

3    form, he acknowledged those requirements.

4        These forms explicitly told the defendant that he must

5    live at his registered address and that he must register in any

6    state where he resided.  You know the defendant was aware of

7    these requirements.  He signed and acknowledged each and every

8    one of those documents.

9        How else do you know that he was aware that he had to

10   verify and update his address?  Well, from 2008 until 2014, the

11   defendant did just that.  Ms. Ernst showed you annual forms

12   that the defendant submitted to state authorities providing

13   information about where he was living.  In 2008, the defendant

14   submitted one of these forms and updated his address in

15   Manhattan.  You saw that the form had a printed address on the

16   top left corner, an address where the defendant had previously

17   indicated he was living.  That address was crossed out.  A new

18   address was written in by hand.  The defendant changed his home

19   address in Manhattan to 52 Arden Street on that form.  What

20   does this tell you?  It tells you that the defendant knew how

21   to update his address if he needed to, if he wanted to.

22       And you also saw Government Exhibit 7 through

23   Government Exhibit 11 in which the defendant verified for years

24   that he was continuing to live at that address.

25       Ladies and gentlemen, the defendant himself does not

1    dispute that he was aware of this requirement.  You heard from

2    Deputy United States Marshal Annon that when she arrested the

3    defendant for this arrest while he was living in Virginia, he

4    informed law enforcement officials that he knew he was required

5    to register as a sex offender.

6         The third and final element requires that the

7    defendant failed to register as a sex offender.  The evidence

8    was clear and simple on this point.  You heard Michael

9    Acquaviva, a representative from the Monmouth County

10   Prosecutor's office testify that he has reviewed a New Jersey

11   state-wide sex offender database as recently as this past week.

12   Mr. Acquaviva confirmed that based on his review, the defendant

13   has never registered as a sex offender in New Jersey.

14        So despite establishing residences in New Jersey,

15   despite organizing his personal matters to reflect that he had

16   moved to New Jersey, and despite knowing that he was required

17   to register there, the defendant knowingly failed to register

18   as a sex offender in New Jersey, that's the third element of

19   this crime.

20        Ladies and gentlemen, you've listened closely to all

21   of the evidence in this case.  You now know that the defendant

22   failed to register as a sex offender for years because he

23   simply didn't want to.  When he left New York, he took care of

24   all of his personal affairs.  He did all of the things he

25   needed to do to make his own life easier.  He made sure that

1   his finances would be in order, that he could drive his

2   vehicles in New Jersey, and that he could vote in New Jersey.

3   But he did not take the time, despite knowing that it was

4   mandated by federal law to register as a sex offender in

5   New Jersey, a step that he needed to take for the public's

6   benefit, a step that informs the public if a sex offender lives

7   in their communities.

8          You've seen the paper trial, you've heard from the

9   witnesses.  This is not a close case.  Think about all of the

10   documents, all of the testimony, and think about how it all

11   fits together.  The evidence is staggering.  The evidence, all

12   of the evidence points to only one conclusion, the defendant is

13   guilty of the crime charged in the indictment, failing to

14   register as a sex offender.

15          Thank you.

16          THE COURT:  Thank you, Ms. Tarlow.

17          Mr. Diaz.

18          MR. DIAZ:  Good afternoon.

19          When I came up here in front of you yesterday, I was

20   nervous.  I'm nervous now too.  I'm not a lawyer, I have never

21   done this before, and all I have through this lengthy period of

22   time that the government has explained my life.  It's common

23   sense.  Not being a lawyer, I didn't know the law.  That,

24   ladies and gentlemen, was the first piece of evidence that the

25   government chose to use against me when they have to prove that

1    when they have the burden of proving a case beyond a reasonable

2    doubt.

3           After seeing that, let's just say I became a little

4    more jittery.  Of course I can come back up here and say, well

5    the details of what the form says, Blah, blah, blah.  The fact

6    is, that doesn't detract from the fact -- I'm sorry, when the

7    detail of the form -- the detail of what the form says doesn't

8    take away from the fact that I have to register, but that is

9    not the point here.  The point here is that the case must be

10   proven using the highest standard of this country beyond a

11   reasonable doubt.  This is the federal government.  They can't

12   have it both ways.  They can't say one section of one document

13   is important and another section, don't worry about it, we made

14   a mistake or that doesn't prove anything, it doesn't prove

15   anything to me.  I don't know.  Does it sound like it proves

16   something to you if there are inconsistencies in the documents?

17          They also say people who came up here to submit this

18   form, they also can't sate people that came up here to submit

19   this form are any authority on the records.  When those people

20   never filled out the records, never wrote the form themselves,

21   never verified or checked to see if the information was correct

22   or accurate.  They just assumed it to be true because they --

23   whoever they were they were part of the state records.  With

24   all due respect, let's just say that the first two witnesses

25   what they were.  They were people who just got paper from one

1   office and put them in a folder in another office without

2   checking and without follow-up, without much care.

3           But you care, or you wouldn't be here, and that's why

4   we selected you to decide this case.  You will be able to take

5   all these forms that we have been -- that have been introduced

6   before you to the jury room and deliberate on those forms.

7   Make sure please that you look at them and compare with each

8   other to see the consistency as the government has said that

9   they have proved everything beyond a reasonable doubt, compare

10  the dates in Exhibit 1 with the dates in Exhibit 3.  You will

11  see in five seconds the dates don't match up, they don't make

12  sense.  That alone is enough to create reasonable doubt in your

13  situation.

14          But there is more, that's not enough.  The rest of the

15  evidence they showed didn't remove the cloak of innocence that

16  I had when I walked into this room, because, remember, ladies

17  and gentlemen, under our laws I am innocent until you decide

18  otherwise.

19          Remember, first, I came over here yesterday and talked

20  to you about stigma.  When I talk about stigma, how stigma

21  breaks people down into a single stereotype.  The government is

22  playing the same game with excessive documentation in the form

23  of just trying to form smoke and mirrors in front of you.  They

24  think you're going to focus in on all this data in the

25  documents -- I'm sorry.  They want you to focus on those

1    things, and that's where you compare those documents, that's

2    where you're going to have to utilize common sense.  The common

3    sense reason why I would need to visit my mother in New Jersey,

4    why I was seen there so many times without actually living

5    there.  They have not proved that I had lived there.  They had

6    proved that I was there a lot time.  Residence constitute,

7    according to the rules that Ms. Obreiter said early, you have

8    to sleep there.  She's said she saw me a lot of times, but her

9    working hours are from 8:30 to 5:30.  So she saw me during the

10   workday.

11          Now, ladies and gentlemen, I know we just met

12   yesterday and you really don't know me, so I would like to

13   explain a few things about me.  I don't know if you noticed,

14   I'm a normally relaxed except when I'm here I tend to laugh a

15   lot and make jokes about different things.  I try to find

16   something pleasant about practically every situation that I

17   live in and I usually do, but part it's only myself, I must be

18   like someone mentioned yesterday that I think I'm funnier than

19   I am.  I'm not a comedian, but I'm not a lawyer either.  I'm

20   just a simple person here trying to prove to you my innocence,

21   even though I don't have to.

22          Remember one morning all of a sudden I had a bunch of

23   marshals knocking on my door, as I said, in Virginia and they

24   wake me up, I answered the door, I opened the door, I welcomed

25   them into my home, I wave on the right to hold -- not to say

1   anything and I give them full testimony of what I said.  Then

2   we finish all that interview, what do I do?  We walked out.  It

3   just so happened that the road if you saw on the exhibits, the

4   road to the place where I lived, which was very remote place

5   where the road is dirt and when it rains, it's extremely muddy,

6   one vehicle on the way in gets stuck on the mud.  So we had to

7   wait over there for a certain amount of time.

8           And while we were waiting for a tow truck to come and

9   release their vehicle from the place, everyone is sitting

10  around and she said there were six people there, not just

11  her --

12          MR. NESSIM:  Your Honor, we object.

13          THE COURT:  Overruled.

14          MR. DIAZ:  Six people sitting around and actually

15  everybody was making a joke about the ordeal that they had to

16  get to my place because of all the rain, all the mud, and I

17  happened to make a statement, a joke like I usually do.

18          There is also something very important to remember

19  here too.  I have not had in any police contact at all since my

20  arrest and conviction.  I have been arrested -- I haven't

21  arrested for anything since the day alleged in this case.

22          MS. TARLOW:  Objection, your Honor.

23          THE COURT:  Sustained.

24          Disregard the statement that he just made about what's

25  happened since he was arrested.

1          You're bound by the record, Mr. Diaz, you're bound by

2     the record that has come into evidence.  They can only consider

3     what's been presented into evidence.

4          MR. DIAZ:  That was my statement I was going to make.

5          THE COURT:  You don't get to make a statement, you get

6     to make a summation.

7          MR. DIAZ:  I understand.

8          This case is about the government trying to make me

9     pay for the rest of my life for what I was convicted of in 2000

10    for what an offense which I already went to jail and did all

11    the time for fulfill my obligation to society.  This is about

12    the government trying to get you to hear a story with the words

13    "sex offender" in it, drowning you in repetitious paperwork

14    with the simple purpose to distract you from paying attention

15    and noticing the missing proof of the elements which they just

16    claimed they fulfilled.

17         All the government's evidence show was that this --

18    that I never was hiding or running from anyone.  If I did, I

19    wouldn't have changed my mail address to a single place like I

20    did.  If you look at the record, you will find all my personal

21    information has always been readily available in this day and

22    age of the Internet, anyone can find out about, bank records,

23    credit cards, driver's license, insurance, vehicle

24    registration, social security records, Veteran Administration

25    records, blood donor, organ donor card -- is that the behavior

1    of someone trying to hide something?

2              When I bought -- in Exhibit 23, you will see the

3    record of my vehicles.  You will find out that I bought a motor

4    home in December of 2014, just prior -- before I moved away

5    from New York.  This is where I lived, in an RV, but I needed a

6    place to have all my records going to and I used my sister's

7    address at 243 Purdue Avenue with all the records.  Apparently

8    I made a mistake because one of the records, the bank record

9    somehow ended up with my mother's address that is the evidence

10   they have presented to you today.  That doesn't prove that I

11   lived there.  It -- even the fact the records don't prove that

12   I lived with my sister either.  I lived in my RV, and the

13   record will show you there's a deed -- registration in the

14   place in Virginia, Chincoteague, Trail's End, where I bought a

15   lot and I placed my vehicle over there.

16             MS. TARLOW:  Objection, your Honor.

17             THE COURT:  Sustained.  You're limited to the record.

18             MR. DIAZ:  The bottom line of this is that I have

19   never had hide my address from anyone.  It's always been a

20   matter of public record and only some circumstances show that

21   because the address listed in New Jersey, it's normally assumed

22   that lived in New Jersey.  No one here has proven that I lived

23   over there.  I moved out of New York at the end of 2014 and

24   immediately all my addresses and all my documents, with the

25   exception of the bank statement from the Navy Federal Credit

1    Union, listed my address as 243 Purdue Avenue.  There is no

2    record of photos that I either spent 30 days at my mother's

3    place.  I visited her many times, I spent a lot of times there,

4    I don't deny that, but my mother had just moved over there.  My

5    mother doesn't speak English.

6            THE COURT:  Mr. Diaz, you can't testify during your

7    summation.  You can only talk about what the evidence shows.

8            MR. DIAZ:  Well, the evidence shows that.

9            THE COURT:  Tell them.

10           MR. DIAZ:  The evidence shows that by -- as we

11   discussed, my mother was a sick woman.  She's 89 years old now.

12   She needed some help, and -- that was the reason why I had -- I

13   visited often at her home.

14           The Judge is going to break down all the elements as

15   the government did and I tried to do unsuccessfully and there

16   are a lot of words you're going to hear.  So I need you to

17   listen to some key pieces here, "knowingly," the government has

18   to prove that I knowingly failed to register.  Remember

19   yesterday when I talked about the word "knowingly" as an

20   element.  The government has to prove beyond a reasonable doubt

21   every single element of the challenge.  I submit to you the

22   main element here is that I knowingly failed to register beyond

23   a reasonable doubt.  When you hear the Judge, she's going to

24   say that mere negligence is not enough.  Were my actions

25   negligent?  That's for you to decide.  But the government

1    established that I might have been negligent is not enough to

2    prove that I'm guilty of the crime beyond a reasonable doubt.

3             I spent 20 years' of service --

4             May I have a second, your Honor?

5             THE COURT:  Yes.

6             MR. DIAZ:  Ladies and gentlemen, when you walk into

7    the deliberations room and begin going over the evidence and

8    get -- if you can get past the stigma that it's inherent in the

9    word "sex offender," you're going to come back and the only

10   evidence that's consistent with the evidence that you've heard.

11            Before my conviction in 2000, I watched television, I

12   was influenced by shows like NCIS, CIS, JAG, where the good

13   guys are the good always trying for the win over evil.  All

14   government agents are official well beyond reproach.  I was

15   like most people, I believed in our government, and I thought

16   an innocent person could not be found guilty under our system

17   of law.  I was wrong.

18            I want to thank you ahead of time for your common

19   sense, for your time and understanding.

20            That is all, your Honor.

21            THE COURT:  Thank you, Mr. Diaz.

22            Rebuttal, Mr. Nessim.

23            MR. NESSIM:  Ladies and gentlemen, you have heard the

24   defendant talk about how he's a man with a sense of humor,

25   about his time in the Navy, about his sick mother.

1          But what you didn't hear the defendant say was

2     anything that undermined the overwhelming evidence of his guilt

3     presented throughout this trial.  He is a sex offender who is

4     required to register but did not.  That's what this case is

5     about.  Everything else is a distraction.

6          Before I talk about some of the evidence in this case,

7     let me take a moment to remind you all of what you have heard

8     so many times.  The defendant has no burden, none whatsoever.

9     The burden of proof is always with the government.  The

10    defendant can simply sit there throughout this trial.  He

11    doesn't need to call any witnesses, he doesn't need to make any

12    arguments to you, and he doesn't need to cross-examine anyone.

13         But if the defendant does make arguments to you and

14    does cross-examine witnesses, as you just saw and saw

15    throughout this trial, you can and should scrutinize those

16    arguments, compare those arguments to all the proof that you've

17    seen in this trial, all of the evidence of the defendant's

18    guilt.  When you see that the defendant's arguments are totally

19    contradicted by the proof, you should see them for what they

20    really are, a distraction.

21         Before I say anything else, let me make one thing

22    clear.  I'm going to respond to some of the arguments defendant

23    just raised, but I expect that Judge Caproni will instruct you

24    that you have to rely only evidence in your deliberations.  She

25    will tell you that evidence is the sworn testimony of witnesses

and the exhibits that have been admitted into the record.  I

expect Judge Caproni will instruct you that things that are not

evidence are questions by a party and arguments from the

parties.

What does that mean?  Anything the defendant told you

or said in his opening and closing, any question that he put to

a witness, those are not evidence.  What is evidence is what

those witnesses told you from the witness stand right there and

the documents that were admitted into evidence.

So what's not evidence?  A story about a muddy road

and his statements to the U.S. Marshals that you just heard.

What else isn't evidence?  A story about his RV and where he

might have been staying.  That's not evidence in this trial,

and as the Judge will instruct you, it should not be considered

in your deliberations.

But now let's talk about the evidence that the

defendant is disputing.  You heard him argue there's no

evidence that he lived in New Jersey, that he established a

residence in New Jersey.  Ladies and gentlemen, that's

ridiculous.  You don't need to watch a video footage of the

defendant's sleeping habits to know that he lived in

New Jersey.  You saw evidence of the things the defendant did

do in New Jersey, that your common sense tells that you people

only do if they live in that state.  The defendant got a

New Jersey driver's license, the defendant registered to vote

in New Jersey, you saw the defendant's bank account statements
which show his monthly statements being sent to him in
New Jersey.  Month after month for years.

You heard Sabrina Obreiter tell you how frequently she
saw the defendant carrying luggage into the building, how she
saw him sneaking into and out of the building, how she was so
sure that he was living there and running afoul of the
building's 30-day restriction on guests who are not on the
lease that she took steps to evict his mother.  You heard the
defendant's own statements after he was arrested, that he lived
in New Jersey.  The evidence that the defendant lived in
New Jersey is overwhelming.

Next, you heard the defendant talk about the
definition of knowing.  He claims that he was negligent of
not -- of needing to know he had to register.  Ladies and
gentlemen, he told Deputy Marshal Annon that he knew he was
required to register.  He signed form after form affirming that
he knew he had obligations to register as a sex offender.  He
knew he had to register as a sex offender and he was required
to do that and he failed to do that.

You heard the defendant argue that he wasn't trying to
hide his real location, that the forms you saw about a driver's
license, voting registration, the bank statements, those were
all his addresses that he provided.  Yes, that's true.  He did
make those statements, but what did he not report?  What did he

1    hide?  His status as a sex offender in the jurisdiction in

2    which he lived.  And that's why we're here, that's what this is

3    about.  We're not arguing that the defendant with total secret

4    tried to fall off the face of the earth.  What's clear from the

5    evidence is that he failed to register as a sex offender and

6    that's the question before you today.

7            You heard about the forms being wrong that you should

8    scrutinize the evidence and you should look at it.  But just

9    because a few forms have typos that you should dismiss them?

10   That is ridiculous and that's a distraction.  This case doesn't

11   turn on whether the New York Division of Criminal Justice

12   Services thinks that the defendant served in the Army or the

13   Navy.  You've seen the certified copy of the defendant's

14   conviction.  He was convicted of a sex offense.  The fact

15   there's a typo in a form about who convicted him doesn't do

16   anything to change that basic fact.  And you heard the witness

17   from the New York Sex Offender Registry.  It doesn't matter

18   whether the Army or the Navy was responsible for the

19   defendant's conviction.  What matters to the Division of

20   Criminal Justice Services is that the defendant was required to

21   register as a sex offender.

22           Again, you've heard from the defendant an account of

23   his life, service in the Navy, his sense of humor, we're not

24   disputing those things.  What we are saying is that they don't

25   matter here, they don't matter in this courtroom.  What matters

1    is, is the defendant a sex offender?  Was he required to

2    register?  Did he fail to register?  The evidence provides the

3    answers to all three of those questions and it is yes.

4         You also heard the defendant talk about how he's also

5    done his time, he's paid his service to society, and he doesn't

6    need to continue to abide by the law, that the government can't

7    prove that he has committed a crime here by failing to

8    register, but what the defendant desires cannot govern his

9    obligations.  As I expect Judge Caproni will instruct you,

10   there is no doubt that the law requires those who have been

11   convicted of a sex offense to register.  The defendant can't

12   pick and choose the laws that apply to them, none of us can.

13   Don't let this distract you from what is so clear:  That he had

14   to register, he knew about it, and he did not.

15        Now that's let's talk about reasonable doubt.  You've

16   heard about this reasonable doubt standard throughout the trial

17   and in the defendant's arguments.  Now, it is our burden, of

18   course, to prove this case beyond a reasonable doubt.  Here, as

19   in other cases.  While it is our burden, and it is a high

20   burden and we embrace it, it is not insurmountable.  Every

21   defendant who has ever been convicted after a trial in this

22   country for more than 200 years have all been found guilty

23   under the same standard, beyond a reasonable doubt.  Is it a

24   high burden?  Yes.  Is it an insurmountable one?  Of course

25   not.  Have we met that burden in this case?  Absolutely.  Every

1   criminal defendant is entitled to a trial, absolutely.  But not

2   every case is a close case, and this case isn't close at all.

3   The defendant is guilty.

4              THE COURT:  Thank you, Mr. Nessim.

5              We're going to take a short break, like seven minutes.

6   So just long enough to get a go to the bathroom if you have to,

7   and we'll get you back in here for the final charge.  Don't

8   discuss the case.  You haven't been charged on the law yet.  A

9   seven-minute break.

10             Leave your books on your chairs.

11             (Jury not present)

12             THE COURT:  Thank you all.  Seven minutes.

13             (Recess)

```
 1              (Trial resumed; jury not present)

 2              THE COURT:  Mr. Diaz, have you been through the binder

 3    of exhibits?  Are they ready to go to jury?

 4              THE DEFENDANT:  Yes, your Honor, I have.

 5              THE COURT:  Where is the binder?

 6              (Jury present)

 7              THE COURT:  Okay.  Please be seated.

 8              Okay.  If you want to follow along, we're going to

 9    start on page three of the binder that's in front of you.

10              Okay.  Members of the Jury, you have heard all of the

11    evidence.  I am now going to instruct you on the law that

12    governs the case.  There are three parts to these instructions:

13              First, I will provide you some general instructions

14    about your role and about how you are to decide the facts of

15    the case.  These instructions would apply to just about any

16    trial.

17              Second, I will give you specific instructions about

18    the legal rules applicable to this particular case.

19              Third, I will give you instructions on the general

20    rules governing your deliberations.  I will read most of this.

21    It's not my favorite way to communicate with a jury, but

22    because there is need for precision, it's important that I get

23    the words just right.  So, that's why I will be reading.

24              I have provided each of you with a copy of the charge.

25    If you find it easier to listen and understand while you're
```

1    reading along, please do so.  If you would prefer, you can just

2    listen.  Either way, you will have a copy of the charge with

3    you in the jury room so you can consult it if you want to

4    re-read any portion to facilitate your deliberations.  You will

5    also have in the jury room, a verdict form on which to record

6    your verdict, which is in the front pocket of your binders.

7          It is my duty to instruct you on the law, just as it

8    has been my duty to preside over the trial and to decide what

9    testimony and evidence is relevant for your consideration.  It

10   is your duty to accept my instructions on the law and to apply

11   them to the facts as you determine them.

12         On legal matters, you must take the law as I give it

13   to you.  You may not substitute your own notions or opinions of

14   what the law is or ought to be.  You should not be concerned

15   about the wisdom of any rule that I state.  Regardless of any

16   opinion that you may have as to what the law may be or should

17   be, it would violate your sworn duty to base a verdict upon any

18   view of the law other than that which I give you.

19         If any attorney or party has stated a legal principle

20   different from what I tell you, you must follow my directions.

21   You should not single out any particular instruction as alone

22   stating the law.  You should consider my instructions as a

23   whole as you deliberate.

24         You should not infer from anything I have said or done

25   during this trial that I have any view on the credibility of

1    witnesses or any view about how you should decide the case.  I

2    have no opinion as to the facts or the verdict that you should

3    render in this case.

4           You are the sole and exclusive judges of the facts.

5    You determine the credibility of the witnesses.  You resolve

6    any conflicts that might exist in the evidence.  You draw

7    whatever reasonable inferences you decide to draw from the

8    facts as you have determined them, and you determine the weight

9    to give the various pieces of evidence.  You must base your

10   discussions and decisions solely on the evidence presented to

11   you during this trial, and that evidence alone.  You may not

12   consider or speculate on matters not in evidence or matters

13   outside the case.

14          As I told you at the outset of the case, it's the duty

15   of the parties to object when the other side offers testimony

16   or evidence that the party believes is not properly admissible.

17   Therefore, you should draw no inference if a party objected to

18   evidence, nor should you draw any inference from the fact that

19   I might have sustained or overruled an objection.

20          You're required to evaluate the evidence calmly and

21   objectively and you must be completely fair and impartial.

22   Your verdict must be based solely on the evidence introduced at

23   this trial or the lack of evidence.  The parties in this case

24   are entitled to a trial free from prejudice or bias, for or

25   against either side.  Our judicial system works only if you

1   reach your verdict through a completely fair and impartial

2   consideration of the evidence.

3         In deciding the facts, it would be improper for you to

4   consider any personal feelings you may have about any party or

5   any witness, any punishment that might be imposed or any other

6   such irrelevant factor.  This case must be decided by you as an

7   action between parties of equal standing in the community and

8   of equal worth.  All parties are entitled to the same fair

9   trial.  The government and the defendant stand as equals before

10  the law and are to be dealt with as equals in this court.

11        The defendant, Salvador Diaz, is charged with a

12  federal crime about which I will instruct you shortly.  Please

13  bear in mind, however, that the charge is not evidence of

14  anything.  Mr. Diaz is presumed innocent.

15        Mr. Diaz has pleaded not guilty.  The government has

16  the burden of proving each essential element of the charge

17  beyond a reasonable doubt.  If the government succeeds in

18  meeting its burden, your verdict must be:  Guilty.  If it

19  fails, your verdict must be:  Not guilty.  The burden of proof

20  never shifts to the defendant.  The law presumes a defendant to

21  be innocent and, therefore, never imposes upon a defendant in a

22  criminal trial the burden or duty of calling any witness or

23  producing any evidence.  In other words, Mr. Diaz starts with a

24  clean slate and is presumed innocent until such time, if ever,

25  that you, as the jury, are satisfied that the government has

proven, beyond a reasonable doubt, that he is guilty of the charged crime.

The question then becomes:  What is reasonable doubt?  The words almost define themselves.  It is a doubt based upon reason and common sense.  It is a doubt that a reasonable person has after carefully weighing all of the evidence.  It is a doubt that would cause a reasonable person to hesitate to act in a matter of importance in his or her personal life.  Proof beyond a reasonable doubt must, therefore, be proof that is so convincing that a reasonable person would not hesitate to rely upon it in making an important decision.  Proof beyond a reasonable doubt is not, however, proof beyond all possible doubt.  A reasonable doubt is not a doubt based on caprice or whim, nor is it a doubt based on speculation or suspicion.  Reasonable doubt is also not an excuse to avoid the performance of an unpleasant duty.  If, after fair and impartial consideration of the evidence, you have a reasonable doubt as to Mr. Diaz's guilt, then you must find him not guilty.

On the other hand, if after fair and impartial consideration of all the evidence, you are satisfied beyond a reasonable doubt of Mr. Diaz's guilt, then you must find him guilty.

I want to take a moment to describe to you what is and is not evidence in this case.  As I have said, you must rely only on evidence in your deliberations.  The evidence in this

1    case is the sworn testimony of the witnesses, the exhibits --

2    there were no stipulations.  If there were, that would be in

3    evidence as well.  Other things are not evidence.  The question

4    by a party is not evidence.  The witnesses' answers are

5    evidence, not the questions.  Arguments are not evidence.  What

6    the parties said in their opening statements and in their

7    summations was intended to help you understand the evidence and

8    to reach a verdict.  If your recollection of the facts differs

9    from the opening and closing statements, it is your

10   recollection that governs.

11         Statements that I may have made concerning the

12   evidence are not evidence.  Testimony that has been stricken or

13   excluded is not evidence and it may not be considered by you in

14   rendering your verdict.  And anything you may have seen or

15   heard outside the courtroom is not evidence.

16         Now, I will discuss what is evidence.  Evidence may

17   come in several forms.  First, the sworn testimony of witnesses

18   regardless of who called the witness, is evidence.  This is

19   true of the witnesses' answers on both direct and

20   cross-examination.  And the exhibits that were admitted during

21   the trial are evidence.

22         Generally, there are two types of evidence that you

23   may consider in reaching your verdict:  Direct and

24   circumstantial.  Direct evidence is testimony by a witness

25   about something he or she knows by virtue of his or her own

senses, something he or she has done, seen, felt, touched or

heard.  For example, if a witness testified that on the day in

question she was in her office and she could see that it was

raining all day, that would be direct evidence about the

weather that day.

Circumstantial evidence is evidence from one fact on

which you infer the existence of other facts.  For example,

assume a witness testified that his office does not have a

window.  On the day in question, however, he saw numerous

people coming into the office with wet raincoats and carrying

dripping umbrellas.  That testimony about the wet raincoats and

dripping umbrellas is circumstantial evidence that it was

raining that day.  So, even though you have no direct evidence

regarding the weather, you have circumstantial evidence that it

was raining.

For circumstantial evidence, you must be careful to

draw reasonable inferences that reflect all of the evidence.

For example, if you live in the city and you wake up in the

morning and you see that the sidewalk is wet but the street is

dry, it's not reasonable to infer that it rained last night.

Instead, a more reasonable inference is that the building staff

has hosed down the sidewalk.  That's all there is to

circumstantial evidence.  You infer on the basis of reason and

common sense from one fact.  And my first example, dripping

raincoats and umbrellas, the existence or nonexistence of some

other fact, in that case, raining weather.  When circumstantial

evidence is presented, it is of no less weight than direct

evidence.

You have had the opportunity to observe the witnesses.

You are the sole judges of the credibility of each witness and

the importance of his or her testimony.  Decide what testimony

to believe and whatnot to believe.  Consider each witnesses'

demeanor and manner of testifying; the witnesses' opportunity

to see, hear and know about the events described; the

witnesses' ability to recall and to describe those things; and

the reasonableness of the testimony in light of all the other

evidence in the case.  Consider whether part of a witness's

testimony was contradicted or supported by other testimony, by

what the witness said or did on a prior occasion, by the

testimony of other witnesses, or by other evidence.

If you find that a witness has willfully testified

falsely as to an important matter, you may disregard the

witness's entire testimony, or you may accept as much of the

testimony that you find to be true, and disregard what you find

to be false.  A witness may have been mistaken or may have lied

in part of his or her testimony and might have been accurate

and truthful in other parts.

You've heard the testimony of law enforcement

officers.  The fact that a witness is employed as a law

enforcement official or as a government employee does not mean

1    that his or her testimony is deserving of more or less

2    consideration, or greater or lesser weight than that of a

3    witness who is not employed by law enforcement or the

4    government.

5           Going back to witnesses generally.  You should

6    consider whether a witness had an opportunity to observe the

7    facts he or she testified about.  You should also consider

8    whether the witness's recollection of the fact stands up in

9    light of the other evidence in the case.  In other words, what

10   you must try to do in deciding credibility is to size up a

11   person just as you would in an important matter in your own

12   life, where you're trying to decide whether a person is

13   truthful, straightforward and accurate in his or her

14   recollection.

15          In deciding whether to believe a witness, you should

16   specifically note any evidence of hostility or affection that

17   the witness may have had for or against Mr. Diaz.  Likewise,

18   you should consider evidence of any other interest or motive

19   that the witness may have had in cooperating with or helping

20   either party.

21          It's your duty to consider whether the witness has

22   permitted any such bias or interest to color his or her

23   testimony.  If you find that a witness is biased, you should

24   view his or her testimony with caution, weigh it with care and

25   subject it to close and scrutiny.

1            Of course, the mere fact that a witness is interested

2     in the outcome of the case does not mean that the witness has

3     not told the truth.  It's for you to decide from your

4     observations and applying your common sense and experience and

5     all the other considerations mentioned, whether the possible

6     interest of a witness has intentionally or otherwise colored or

7     distorted the witness's testimony.  You are not required to

8     believe or disbelieve an interested witness.  You may accept as

9     much of the testimony as you deem reliable, and reject as much

10    as you deem unworthy of your belief.

11            Among the exhibits admitted into evidence were

12    documents that were redacted.  Redacted means that part of the

13    document was removed or blacked out.  You are to concern

14    yourself only with the part of the item that has been admitted

15    into evidence.  You should not consider any possible reason why

16    the remainder has been redacted or speculate as to what may

17    have been redacted that was not are introduced into evidence.

18            Under our constitution, a defendant has no obligation

19    to testify or to present any evidence, because it's the

20    government's burden to prove a defendant's guilt beyond a

21    reasonable doubt.  The defendant is never required to prove

22    that he is not guilty.  In this case, Mr. Diaz did not testify.

23    You must not attach any significance to that fact.  You may not

24    draw any adverse inference against Mr. Diaz because he did not

25    testify, and you may not consider it against Mr. Diaz in any

1    way during your deliberations.

2             Mr. Diaz chose to represent himself during this trial.

3    Mr. Diaz, like every defendant in a criminal case, has a

4    constitutional right to be represented by an attorney or to

5    represent himself.  As I told you at the beginning of the

6    trial, Mr. Diaz's decision to represent himself can have no

7    bearing on your verdict, and you may not draw any inference,

8    favorable or unfavorable, based on the fact that he represented

9    himself.  You may also not draw any inference from Mr. Diaz's

10   decision to consult or not to consult with his standby counsel.

11   Even though Mr. Diaz represented himself, the same rules apply

12   to him as applied to the attorneys.  Questions that he asked

13   the witnesses, and arguments that he made during opening and

14   closing statements are not evidence.

15            Mr. Diaz is charged in an indictment.  You will have

16   the indictment with you in the jury room.  I believe it's also

17   in your folders.  But the indictment itself is not evidence of

18   anything.  It's merely an accusation.  The indictment charges

19   Mr. Diaz with knowingly failing to register as a sex-offender

20   or to update his sex-offender registration between

21   approximately 2014 and January 2017.  To sustain its burden of

22   proof, the government must prove beyond a reasonable doubt the

23   following three elements:

24            First, that Mr. Diaz was required to register as a

25   sex-offender under federal law.

1           Second, that Mr. Diaz traveled in interstate commerce.

2           And third, that Mr. Diaz knowingly failed to register

3    as a sex-offender or knowingly failed to update his

4    sex-offender registration, as required by federal law.

5           These elements must be satisfied in chronological

6    sequence.  That is, the government must prove that Mr. Diaz

7    first became required to register as a sex-offender and then

8    travelled in interstate commerce, and then failed to register

9    or to update his registration.

10          Under federal law an individual is required to

11   register as a sex-offender if he has previously been convicted

12   of a sex offense.  The term "sex offense" has a specific

13   meaning.  I instruct you as a matter of law that a violation of

14   Article 120 of the Uniform Code of Military Justice is a sex

15   offense.  Therefore, if you find beyond a reasonable doubt that

16   Mr. Diaz has been convicted of a violation of Article 120 of

17   the Uniform Code of Military Justice, then this element is

18   satisfied.

19          As I told you at the beginning of the trial, you are

20   not to concern yourself with the facts or circumstances

21   underlying Mr. Diaz's alleged prior conviction.  You may not

22   consider evidence of Mr. Diaz's prior conviction as evidence

23   that he has criminal personality or a bad character.  You may

24   consider any evidence of a prior conviction only for the

25   purpose of determining whether Mr. Diaz has previously been

1    convicted of a sex offense, and not for any other purpose.

2           The second element is that Mr. Diaz traveled in

3    interstate commerce after he was convicted of a sex offense and

4    after the federal sex-offender registration laws became

5    effective.  The federal sex-offender registration laws became

6    effective on August 1, 2008.  To travel in interstate commerce

7    just means to travel from one state to another.  Thus, to

8    satisfy this element, the government must prove that Mr. Diaz

9    traveled from one state to another after he was convicted of

10   the sex offense described in element one, and after August 1,

11   2008.

12          The government has alleged that Mr. Diaz traveled in

13   interstate commerce between New York and New Jersey.  Although

14   you have also heard evidence that Mr. Diaz traveled to

15   Virginia, you may find element two satisfied only if you

16   unanimously agree that Mr. Diaz traveled in interstate commerce

17   from New York to New Jersey and that he did so after the date

18   of his sex offense conviction and after August 1, 2008.

19          The third element is that Mr. Diaz knowingly failed

20   either to register as a sex offender or knowingly failed to

21   update his sex-offender registration.

22          Under federal law, a sex offender must register in

23   each state in which he resides, is employed and is a student,

24   and must do so within three business days of beginning to

25   reside, becoming employed or becoming a student in that state.

1    To register means to provide personal information, such as name

2    and address, to a state official for inclusion in the

3    state-offender registry.

4         A person resides in the place he calls his home, even

5    if the person has no fixed address.  Alternatively, a person

6    may also reside where the person habitually lives, meaning

7    where he intends to live with some regularity for at least 30

8    days, even if he does not call the place his home.

9         A person may reside in more than one place and must

10   include in his registration each place where he resides.

11   Federal law also requires the sex offender to promptly update

12   his registration.  This means that the sex-offender must report

13   any change of name, residence, employment or student status

14   within three business days of the change.

15        I have just instructed you on the definition of

16   "resides" or "residence," and that instruction applies here

17   too.  An act is done knowingly if it is done deliberately and

18   voluntarily rather than the product of mistake, accident, mere

19   negligence or some other innocent reason.  The government does

20   not need to prove that Mr. Diaz knew the specific provision or

21   statute and imposed his duty to register or his duty to update

22   his registration, nor does the government need to prove that

23   Mr. Diaz knew that failing to comply with these duties was a

24   federal crime.  It is sufficient for the government to prove

25   that Mr. Diaz new generally that he had a duty to register or a

1   duty to update his registration and that he deliberately and

2   voluntarily failed to do so.

3          The government may satisfy its burden of proof on

4   element three by proving either that Mr. Diaz knowingly failed

5   to register as a sex-offender or that he knowingly failed to

6   update his registration.  You must, however, be unanimous on

7   which theory has been proven in order to find that this element

8   has been satisfied.

9          If you find that the government must prove all of

10  these elements in chronological sequence beyond a reasonable

11  doubt, then you must find Mr. Diaz guilty.  On the other hand,

12  if you find that the government has failed to prove any of the

13  elements beyond a reasonable doubt, then you must find Mr. Diaz

14  not guilty.

15         In addition to proving the essential elements of the

16  charged crime beyond a reasonable doubt, the government must

17  also establish what is called venue.  This means that the

18  government must prove that an act pertaining to the charged

19  offense occurred in the Southern District of New York,

20  specifically the government must prove that Mr. Diaz's travel

21  in interstate commerce, as defined in element two, began,

22  continued, or ended in the Southern District of New York.

23         The Southern District of New York includes all of

24  Manhattan and the Bronx, as well as Westchester, Rockland,

25  Putnam, Dutches, Orange Sullivan Counties.  Unlike the elements

1  of the offense that I discussed earlier, each of which must be

2  proved beyond a reasonable doubt, the government is required to

3  prove venue only by a preponderance of the evidence.  A

4  preponderance of the evidence means that it's more probable

5  than not that some part of the charged offense occurred in the

6  Southern District of the New York.  Therefore, if you find by a

7  preponderance of the evidence that Mr. Diaz's travel in

8  interstate commerce began, continued or ended in the Southern

9  District of New York, then venue is satisfied.  On the other

10  hand, if you find that the government has failed to prove venue

11  by a preponderance of the evidence, then you must return a

12  verdict of not guilty.

13          The indictment alleges that the charged crime occurred

14  between approximately 2014 and January 2017.  It does not

15  matter if the evidence you heard at trial indicates that a

16  particular act occurred exactly within this timeframe.  The law

17  requires only a substantial similarity between the dates

18  alleged in the indictment and the dates established by the

19  evidence.

20          You have heard evidence that Mr. Diaz made certain

21  statements.  Evidence of those statements was properly admitted

22  and may be considered by you.  You're about to begin your

23  deliberations.  We will send the indictment and all of the

24  exhibits that were received into evidence into the jury room

25  for your use during deliberations.

1              The exhibits will be provided to you in the binder.

2     If you want any further explanation of the law, or if you want

3     to hear any testimony read back, you may request that also.  If

4     you ask for any testimony to be re-read, please be as specific

5     as possible, so we can identify exactly what you want read and

6     not waste time reading testimony that you do not want to hear.

7              If there's any doubt or question about the meaning of

8     any part of the instructions that I have given you, you should

9     not hesitate to send me a note asking for clarification or for

10    further explanation.

11             It's very important that you not communicate with

12    anyone outside the jury room about your deliberations or about

13    anything touching on this case.  There is only one exception

14    during this rule.  If it becomes necessary during your

15    deliberations to communicate with me, you should send me a note

16    in writing, signed by your foreperson, and give it to the

17    marshal, who will be available outside your jury room

18    throughout your deliberations.  No member of the jury should

19    ever attempt to communicate with me, except by assigned

20    writing.  And I will never communicate with any member of the

21    jury on any subject touching on the merits of this case only in

22    writing.  If you send any notes to the Court, do not disclose

23    anything about your deliberations.  Specifically, do not

24    disclose to anyone, not even to me, how the jury stands,

25    numerically or otherwise, until after you have reached a

1    unanimous verdict or have been discharged.

2           Some of you have taken notes throughout this trial.  I

3    want to emphasize to you that notes are simply an aid to

4    memory.  Your notes may not be given any greater weight or

5    influence in the determination of the case and the recollection

6    of other jurors.  Any difference between a juror's recollection

7    and another juror's notes should be settled by having the court

8    reporter read back the transcript, because it's the Court

9    record that the jury must rely on when making a determination

10   of the facts and rendering a verdict.

11          You will now retire to decide your verdict.  As I have

12   already explained, for the government to prevail against

13   Mr. Diaz, the government must prove each essential element of

14   the charge beyond a reasonable doubt.

15          If the government carries its burden, you must find

16   Mr. Diaz guilty of that charge; otherwise, you must find

17   Mr. Diaz not guilty of the charge.  Your verdict must be

18   unanimous.  Each juror is entitled to his or her opinion but

19   you are also required to exchange views with your fellow

20   jurors.  That's the very essence of jury deliberation.  If you

21   have a point of view, and after discussing it with the other

22   jurors, it appears that your own judgment is open to question,

23   then, of course, you should not hesitate to yield your original

24   point of view if you're convinced that the other view is one

25   that satisfies your judgment and conscience.  Do not give up a

point of view that you conscientiously believe simply because
you are outnumbered.  You should vote with the others only if
you are convinced on the evidence, the facts and the law, that
that is the correct way to decide the case.

After any breaks, or when you arrive in the morning,
if deliberations last longer than today, do not begin to
discuss the case until all 12 jurors are present.

The first thing you should do when you retire to
deliberate is to select one of you to act as your foreperson.
Traditionally, juror number one is the foreperson, but that is
only a tradition.  You're free to select any of your members as
your foreperson, although I urge you not to spend a lot of time
on this issue.

Once you have reached your verdict, you must record it
on the verdict form that I have prepared for you.  The
foreperson should fill in the verdict sheet, date it and sign
it.  The foreperson should then give a note to the marshal
outside your door, stating that you have reached a verdict.  Do
not specify what the verdict is in the note.  The foreperson
should keep the verdict sheet until I ask for it.  You must all
be in agreement with the verdict that is announced in court.

Please remain seated while I consult with the parties.

(Continued on next page)

```
 1              (At side bar)

 2              THE COURT:  Any objections?

 3              MS. TARLOW:  Your Honor, on page 13, line 10, the

 4    charge is given was "inclusion in any state-offender registry"

 5    as opposed to "sex-offender registry."

 6              THE COURT:  Line 13.

 7              MS. TARLOW:  Page 10 -- I'm sorry.  Page 13, line 10.

 8    The instruction as written is "inclusion in a sex-offender

 9    registry."  And as given, it was "inclusion in a state-offender

10    registry."

11              THE COURT:  Okay.

12              THE DEFENDANT:  What was that?  I'm sorry?

13              THE COURT:  Line ten, page 13.

14              Any objection from the Defense?

15              THE DEFENDANT:  No.

16              THE COURT:  Okay.  Step back.

17              THE DEFENDANT:  I object.  I want to preserve my

18    objection to introducing state travel as element of sex

19    offense.

20              THE COURT:  Okay.

21              THE DEFENDANT:  And the issue of venue, improper venue

22    for this case.

23              THE COURT:  Okay.  Thank you.  Step back.

24         (Continued on next page)

25
```

1              (In open court)

2              THE COURT:  Okay.  I think I may have misread one of

3      the sentences.  So, let me do it again.

4              On page 13, focusing on line nine.  So, the definition

5      of register:  So, to register means to provide personal

6      information, such as name and address, to a state official for

7      inclusion in the sex-offender registry.

8              Okay.  Mr. Pecorino, could you please swear in the

9      marshal.

10             (Marshal sworn)

11             THE COURT:  Ladies and gentlemen, I remind you that at

12     the very beginning of this case, you took an oath.  Your oath

13     sums up your duty.  You must well and truly try the matters in

14     issue and render a true verdict according to the law and the

15     evidence.  You may now retire to the jury room and begin your

16     deliberations, except for the alternate.

17             (At 2:50 p.m. the jury retired to deliberate)

18             THE COURT:  Alternate No. 1, thank you for your

19     service.  Looks like we're not going to need you.  I'm not

20     going to discharge you from the jury, however.  In the unlikely

21     event that something happens to one of the deliberating jurors,

22     we will bring you back, and you will become a deliberating

23     juror.  What that means is all my admonitions continue to

24     exist.  Don't discuss the case with anyone until you're

25     discharged.  Mr. Pecorino will give you a call when this is

1    fully finished, and at that point, you're discharged from your

2    jury service.

3              Thank you for coming and showing up on time.  And

4    you're now free to go.

5              ALTERNATE JUROR:  Thank you.

6              (Alternate juror excused)

7              THE COURT:  Anything?

8              THE DEFENDANT:  No, Your Honor.

9              MS. TARLOW:  Not from the government.

10             THE COURT:  Okay.  Make sure we know how to reach you.

11   You might want to stick around.  I'm not sure this is going to

12   take a long time, but who knows.

13             (Recess pending verdict)

14             (Trial resumed; jury not present)

15             THE COURT:  Okay.  Please be seated.

16             All right.  We have a note.  The note we will mark as

17   Court Exhibit 1 is, "We have reached a verdict."

18             Bring out the jury.

19             THE DEFENDANT:  Your Honor?

20             THE COURT:  Yes.

21             THE DEFENDANT:  May we request the verdict sheet?

22             THE COURT:  Request the verdict sheet?  You should

23   have one.  Dan will bring you one.

24             This isn't a complicated verdict sheet.  I almost

25   dispensed with it entirely.

 1              MS. KELLMAN:  Yes.

 2              (Jury present)

 3              THE COURT:  Ladies and gentlemen, we received a note.

 4    It says, "We reached a verdict".  We marked this as Court

 5    Exhibit 1.

 6              Mr. Foreperson, could you give the verdict sheet to

 7    Mr. Pecorino.

 8              Okay.  Mr. Foreperson, could you please rise.

 9              On the charge of failure to register as a sex offender

10    or to update sex-offender registration, we, the jury, find the

11    defendant, Salvador, Diaz, not guilty or guilty?

12              THE FOREPERSON:  Guilty, your Honor.

13              THE COURT:  Mr. Pecorino, could you please poll the

14    jury.

15              (Jury polled)

16              DEPUTY CLERK:  Juror No. 1, is this your verdict?

17              JUROR:  Yes.

18              DEPUTY CLERK:  Juror No. 2, is this your verdict?

19              JUROR:  Yes.

20              DEPUTY CLERK:  Juror No. 3, is this your verdict?

21              JUROR:  Yes.

22              DEPUTY CLERK:  Juror No. 4, is this your verdict?

23              JUROR:  Yes.

24              DEPUTY CLERK:  Juror No. 5, is this your verdict?

25              JUROR:  Yes.

1          DEPUTY CLERK:  Juror No. 6, is this your verdict?

2          JUROR:  Yes.

3          DEPUTY CLERK:  Juror No. 7, is this your verdict?

4          JUROR:  Yes.

5          DEPUTY CLERK:  Juror No. 8, is this your verdict?

6          JUROR:  Yes.

7          DEPUTY CLERK:  Juror No. 9, is this your verdict?

8          JUROR:  Yes.

9          DEPUTY CLERK:  Juror No. 10, is this your verdict?

10         JUROR:  Yes.

11         DEPUTY CLERK:  Juror No. 11, is this your verdict?

12         JUROR:  Yes.

13         DEPUTY CLERK:  Juror No. 12, is this your verdict?

14         JUROR:  Yes.

15         DEPUTY CLERK:  Jury is polled, your Honor.

16         THE COURT:  Thank you.

17         Is there any reason why we shouldn't discharge the

18    jury?

19         MS. TARLOW:  No, Your Honor.

20         THE DEFENDANT:  No, Your Honor.

21         THE COURT:  Okay.  Ladies and gentlemen, you're being

22    discharged, with the thanks of the Court.  I would ask you to

23    wait in the jury room for a second so I can chat with you.  I

24    got a little bit of work, so if you can just wait for me in the

25    jury room, I'd appreciate it.  We'll take the verdict sheet.

```
 1                  (In open court; jury not present)

 2                  THE COURT:  Does the government have a motion?

 3                  MR. NESSIM:  Yes, your Honor.  We'd move for remand

 4      under title 18 U.S.C. 3143.

 5                  THE COURT:  Okay.  That is denied.  I'm not going to

 6      make Mr. Diaz argue that.  I don't see that Mr. Diaz poses any

 7      risk of flight.  And he's no more a risk to the community now

 8      than he was before.  He's made all his court appearances.  I

 9      don't have any reason to believe that he's not going to

10      continue making his court appearances.  So, I'm not going to

11      remand.

12                  has he registered yet; do you know?

13                  MS. KELLMAN:  Your Honor, my understanding is that

14      he's registered only just where he's residing.

15                  THE COURT:  Good.  Do we have a sentencing date yet?

16                  DEPUTY CLERK:  Wednesday, June 26th at 11:00 a.m.

17                  THE COURT:  So, your presentencing submissions are

18      due?

19                  DEPUTY CLERK:  June 12th.

20                  THE COURT:  June 12th, for both the government and the

21      defense.

22                  Anything further from the government?

23                  THE DEFENDANT:  Yes, your Honor.

24                  THE COURT:  I'll start with the government.

25                  MS. TARLOW:  No, Your Honor.  Not from the government.
```

1           THE COURT:  Yes, Mr. Diaz.

2           THE DEFENDANT:  I'd like to renew my motion for Rule

3     29(c).

4           THE COURT:  It's denied.

5           Okay.  So, Mr. Diaz, you got your sentencing date.

6     You've got the date in advance of that, which means you can

7     make any submission that you want to make to me for purposes of

8     consideration.  We're ordering a presentence report to be

9     prepared.  You need --

10          what do we need him to do?  Usually I'd depend on the

11    defense attorneys to do this.

12          MS. KELLMAN:  Can I have just a minute, Judge?

13          THE COURT:  Sure.

14          THE DEFENDANT:  Well, with respect to -- I know this

15    is flip-flopping.  And we agreed we were not going to, but if

16    the Court would allow, I would like for them to go back --

17    because they have a lot of experience with the sentences.

18          THE COURT:  I thought you might make that decision,

19    and that's fine.

20          Ms. Kellman and Mr. Santiago, do you agree to

21    represent Mr. Diaz now, of course, recognizing that you may

22    easily get fired again before sentencing?

23          MS. KELLMAN:  I'm a defense lawyer.  I'm good with

24    rejection.

25          THE COURT:  Okay.  All right.  Please make

1  arrangements for him to be interviewed by probation in the next

2  two weeks.

3            MS. KELLMAN:  Yes.  Two weeks.

4            THE COURT:  Mr. Diaz, you're going to be interviewed

5  by the probation office.  You can and you should have your

6  lawyer with you for that interview.  If you say anything to the

7  probation officer, it's important that what you say is complete

8  and accurate.  The report that they prepare is very important

9  to me in determining an appropriate sentence in your case, even

10 though I sort of feel like I know you by this point.

11 Nevertheless, that report is important.  A draft report will be

12 prepared and provided to your attorney.  Review the report

13 carefully.  If anything in it isn't accurate, make sure you

14 tell Ms. Kellman so she can tell probation, so it can be

15 corrected before the date of sentence.  You and your attorney

16 will have an opportunity to speak on your behalf at the time of

17 sentencing.

18            THE DEFENDANT:  Thank you, Judge.

19            THE COURT:  Thank you, all.

20            MS. KELLMAN:  Thank you, Judge.

21            MS. TARLOW:  Thank you, your Honor.

22            (Adjourned)

23

24

25

```
1                            INDEX OF EXAMINATION

2    Examination of:                                  Page

3    CHARLES FRANCIS JOHNSON

4    SABRINA OBREITER

5    Direct By Mr. Nessim . . . . . . . . . . . . 166
     Cross By Mr. Diaz  . . . . . . . . . . . . . 190
6    Redirect By Mr. Nessim . . . . . . . . . . . 201
     Recross By Mr. Diaz  . . . . . . . . . . . . 204
7     JAMES R. HAMILTON

8    Direct By Mr. Nessim . . . . . . . . . . . . 206

9     CHARLES F. JOHNSON

10   Direct By Ms. Tarlow . . . . . . . . . . . . 212

11    JOSEPH MAZZA

12   Direct By Mr. Nessim . . . . . . . . . . . . 217

13   MICHAEL ACQUAVIVA

14   Direct By Mr. Nessim . . . . . . . . . . . . 228

15   SHERRI ANNAN

16   Direct By Ms. Tarlow . . . . . . . . . . . . 234
     Cross By The Defendant . . . . . . . . . . . 242
17                       GOVERNMENT EXHIBITS

18   Exhibit No.                                  Received

19   50, 53, 55, 57 . . . . . . . . . . . . . . . 168
     32, 33 and 34  . . . . . . . . . . . . . . . 172
20   35  . . . . . . . . . . . . . . . . . . . . 189

21   38A-38D  . . . . . . . . . . . . . . . . . . 208

22   45  . . . . . . . . . . . . . . . . . . . . 214

23   63 and 64  . . . . . . . . . . . . . . . . . 220

24   22  . . . . . . . . . . . . . . . . . . . . 237

25   26  . . . . . . . . . . . . . . . . . . . . 239
```